UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ASHWIN GOWDA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Ashwin Gowda ("Plaintiff Gowda", "Gowda" or "Plaintiff") individually and on behalf of all others similarly situated, alleges the following against defendants Digital Currency Group, Inc. ("DCG" or "Digital Currency Group"), Barry Silbert, Michael Kraines, Mark Murphy, Soichiro "Michael" Moro, and Derar Islim (collectively, the "Defendants") based upon information and belief, personal knowledge, and the investigation of counsel.

**INTRODUCTION**

1. This case (the "Action") arises out of Defendants' coordinated scheme to illegally conceal Genesis Global Capital's insolvency, wrongfully retain investor assets, and induce further investment.

2. Plaintiff Gowda brings this protective action to assert and preserve state consumer-protection and common-law claims dismissed without prejudice in *McGreevy v. Digital Currency Group, Inc.*, No. 3:23-cv-00082-SRU ("*McGreevy*" or the "*McGreevy* Action") together with additional common law claims. Plaintiff Gowda does not seek duplicative relief via this Action,

and seeks only those damages and remedies that remain unrecovered, and any recovery in this Action shall be reduced to the extent necessary to prevent a double recovery for the same injury.

3. Plaintiff Gowda brings claims on behalf of himself and all Texas residents who invested in Genesis Yield as offered by non-party Genesis Global Capital, LLC ("Genesis Global Capital," "GGC" or the "Company") during the period February 2, 2021 through November 16, 2022 (the "Class Period").

4. The claims include claims under the Texas Deceptive Trade Practices–Consumer Protection Act and Texas common law. Plaintiff Gowda asserts claims for deceptive and unconscionable acts and practices, common-law fraud, fraudulent inducement, fraud by nondisclosure, negligent misrepresentation in the alternative, civil conspiracy, and equitable restitution, including unjust enrichment. These claims arise from Defendants' concealment of Genesis Global Capital's insolvency and financial condition, their misrepresentations concerning Genesis Yield, DCG's support, Genesis's risk-management practices, and investors' redemption rights, and their coordinated course of conduct that induced Plaintiff and other Texas investors to place or maintain digital assets in Genesis Yield until Genesis suspended redemptions on November 16, 2022.

5. The claims rest on a single shared set of facts which are the same as those underlying the *McGreevy* Action. Defendants concealed Genesis Global Capital's insolvency, the terms and value of the Digital Currency Group promissory note, and the risks to customer assets, while continuing to solicit and retain those assets and to discourage redemptions. Had the truth been disclosed, Plaintiff Gowda would not have entrusted his digital assets to the Genesis Yield program. Defendants' misrepresentations and failures to disclose information they had a duty to disclose violated Texas law.

6. Before and during the Class Period, Genesis Global Capital purported to be a part of a "full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors" and provided "a full suite of services global investors require to manage their digital asset portfolios."

7. Genesis Global Capital's role was raising capital for the greater conglomerate of companies operated by DCG and Silbert, by offering opportunities to invest in Genesis Global Capital's Genesis Yield (as defined herein) to individuals and entities to be pooled and invested by Genesis Global Capital and DCG. Members of the Class invested in Genesis Yield offered by Genesis Global Capital by entering into standard form agreements and then tendering digital assets or cash to Genesis Global Capital pursuant to either executed term sheets (for direct investors) or the terms presented to them via the Gemini Earn platform (for Gemini Earn investors). In exchange for their investment in Genesis Yield, members of the Class received interest payments and the promise of the eventual return of their digital assets on demand.[1]

8. Genesis Global Capital pooled investors' digital assets it received pursuant to the Genesis Yield Investment Agreements and invested the digital assets pursuant to certain strategies designed to generate revenue for Genesis Global Capital and its affiliates, and to pay Genesis Global Capital's investors interest.

9. Defendant DCG is the parent entity of a conglomerate of subsidiaries that operate and invest in the digital currency, or crypto, market, including the Genesis-affiliated companies.

---

[1] For ease of reference, references in this Complaint to "Genesis Yield" mean the Genesis Yield program described below, through which Genesis Global Capital offered investors the opportunity to invest digital assets or cash and sold Genesis Yield securities pursuant to Genesis Yield Investment Agreements. Investors accepted those offers by entering into Genesis Yield Investment Agreements and tendering digital assets or cash to Genesis Global Capital pursuant to those agreements.

At all times alleged herein DCG was the 100% owner of a holding company, Genesis Global Holdco, LLC ("GGH"), which was the 100% owner of Genesis Global Capital and the Company's sole managing member. GGH does not operate any business separate from Genesis Global Capital and its other operating subsidiaries. GGH and Genesis Global Capital do not have separate boards and the board members of GGH through GGH's board controlled and managed the day-to-day affairs of the Company. GGH is a sister company of Genesis Global Trading, Inc. ("GGT"), which is 100% owned by DCG and engaged in crypto trading, derivatives, and custody services. GGH and Genesis Global Capital had no independent board of directors until after June 30, 2022. Instead, non-party GGT's board of directors heard matters pertaining to Genesis Holdco and Genesis Global Capital through at least June 30, 2022.

10. Defendant Silbert is the founder of DCG, Genesis Global Capital, and several other DCG subsidiary companies. During the Class Period, Silbert was the controlling shareholder of DCG (owning approximately 40%), chairman of DCG's three-person board of directors, and DCG's Chief Executive Officer ("CEO").

11. Defendants DCG and Silbert closely managed and controlled the Company and its affiliates through interlocking directors and officers. Defendant Mark Murphy ("Murphy") was the Chief Operating Officer ("COO") of DCG during the period January 2020 through November 2022, and has been President of DCG since October 2022, and is a member of the board of directors of GGH which managed and controlled the Company. Defendant Michael Kraines ("Kraines") was the Chief Financial Officer ("CFO") of DCG from in or around September 2021 through April 2023, and is a member of the board of directors of GGH which managed and controlled the Company.

12. Defendant Soichiro "Michael" Moro ("Moro") was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022 when he "stepped down" as CEO, and was a member of the board of GGT. Defendant Derar Islim ("Islim") has served as the COO of Genesis Global Capital and GGT since the start of the Class Period. On or around August 17, 2022, Defendants DCG and Murphy hand-picked Defendant Islim to serve as interim CEO of Genesis Global Capital and GGT, and during the Class Period he was a member of the board of directors of GGH, which was the sole managing member of Genesis. Matthew Ballensweig ("Ballensweig") was the managing director and co-head of sales and trading of GGT before the Class Period through September 28, 2022.

13. GGC, GGH, and GGT (the "Genesis Entities") operated as a single entity during the Relevant Period. They shared officers, capital, offices, IT infrastructure, and back-office functions. Genesis Capital and GGT, the broker-dealer entity, each had their own balance sheet, however, corporate formalities and separateness were regularly disregarded or ignored. For example, investors who invested in Genesis Yield from Genesis Global Capital logged on to their accounts through GGT's platform, employees of GGT whose Internal Revenue Service W-2 forms reported GGT as their employer performed services for Genesis Global Capital, and information concerning Genesis Global Capital was disseminated through the twitter account of GGT.

14. During the Relevant Period, Defendants controlled the Genesis Entities' key hiring decisions, business strategy, and budget. DCG and the Genesis Entities also shared IT infrastructure and DCG had direct access to the Genesis Entities' books and records. Members of DCG's management team served as directors of Genesis Trading and Genesis Holdco, and sat on the Genesis Entities' Organizational Risk Committee, which managed risks arising from the Genesis Entities' lending business.

15. Genesis Global Capital became unable to meet investor withdrawals on November 8, 2022. On November 16, 2022, as Genesis Global Capital continued to experience a slew of withdrawal requests from investors, and because Genesis Global Capital did not have the assets to honor redemption requests from investors, the Company unilaterally stopped honoring redemption requests from investors, meaning no investor could obtain their digital assets from Genesis Global Capital and interest payments were suspended. At the time the Company stopped honoring redemption requests from investors, billions of dollars' worth of investors' digital assets had been invested with the Company pursuant to the Genesis Yield program.

16. On January 19, 2023, the Company and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101—1532 in the United States Bankruptcy Court for the Southern District of New York and the chapter 11 overview of cases are being jointly administered under the lead case *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.) (the "Genesis Bankruptcy Action"). Under Section 362(a) of the Bankruptcy Code, the Company's filing of its voluntary petition gave rise to a stay of claims alleged against it in the Action. But for their bankruptcy, Genesis Global Capital and GGH would have been named as defendants in the Action for their wrongful conduct alleged herein. The results of bankruptcy for Class Members are now largely known.

17. In or around May and June 2024, as part of the Genesis Bankruptcy Action and related arrangements involving Gemini, investors who had invested with Genesis Global Capital through the Gemini Earn platform received in-kind distributions of digital assets.

18. Although billed as "100% in-kind distributions", those distributions did not fully compensate Genesis Yield investors who invested via Gemini Earn. Among other things, the distributions (1) did not include the interest Genesis Global Capital promised to pay on the assets

from November 16, 2022 through the dates on which the assets were returned; (2) did not compensate investors for the loss of use, control, liquidity, or time value of their digital assets during that period; (3) did not compensate investors for the inability to sell, transfer, reinvest, hedge, stake, lend, or otherwise deploy their assets while withdrawals were suspended; (4) did not compensate investors for the risks, costs, and economic injuries they incurred while Defendants' misconduct prevented them from obtaining the return of their assets; (5) did not provide for punitive or treble damages Genesis Yield investors would be entitled to under state consumer protection laws; and (6) did not force Defendants to disgorge their ill-gotten gains resulting from their wrongful retention of the assets of Plaintiff Gowda and the Class.

19. Plaintiff Gowda and Class members who invested assets with Genesis Global Capital through the Gemini Earn platform thus do not seek a duplicative recovery of principal that has been returned to them. They seek damages for, among other things, unpaid promised interest and yield; the loss of use, control, and liquidity of their digital assets from the November 16, 2022 redemption suspension through the dates their assets were returned; the time value of the withheld assets; and any consequential losses caused by their inability to withdraw, sell, exchange, lend, stake, hedge, or otherwise deploy their assets during that period. They also seek restitution and disgorgement of the benefits Defendants retained and the costs Defendants avoided as a result of their misconduct, statutory damages, treble damages, exemplary damages, attorneys' fees, costs, and pre- and post-judgment interest to the extent permitted by law.

22. On February 24, 2026, the *McGreevy* court ruled on Defendants' motions to dismiss the Third Amended Complaint. The court sustained the federal securities claims, holding that the operative complaint plausibly alleged that the Genesis Yield program was a security and that Defendants made material misrepresentations and omissions concerning Genesis's financial

condition. The court dismissed the claims on the basis it would need to exercise supplemental jurisdiction over the state consumer-protection and common-law fraud claims under 28 U.S.C. § 1367(c) and declined to do so because those claims overlapped with the federal claims, their adjudication would delay the federal case, and that the cited state statutes raised unsettled questions about their application to securities transactions. The court dismissed the state-law claims without prejudice. Gowda continues to prosecute the federal securities claims in *McGreevy*.

23. Plaintiff Gowda continues to maintain that Genesis Yield constituted a security under federal law. Plaintiff Gowda does not waive that position by asserting Texas common-law and consumer-protection claims here and no allegation in this complaint should be treated as an admission that Genesis Yield was not a security.

24. Plaintiff Gowda pleads these claims in the alternative under Rule 8(d)(2) and (3), including to the extent Genesis Yield is determined not to be a security, or to the extent Defendants' marketing, solicitation, servicing, concealment, retention, redemption-related conduct, and failure to return investor assets and promised interest are actionable under Texas law independent of whether Genesis Yield is a security.

25. Plaintiff Gowda's Texas statutory and common-law claims arise from the same course of misconduct alleged in *McGreevy*: Defendants' marketing and solicitation of Genesis Yield; Defendants' concealment of Genesis Global Capital's risk-management failures, counterparty concentration, related-party exposure, liquidity problems, and insolvency; Defendants' use and mischaracterization of the DCG Promissory Note to conceal the effect of the 3AC default; Defendants' dissemination or approval of misleading solvency, liquidity, capitalization, and "business as usual" statements; Defendants' efforts to induce investors to

invest, continue investing, refrain from recalling assets, or delay redemption; and Genesis Global Capital's failure to return investor digital assets and interest as promised.

26. Defendants' conduct violated the Texas Deceptive Trade Practices—Consumer Protection Act, Texas Bus. & Com. Code §§ 17.41 *et seq*. Plaintiff Gowda and Texas Class members sought or acquired Genesis Yield-related services, account services, lending services, yield-generation services, interest-accrual services, and redemption-related services for personal investment and financial purposes. Defendants, directly and through Genesis Global Capital, Gemini, and other agents or channels, engaged in false, misleading, deceptive, and unconscionable acts and practices in connection with those services.

27. Defendants' deceptive and unconscionable acts included misrepresenting the characteristics, benefits, liquidity, safety, solvency, risk profile, and redemption features of Genesis Yield; concealing material facts concerning Genesis Global Capital's financial condition, risk management, counterparty concentration, related-party exposure, and ability to honor withdrawals; misrepresenting the nature and effect of the DCG Promissory Note; and exploiting a gross disparity in knowledge concerning Genesis Global Capital's true condition to Plaintiff Gowda's and Texas Class members' detriment.

28. Defendants also committed common-law fraud, fraudulent inducement, and fraud by nondisclosure. Defendants made or caused materially false and misleading statements and omissions concerning Genesis Global Capital's solvency, liquidity, capitalization, risk management, exposure to 3AC and related parties, DCG support, and ability to honor redemption requests. Defendants knew those statements were false or misleading, or made them recklessly, and intended that Plaintiff Gowda, Texas Class members, Gemini as their agent, and other investors and investor agents rely on them. Plaintiff Gowda and Texas Class members reasonably

relied on those statements and omissions, directly or through Gemini as their agent, and were damaged as a result.

29. Defendants also are liable for negligent misrepresentation in the alternative. In the course of their business, Defendants supplied false and misleading information for the guidance of Plaintiff Gowda, Texas Class members, Gemini as their agent, and other investors and investor agents in deciding whether to invest in Genesis Yield, continue investing, refrain from recalling assets, or delay redemption. Defendants failed to exercise reasonable care or competence in obtaining or communicating that information, and Plaintiff Gowda and Texas Class members suffered pecuniary loss as a result of their justifiable reliance.

30. Defendants are also liable for civil conspiracy. Defendants agreed, expressly or tacitly, to conceal Genesis Global Capital's true financial condition and to prevent investors and their agents from learning that Genesis Global Capital was impaired, illiquid, or insolvent. Defendants had a meeting of the minds on the object of the conspiracy, committed unlawful overt acts in furtherance of that object, and caused injury to Plaintiff Gowda and Texas Class members.

31. Defendants are further liable for unjust enrichment, restitution, and money had and received. Defendants obtained and retained benefits from their misconduct, including the use and retention of investor assets, avoided repayment costs, avoided interest obligations, benefits preserved for DCG and its insiders, and value shifted to or preserved for the DCG conglomerate. Equity and good conscience require Defendants to restore, disgorge, or otherwise return those benefits to Plaintiff Gowda and Texas Class members.

32. The in-kind distributions received by Gemini Earn investors through the Genesis Bankruptcy Action do not eliminate Plaintiff Gowda's and Texas Class members' claims. Those distributions did not include all promised interest, did not compensate investors for the loss of use,

control, liquidity, and time value of their assets, did not compensate investors for the inability to sell, transfer, reinvest, hedge, stake, lend, or otherwise deploy their assets while withdrawals were suspended, and did not disgorge the benefits Defendants obtained or retained through their misconduct.

33. As a result of Defendants' conduct, Plaintiff Gowda and Texas Class members invested digital assets or cash with Genesis Global Capital, continued to maintain assets at Genesis Global Capital, refrained from seeking redemption, delayed seeking redemption, or were otherwise deprived of the opportunity to protect their assets. Plaintiff Gowda and Texas Class members suffered economic injury, including unpaid interest, loss of use of their assets, loss of control and liquidity, time-value damages, consequential economic losses, and other damages alleged herein.

34. Plaintiff Gowda asserts these claims individually and on behalf of the Texas Class. Plaintiff Gowda seeks actual damages, economic damages, statutory damages where available, treble damages where available, exemplary damages where available, restitution, disgorgement, money had and received, pre- and post-judgment interest, attorneys' fees and costs where authorized, and all other relief available under Texas law.

## PARTIES

### I. Plaintiff Ashwin Gowda

35. Plaintiff Ashwin Gowda is a resident of Texas. Gowda invested at least $185,925.50 in digital assets in Genesis Yield prior to June 13, 2022 and at least $431,000 in digital assets after June 13, 2022.

36. Plaintiff Gowda was therefore damaged by the Company's suspension of redemptions in November 2022.

37. As stated in the Genesis Yield Investment Agreement reviewed and signed by Plaintiff Gowda, Plaintiff Gowda reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

38. Plaintiff Gowda relied, directly and through Gemini as his appointed agent, on Genesis Global Capital's representations and warranties in connection with each and every investment he made in Genesis Yield, including Genesis Global Capital's representations and warranties that it was not insolvent, was not subject to bankruptcy or insolvency proceedings, and was not aware of any pending or threatened proceedings that could reasonably be expected to adversely affect the transactions contemplated by the Genesis Yield agreements or the accuracy of Genesis Global Capital's representations and warranties. Plaintiff Gowda would not have invested, continued investing, refrained from recalling his assets, or delayed seeking redemption had he known that those representations and warranties were false or misleading, or that Genesis Global Capital was impaired, illiquid, insolvent, unable to honor redemptions in the ordinary course, or exposed to undisclosed risks that materially affected its ability to return investor assets and pay promised interest.

## II. Defendants

39. Defendant DCG is a corporation formed and existing under and pursuant to the laws of Delaware. DCG maintains its principal place of business in Stamford, Connecticut. Prior to moving to Stamford, Connecticut, DCG maintained its principal place of business in New York, New York.

a) **DCG Controlled Genesis.** At all times alleged herein DCG was the 100% owner of GGH, which was the 100% owner of the Genesis Global Capital

and the Company's sole managing member. Defendant DCG had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. Defendant DCG, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

b) DCG executives, Defendants Silbert, Kraines and Murphy had effective control over GGH, the Company and GGT—controlling strategy, hiring, allocation of resources, which were implemented with DCG executives on board of GGH, namely Murphy and Kraines. Furthermore, Matt Kummell, DCG Senior VP of Operations, was Defendant Silbert's eyes and ears at the Company. Kummell was plugged into everything at Genesis and had a direct line to Defendant Silbert.

c) For example, on June 14, 2022, Defendant Silbert, on behalf of the DCG board instructed Genesis to "shrink" its loan book.

d) On June 17, 2022, Defendant Moro sent two tweets from his personal account regarding Genesis losses and its plan for recovery. Those tweets were reviewed and edited by DCG's COO, Defendant Murphy, who directed Defendant Moro to send the tweets from his personal account, "despite directions from Genesis Capital's compliance department that these tweets should come from Genesis Capital's corporate account."

e) Further, in July 2022 to November 2022, DCG and Silbert caused Genesis to extend the maturity date for hundreds of millions of dollars of loans to

DCG for no consideration. In fact, on November 10, 2022, Defendant DCG "made" Genesis extend the maturity date for outstanding loans to May 11, 2023. This shows DCG and Silbert's total domination and control over Genesis Global Capital.

40. Defendant Barry Silbert is the founder and the CEO of DCG, and chair of DCG's board of directors. Silbert was a resident of Connecticut during at least part of the Class Period and is currently a resident of Rye, New York. Silbert reportedly owns 40% of the equity of DCG. Silbert has consistent and daily management responsibilities for DCG's and DCG's subsidiaries' operations, including the Company, GGT, and Grayscale Investments. For example, Silbert reportedly prefers focusing on the capital allocation activities of DCG and its subsidiaries. Silbert's activities and responsibilities include making the decision not to register Genesis Global Capital's securities (notes or investment contracts) with the SEC, and engaging in the transaction which led to the issuance of the DCG Promissory Note and execution of the DCG Promissory Note. Silbert has repeatedly and publicly discussed his role in DCG and oversight of its wholly-owned subsidiaries.

a) **Silbert Controlled Genesis.** As CEO and founder of both Defendant DCG and Genesis Global Capital, and controlling shareholder owning 40% of the equity of DCG (which in turn owned 100% of Genesis Global Capital through GGH), Defendant Silbert had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. Defendant Silbert, at the time of the wrongs alleged

herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

b) According to a Genesis's filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant Islim as Interim CEO of Genesis, during the Class Period Defendant Silbert controlled Genesis Global Capital:

23-10063-shl Doc 143 Filed 03/21/23 Entered 03/21/23 01:05:04 Main Document Pg 81 of 82

Debtor Name: Genesis Global Capital, LLC Case Number: 23-10064

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 28:** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|---|---|---|---|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| BARRY SILBERT | ADDRESS ON FILE | CEO OF DIGITAL CURRENCY GROUP | N/A |
| GENESIS GLOBAL HOLDCO, LLC | 250 PARK AVE S<br>5TH FLOOR<br>NEW YORK, NY 10003 | SOLE MEMBER | 100 |

c) Defendant Silbert exercised his power to direct or cause the direction of the management and policies of Genesis numerous times throughout the Class Period. For example, according to the NYAG Complaint, on June 14, 2022, Defendant Silbert, on behalf of the DCG board, used his power and influence by giving Defendant Moro and Genesis instructions on how to utilize Genesis's loan book. The next day, June 15, 2022, Defendant Silbert again demonstrated his power and influence over Genesis by directing Genesis Capital personnel, including Defendant Moro, to perpetuate the idea that Genesis Capital was "highly stable." This instruction by Defendant

Silbert to Defendant Moro, who was Genesis's CEO, resulted in Defendant Moro tweeting the sentiment that Genesis had "shed the risk." Furthermore, in July 2022, Defendant Silbert reviewed tweets that Defendant Moro made on behalf of the Company concerning its financial condition before Defendant Moro posted them.

d) When Gemini indicated that it intended to terminate the Gemini Earn program with Genesis Global Capital—Silbert, not Islim, then Genesis Global Capital CEO—intervened to convince Gemini not to do so because it was in the best interest of Gemini and DCG.

41. Defendant Moro was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022, with August 26, 2022 as his last day at the Company.

a) **Moro Controlled Genesis.** During this time, Defendant Moro caused the Company to offer or sell Genesis Yield.

b) According to Genesis's filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant Islim as Interim CEO of Genesis, during the Class Period Defendant Moro controlled Genesis:

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 29:** Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

| Name | Address | Position | Start | End |
|---|---|---|---|---|
| KRISTOPHER JOHNSON | ADDRESS ON FILE | FORMER SENIOR RISK MANAGER | 01/19/2022 | 01/20/2022 |
| MATTHEW BALLENSWEIG | ADDRESS ON FILE | FORMER CO-HEAD OF TRADING AND LENDING | 01/19/2022 | 09/2022 |
| MICHAEL PALEOKRASSAS | ADDRESS ON FILE | FORMER CO-HEAD OF TRADING AND LENDING | 01/19/2022 | 09/2022 |
| MICHAEL PATCHEN | ADDRESS ON FILE | FORMER CHIEF RISK OFFICER | 01/19/2022 | 10/2022 |
| SOICHIRO MICHAEL MORO | ADDRESS ON FILE | FORMER CHIEF EXECUTIVE OFFICER | 01/19/2022 | 08/15/2022 |

c) As CEO of Genesis, Moro had the power to speak publicly, act on behalf of Genesis and enter into contracts and agreements on behalf of Genesis, and to hire executives of Genesis, and he exercised that power, and through his acts alleged herein exercised his power and influence over Genesis Global Capital. For example, on June 30, 2022, Moro executed the DCG Promissory Note on behalf of Genesis, GGH and as a director of Genesis Asia Pacific, and directed that the DCG Promissory Note be reported as an asset on Genesis's balance sheet, and tweeted publicly on behalf of Genesis concerning its impact on the financial condition of Genesis.

d) On June 13, 2022, after the 3AC default, during a chat among Defendant Silbert, Moro, Islim and Kraines, Defendant Silbert directed Defendants Moro and Islim to "guide the ship." Defendant Silbert further stated to Defendants Moro and Islim that he wanted "to make sure you're leading this process with support and guidance from DCG," to which Defendant Moro responded "Derar [Islim] and I are involved in every step of what has been happening." Defendant Silbert concluded with a request that

Defendants Moro, Islim, Matt Ballensweig and Arianna Pretto-Sakmann provide an update to the DCG board.

e) As CEO, in 2019 Moro led Genesis's acquisitions of Qu Capital, an algorithmic trading firm, and in 2020 Vo1t, a digital currency custodian. Throughout the Class Period, Moro communicated with investors about Genesis through twitter, including updates on Genesis's financial condition. In 2019, Moro announced that he hired additional members to the Genesis leadership team, stating "It is really exciting to add this talented group to the Genesis team . . . We are confident that these individuals will build on our sustained success in the digital currency marketplace and play critical role in expanding our business around the world." Furthermore, according to the *Wall Street Journal*, in late 2018, Moro participated in due diligence of Genesis's partners, including a 2018 site visit to meet Sam Bankman-Fried and Alameda Research in Berkeley, California. During the Class Period and during the time Defendant Moro served as CEO of Genesis, Genesis made hundreds of millions of dollars of unsecured loans to Alameda.

42. Defendant Derar Islim was the COO since the start of the Class Period and on August 17, 2022, he was appointed interim CEO by DCG and Murphy, and during the Class Period he was a member of the board of directors of GGH.

a) **Islim Controlled Genesis:** Defendant Islim has served as the COO of Genesis Global Capital and GGT since the start of the Class Period. On or around August 17, 2022, Defendants DCG and Murphy hand-picked

Defendant Islim to serve as interim CEO of Genesis Global Capital and GGT, and during the Class Period he was a member of the board of directors of GGH which was sole managing member of the Company, and through his acts alleged herein exercised his power and influence over Genesis Global Capital. As a member of the board of GGH, which was the sole managing member of Genesis, and CEO, Islim controlled the Company, and during the time Islim held these positions through the end of the Class Period, Defendant Islim caused the Company to offer or sell Genesis Yield.

b) On June 13, 2022, after the 3AC default, during a chat among Defendant Silbert, Moro, Islim and Kraines, Defendant Silbert directed Defendants Moro and Islim to "guide the ship." In response, Defendant Islim stated: "I am working closely with him [Matt Ballensweig] . . . He wants to ensure the [Genesis Global Capital loan] book is in good liquidity stand[ing] at this point." Defendant Silbert further stated that he wanted "to make sure you're leading this process with support and guidance from DCG," to which Defendant Moro responded "Derar [Islim] and I are involved in every step of what has been happening." Defendant Silbert concluded with a request that Defendants Moro, Islim, Matt Ballensweig and Arianna Pretto-Sakmann provide an update to the DCG board.

c) According to a Genesis filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant DCG Islim as Interim CEO of Genesis, during the Class Period Islim controlled Genesis:

Debtor Name: Genesis Global Capital, LLC Case Number: 23-10064

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 28:** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|---|---|---|---|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| BARRY SILBERT | ADDRESS ON FILE | CEO OF DIGITAL CURRENCY GROUP | N/A |
| GENESIS GLOBAL HOLDCO, LLC | 250 PARK AVE S<br>5TH FLOOR<br>NEW YORK, NY 10003 | SOLE MEMBER | 100 |

43. Defendant Michael Kraines was CFO of DCG from on or around September 2021 through April 2023, and during the Class Period was a member of the board of directors of GGH, which was the sole managing member of the Company and through which Kraines controlled and managed the Company.

a) **Kraines Controlled Genesis**. Defendant Kraines is the CFO of DCG. In that role he oversaw all of DCG's financial operations, M&A activity, and corporate development efforts. Defendant Kraines also supported the continued growth of DCG's operating subsidiaries which included Genesis.

b) Kraines further exercised his control over Genesis as a member of the board of GGH, which was the sole managing member of Genesis.

c) For example, on June 15, 2022, during a Microsoft Team teams chat that involved Defendants Islim, Silbert, Murphy, Moro and Kraines, Defendant Kraines directly participated in the management of Genesis Global Capital, providing input regarding the status of Genesis Global Capital's collateral

and whether it should be preserved for investor redemptions or hedged to mitigate downside risk.

d) Defendant Kraines formulated and disseminated on behalf of the Company information to Genesis Global Capital investors concerning its solvency.

e) By virtue of his position as CFO of DCG, which wholly owns GGH, and as a member of the board of GGH, Kraines possessed the power and influence to cause the direction and management of Genesis Global Capital, and through his acts alleged herein exercised his power and influence over Genesis Global Capital.

f) According to a Genesis's filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant DCG Islim as Interim CEO of Genesis Global Capital, during the Class Period Kraines controlled Genesis through his position with GGH:

Pg 41 of 42

Debtor Name: Genesis Global Holdco, LLC Case Number: 23-10063

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 28:** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|---|---|---|---|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER / DIRECTOR | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING; CORPORATE SECRETARY | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| DIANA KIM | ADDRESS ON FILE | CORPORATE SECRETARY | N/A |
| DIGITAL CURRENCY GROUP, INC. | 262 HARBOR DRIVE<br>3RD FLOOR<br>STAMFORD, CT 06092 | SOLE MEMBER | 100 |
| MARK MURPHY | ADDRESS ON FILE | DIRECTOR | N/A |
| MICHAEL KRAINES | ADDRESS ON FILE | DIRECTOR | N/A |
| PAUL ARONZON | ADDRESS ON FILE | DIRECTOR | N/A |
| TOM CONHEENEY | ADDRESS ON FILE | DIRECTOR | N/A |

44. Defendant Mark Murphy was the COO of DCG during the period January 2020 through November 2022, and has been President of DCG since October 2022, and is a member of

the board of directors of GGH, which was the sole managing member of the Company and through which Murphy controlled and managed the Company. As COO of DCG Murphy worked closely with DCG's subsidiaries, including Genesis Global Capital, on strategy, execution, marketing and all management matters. Murphy led DCG's legal, communications, marketing, brand and public policy efforts and supported Defendant Silbert on day-to-day management of DCG. On August 17, 2022, Defendant Murphy, as COO of DCG and on DCG's behalf, stated "we're pleased to elevate [Defendant Islim] to the interim CEO role—he has our full trust and confidence and has been instrumental in developing key areas of the Genesis business," indicating that DCG and Murphy hand-picked the Company's interim CEO.

a) **Murphy Controlled Genesis**. Defendant Murphy was DCG's Chief Operating Officer during the period January 2020 through November 2022, and since October 2022 has served as President of DCG. According to his LinkedIn profile, Murphy led DCG's legal, communications, marketing, brand, and public policy efforts and supported DCG's CEO (Defendant Silbert) on day-to-day management of DCG.

b) Defendant Murphy served as a director of GGH, a wholly owned subsidiary of DCG, and as a director of GGH, which was the sole managing member of Genesis, through which he controlled and managed Genesis Global Capital, and through his acts alleged herein exercised his power and influence over Genesis Global Capital. According to his LinkedIn profile, Defendant Murphy worked closely with DCG's wholly owned subsidiaries, which include Genesis, on strategy, execution, and all management matters.

c) On or around August 17, 2022, Defendant Murphy hand-picked Defendant Islim to serve as interim COO of the Company and GGT and to serve as a member of the board of GGH, he further and hand-picked Tom Conheeney to serve as a special advisor to the Company and GGT and to serve as a member of the board of GGH.

d) In July 2022, Defendant Murphy edited and helped draft tweets that Defendant Moro made on behalf of the Company concerning its financial condition.

e) On June 15, 2022, during a Microsoft Team teams chat that involved Defendants Islim, Silbert, Murphy, Moro and Kraines, Defendant Murphy directed that Genesis from its twitter account retweet Defendant Silbert's tweet.

f) Defendant Murphy formulated and disseminated information on behalf of the Company to Genesis Global Capital investors concerning its solvency.

g) According to a Genesis filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant DCG and Defendant Islim as Interim CEO of Genesis, Murphy controlled Genesis through his position with GGH during the Class Period:

Debtor Name: Genesis Global Holdco, LLC Case Number: 23-10063

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 28:** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|---|---|---|---|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER / DIRECTOR | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING; CORPORATE SECRETARY | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| DIANA KIM | ADDRESS ON FILE | CORPORATE SECRETARY | N/A |
| DIGITAL CURRENCY GROUP, INC. | 262 HARBOR DRIVE<br>3RD FLOOR<br>STAMFORD, CT 06092 | SOLE MEMBER | 100 |
| MARK MURPHY | ADDRESS ON FILE | DIRECTOR | N/A |
| MICHAEL KRAINES | ADDRESS ON FILE | DIRECTOR | N/A |
| PAUL ARONZON | ADDRESS ON FILE | DIRECTOR | N/A |
| TOM CONHEENEY | ADDRESS ON FILE | DIRECTOR | N/A |

45. Defendants' positions with the DCG, GGH, Genesis Global Capital and/or GGT, gave them the power and authority to control the sale or offering of securities by Genesis Global Capital, and/or acted within the scope of their authority or employment. Because of their positions and access to material non-public information available to them, but not to investors, each of them knew, or at least recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from investors in Genesis Yield Investment Agreements and that the positive representations which were being made were then materially false and misleading.

## JURISDICTION AND VENUE.

46. Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) because Defendants, including Defendants DCG and Silbert transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to the Action took place in this District.

47. The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts throughout the United States, including in this District. The wrongful conduct alleged in this complaint have been directed at, and have had the intended

effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

48. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). Plaintiff Gowda is a citizen of Texas. Defendant DCG is incorporated in Delaware and has its principal place of business in Connecticut. Upon information and belief, no Defendant is a citizen of Texas. The amount in controversy as to Plaintiff Gowda exceeds $75,000, exclusive of interest and costs.

49. This Court has subject matter jurisdiction over the Action pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and Plaintiff Gowda and most members of the proposed Class are citizens of a state different from Defendants

50. This Court has jurisdiction over the Defendants who are domiciled in the State of Connecticut and because the Defendants have transacted business within the State of Connecticut.

## SUBSTANTIVE ALLEGATIONS

## I. THE DCG CONGLOMERATE

### A. DIGITAL CURRENCY GROUP.

51. Defendant DCG was founded by Defendant Silbert in 2015. In addition to founding DCG, Silbert has at all times served as CEO and Chairman of the board of directors of DCG. Until 2021, Defendant Silbert was also CEO of DCG's wholly-owned subsidiary business, Grayscale, and served as Chairman of Grayscale's board of directors.

52. Defendant Silbert's aim has been to run DCG as a private conglomerate with divisions in every aspect of the digital asset market: "the model I use as an inspiration is Standard Oil," Silbert has stated, referring to the 19th-century oil conglomerate founded by John D. Rockefeller.

53. DCG describes itself as follows:

> Founded in 2015 by CEO Barry Silbert, DCG is the most active investor in the blockchain sector, with a mission to accelerate the development of a better financial system through the proliferation of digital assets and blockchain technology. Today, DCG sits at the epicenter of the industry, backing more than 175 blockchain-related companies in over 35 countries. DCG also invests directly in digital currencies and other digital assets. In addition to its investment portfolio, DCG is the parent company of Genesis (a global digital asset prime brokerage), Grayscale Investments (the largest digital currency asset manager), CoinDesk (a leading financial media, data, and information company), Foundry (a leader in bitcoin mining and staking) and Luno (a leading cryptocurrency platform with a large international footprint).

54. To maintain control over Defendant DCG and its wholly-owned subsidiaries, Defendant Silbert has eschewed conducting an initial public offering to raise capital for Defendant DCG, stating "[DCG] doesn't need to dilute its ownership to raise capital . . . [i]t is not only not in the works, it's not even being discussed."

55. For example, while Defendant DCG engaged in a 2021 financing round which valued Defendant DCG at more than $10 billion, according to Defendant Silbert, this transaction was less about raising capital and was more "an opportunity for some early investors to exit and take profits . . . all the money raised went to the selling shareholders, and none sold their entire stake."

56. Importantly, Defendant Silbert, who then owned approximately 40% of DCG, didn't sell any stock in the offering.

57. As just one example of his control of Defendant DCG and its subsidiaries Defendant Silbert decided to move DCG and many of its subsidiary businesses, including Grayscale, from New York, New York to Stamford, Connecticut, where Defendant Silbert then lived. Defendant DCG and Grayscale's moves were completed in early 2022.

58. Defendant Silbert still owns approximately 40% of DCG and at all relevant times controlled the day-to-day activities of DCG and its wholly-owned subsidiaries Grayscale, Genesis Global Capital, GGH, and GGT, including the capital allocation and investment strategies employed by these entities.

59. In April 2022, Forbes estimated Defendant Silbert's net worth at $3.2 billion, up from 2021's estimate of $1.6 billion.

60. Defendants DCG and Silbert closely managed and controlled its subsidiaries through interlocking directors and officers. Defendant Murphy was the COO of DCG during the period January 2020 through November 2022, has been President of DCG since October 2022, and is a member of the board of directors of GGH. Defendant Kraines was CFO of DCG from in or around September 2021 through April 2023, and is a member of the board of directors of GGH. GGH was the sole managing member of Genesis Global Capital and through their positions on the GGH board Kraines and Murphy controlled the Company on behalf of Defendants DCG and Silbert.

**B. GRAYSCALE INVESTMENTS.**

61. Grayscale is a subsidiary of Defendant DCG and is a digital asset management company that offers investment products that provide exposure to the price movement of various digital currencies. Grayscale's most popular investment product is the Grayscale Bitcoin Trust, or "GBTC."

62. GBTC is a publicly traded investment vehicle managed by Grayscale that provides exposure to bitcoin's price movements without the need to directly buy and hold the digital currency.

63. Before and during the Class Period, GBTC was traded on OTCQX, a market for OTC securities.

64. Before and during the Class Period, GBTC shares could be acquired in two ways: (1) anyone with a brokerage account could buy GBTC shares in the OTC securities markets; and (2) investors could subscribe to the underlying trust (the "Trust").

65. Subscribing to the Trust required a minimum investment of $50,000 and was available only to accredited investors.

66. Trust subscribers received GBTC shares representing the value of Bitcoin held in the Trust equal to the amount of Bitcoin invested by the subscriber into the Trust.

67. GBTC shares issued via subscriptions were subject to a six-month lockup period during which subscribers could not sell their shares.

68. GBTC subscribers were free to sell their GBTC shares once the lockup period ended.

69. Grayscale charged a 2% annual management fee to manage GBTC, meaning that Grayscale, DCG, and Silbert took hundreds of millions of dollars annually and had an incentive to maximize the assets under management ("AUM") of Grayscale.

### C. GENESIS GLOBAL TRADING, INC. & GENESIS GLOBAL CAPITAL, LLC.

70. GGT was formed in 2005 and was initially operated by Defendant Silbert as the bitcoin trading arm of Silbert's company SecondMarket, which Silbert launched in 2004 as a private marketplace where accredited investors could buy and sell shares of private companies. Silbert served as CEO of SecondMarket until selling SecondMarket to Nasdaq in 2015.

71. Defendant Silbert spun GGT out of SecondMarket prior to selling SecondMarket to Nasdaq and relaunched GGT as a standalone broker-dealer specializing in digital currencies on April 16, 2015, over six months before Defendant Silbert announced the formation of DCG.

72. In October 2015, in conjunction with the formation of DCG, Defendant Silbert caused GGT to become a wholly-owned subsidiary of DCG with Defendant Silbert serving as DCG's CEO, Chairman, and controlling shareholder, thus controlling GGT.

73. GGT operated as a New York-based non-custodial, OTC market-maker in digital assets and brokerage, holding a virtual currency BitLicense with the New York Department of Financial Services ("NYDFS"), and registered as a broker-dealer with the SEC and the Financial Industry Regulatory Authority, or FINRA.

74. In late 2017, Defendant Silbert and DCG organized Genesis Global Capital under the laws of the State of Delaware to house the growing digital asset investment business of the DCG conglomerate GGT had been operating for Silbert and DCG.

75. Defendants Silbert and DCG formally spun Genesis Global Capital out of GGT as a standalone entity in April 2018, provided Genesis Global Capital with $40 million in seed capital, and caused GGT to reassign all existing digital asset loan agreements to Genesis Global Capital.

76. According to the Genesis Global Capital, LLC Amended and Restated Operating Agreement entered into as of January 19, 2022 by Genesis Global Holdco, LLC (the "GGC Operating Agreement"), the managing member of Genesis Global Capital, LLC is Genesis Global Holdco, LLC, holding a 100% interest in Genesis Global Capital, LLC. The GGC Operating Agreement was signed by Defendant Moro as CEO and Managing Member of Genesis Global Holdco, LLC.

77. Under the GGC Operating Agreement:

> [Genesis Global Holdco, LLC] shall be the Company's Managing Member. The business and affairs of the Company shall be managed by [Genesis Global Holdco, LLC] . . . [Genesis Global Holdco, LLC] shall have the exclusive power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including, without limitation, all powers, statutory or otherwise, possessed by members under the Act. . . .

> [Genesis Global Holdco, LLC] shall appoint a chief executive officer (the "CEO''). Each of [Genesis Global Holdco, LLC] or the CEO may hire other employees and appoint other officers of the Company, with such titles, authority and responsibilities as may be determined by the [Genesis Global Holdco, LLC] or the CEO, to oversee the daily operation of the Company. Such employees and officers shall be subject to removal by the [Genesis Global Holdco, LLC] or the CEO at any time. [Genesis Global Holdco, LLC], the CEO and any employee or officer authorized by [Genesis Global Holdco, LLC] or the CEO, is authorized to execute, deliver and file, in the name of and on behalf of the Company, any and all documents, agreements, certificates, receipts, instruments, forms, letters, or similar documents and to do or cause to be done any other actions as the [Genesis Global Holdco, LLC] or the CEO, or such authorized employee or officer, may deem necessary or desirable to further the interests of the Company, except as may be limited by the Act or the terms of this Agreement.
>
> (b) Notwithstanding the foregoing, none of the CEO or any officer or employee may take any of the following actions without the written consent of [Genesis Global Holdco, LLC]: . . .
>
> (iii) the filing of any petition in bankruptcy by the Company; . . .
>
> (vi) any other matter required under the Act or this Agreement.

78. According to the Genesis Global Holdco, LLC Amended and Restated Operating Agreement entered into as of July 19, 2022 by Defendant DCG (the "GGH Operating Agreement"), the managing member of Genesis Global Holdco, LLC is Defendant DCG, holding a 100% interest in Genesis Global Holdco, LLC. The GGH Operating Agreement was signed by Defendant Silbert as CEO of Genesis Global Holdco, LLC's parent, Defendant DCG.

79. Under the GGH Operating Agreement:

> The business and affairs of the Company shall be managed by a Board of Directors (the "Board"). The size of the Board shall be set by [Defendant DCG], but shall consist of at least three (3) directors (each, a "Director"). Each director shall be designated one of: a parent Director (each, a "Parent Director"), a Genesis Director (each, a "Genesis Director") or an independent Director (each, an "Independent Director"). Each Director shall serve as a "manager" of the Company within the meaning of the Act and the Board shall have overall management responsibility of the Company.
>
> (b) The affirmative vote or written consent given by a majority in number of the Directors shall constitute the approval of the Board; *provided*, *however*, that the unanimous affirmative vote or written consent of the Parent [DCG] Directors shall

> be required for the approval of the following matters (and the Company will not take any of the following actions without such approval): . . .
>
> (iii) the filing of any petition in bankruptcy by the Company;

80. Defendant Moro was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022, and CEO of Genesis Global Holdco, LLC, and during the Class Period he reported to Defendant Silbert.

81. Defendant Islim was the COO of Genesis Global Capital and on August 17, 2022, Defendants DCG and Murphy appointed him interim CEO of Genesis Global Capital and GGT. During the Class Period he was a member of the board of directors of GGH and the Company and he reported to Defendant Silbert.

82. Defendants Kraines and Murphy were members of the board of directors of Genesis Global Holdco, LLC that managed the business of Genesis Global Capital. Defendants Kraines and Murphy as DCG's representatives reported to Defendant Silbert.

83. Ballensweig was the managing director and co-head of sales and trading of GGT before the Class Period through September 28, 2022. Ballensweig was responsible for the origination and execution of digital asset and cash loans and reported to Defendants Moro and Islim who oversaw and supervised the business of Genesis Global Capital.

84. Defendants DCG and Silbert controlled Genesis Global Capital through, *inter alia*, DCG's 100% ownership of Genesis Global Capital, the placement of DCG and Silbert's representatives and agents on the board of GGH and GGT, as well as DCG and Silbert's ability to hire and fire executives of Genesis Global Capital and GGT, and other authority under the operating agreements of GGC and GGH.

### D. DCG, ITS OWNERS, DIRECTORS, AND OFFICERS CONTROLLED GENESIS

85. On May 13, 2025, Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific PTE. Ltd., filed a Verified Complaint under seal in Delaware Chancery Court (the "Delaware Chancery Complaint" or "DE Comp.") containing allegations and admissions drawn from tens of thousands of documents Defendants produced to Genesis in the bankruptcy and expressly authorized Genesis to use outside the bankruptcy. The Delaware Chancery Complaint later unsealed, revealing extensive evidence of Defendants' control over Genesis.

86. Notably, in the Delaware Chancery Complaint Genesis admits that Genesis "did not have a separate, independent existence from DCG and shows that internal DCG communications exhaustively document DCG's understanding that Genesis was DCG's alter ego. For example, on March 25, 2021, Defendant Kraines asked GGC's Chief Operating Officer Derar Islim whether DCG and Genesis had "ever reviewed w[ith] outside counsel (or even received a legal opinion) stating the creditors wouldn't be able to 'pierce the corporate veil' up to the parent [DCG] in the event of a catastrophe." Kraines asked for "the best way … to stress test or shock the current loan book to see what would happen to blow up Genesis." Kraines even admitted that a future plaintiff could argue that Genesis was DCG's alter ego. He wrote to Moro and others to pose a "war-gaming exercise" addressing the arguments the plaintiff would make if Genesis went bankrupt, which closely track the allegations in this Verified Complaint:

The question on my mind simply put is *"if Genesis were to somehow blow itself up could that somehow tank DCG to the profound detriment of its board and shareholders?"* My prefatory thinking here is as follows:

1. Let's assume that something catastrophic happens and Genesis faces deep pocketed creditors who are very unhappy and more than willing to retain expensive litigators.
2. Our baseline assumption is that the plaintiffs' counsel will sue DCG in this event under some version of a piercing the corporate veil theory. Our purpose is to war game this and mitigate the risk.
3. In our hypothetical, plaintiffs' counsel makes the following arguments (this is just top of mind – not researched):
a. Yes there is a Genesis contract that says that DCG and related entities aren't liable but that's just boilerplate/adhesion contract stuff that pales in the face of the other facts.
b. Genesis is the puppet of DCG. It is 100% owned and controlled by DCG and does what DCG tells it to do. Discovery of emails will be produced to support this.
c. Genesis is very clearly undercapitalized as an entity. There is not enough equity to support a multi-billion dollar loan book and global trading operation given all of the volatility and risk around this untamed crypto sector. Genesis is managed by super evil traders who naturally know all of this.
d. Agents of Genesis (salespeople) have explicitly told customers and potential customers that Genesis is backed by DCG as a material inducement to getting them to do business with Genesis. Plaintiffs detrimentally relied upon the DCG name and backing when making their decision to place their sacred trust in Genesis as a counterparty. Witnesses will be produced to testify that that is the case.
e. Net net the entire DCG/Genesis enterprise was in reality a single enterprise acting in close coordination to lure the less suspecting keepers of capital for widows and children into transacting with them. Clearly as a result DCG and its other subsidiaries must be held responsible for any harm done by Genesis.

87. Over the course of 2021, as the size of Genesis's loan book rapidly increased, DCG "devot[ed] substantial resources towards an analysis of a plaintiff's ability to pierce the DCG corporate veil in the event of a hypothetical blow up at Genesis." This effort was known as "Project Euclid." DCG hired two reputable law firms—Goodwin Proctor LLP ("Goodwin") and Sullivan & Cromwell LLP ("S&C")—to assess the risk of a successful alter ego claim. Project Euclid confirmed key vulnerabilities showing that DCG dominated and controlled Genesis.

88. DCG did nothing to address these issues and vulnerabilities. Instead, throughout 2022, Genesis remained the alter ego and instrumentality of DCG, including in June 2022 when Kraines referred to DCG and Genesis as "all one consolidated entity at the end of the day."

89. Neither GGC nor GGH had boards of their own, or any other formal internal governance processes before July 2022. Instead, DCG's Silbert, Kraines, and Murphy, *i.e.*, the De Facto Managers, exercised control and power over decision-making at Genesis, including Genesis's business strategy, hiring practices, and public relations. In fact, Silbert, Kraines, and

Murphy had weekly or bi-weekly meetings with Moro, during which the DCG executives dictated major decisions at Genesis. In these meetings, Defendants Silbert, Kraines, and Murphy would direct and pressure Genesis to grow its lending business so that DCG had ready access to borrowed capital to fuel its own growth and profitability. Even outside of those meetings, Genesis executives were required to secure DCG's and Silbert's approval of all major decisions and key business operations.

90. The GGT Board and DCG Board also heard matters pertaining to, and made decisions for, Genesis, including about the organization of companies within the Genesis corporate family, Genesis's risk committee and risk management, and Genesis's financial audits. Defendant Silbert was Chair of the DCG Board and Chair of the GGT Board until June 22, 2022, at which point Murphy, who was already attending GGT Board meetings regularly, assumed Silbert's place. Kraines was also a member of the GGT Board beginning no later than April 2021.

91. Genesis's CEO, Defendant Moro, referred to the De Facto Managers as his "bosses" and rarely, if ever, voiced disagreement with DCG. He did nothing to address what other Genesis employees, including Islim, described as a "culture of submission" and acquiesced to all DCG's demands. Defendants Silbert, Murphy, and Kraines knew that no one at Genesis, including Defendant Moro, would push back against DCG's demands for fear of becoming a casualty of DCG's discretionary firing power. Because Genesis employees knew that any important strategy decisions or communications would need DCG approval, and because Genesis employees were aware of DCG's prerogative to run Genesis primarily to benefit DCG, DCG created a culture where Genesis employees were forced to prioritize DCG's interests.

92. DCG's Project Euclid consultants confirmed that DCG's managerial control over Genesis was problematic. Goodwin confirmed that "DCG management ha[d] regular meetings

with GGC, during which important business matters [we]re discussed." It likewise confirmed that "DCG management … maintain[ed] discretion over the hiring and firing of key [Genesis] personnel." S&C determined that Genesis "generally viewed" DCG "as having a veto [right] over many fundamental [Genesis] business decisions." S&C suggested that, going forward, DCG discontinue its "[d]irect involvement in [Genesis] lending decisions." Similarly, Goodwin identified as an issue DCG's "business referrals to GGC, including introductions to certain DCG business partners who may enter into lending relationships with GGC."

93. Both Goodwin and S&C recommended that DCG create separate boards for GGC and GGH. Goodwin suggested this would be a "[p]otentially really easy [fix] to implement." S&C specifically recommended that a Genesis board have "one or more independent directors," and that it "should approve any distributions to DCG, after appropriately considering the ongoing needs of [Genesis]." Despite receiving this advice as early as July 2021, DCG never created a board for GGC and did not create a board for GGH until July 2022, by which time both Terra Luna and 3AC had already collapsed. And even then, the GGH Board was dominated by DCG's executives.

**a. DCG and Genesis Had Significant Overlap in Operations**

94. Beyond shared governance and common executives in decision-making positions, Genesis's operations overlapped with DCG's operations in other significant ways. For example, Silbert mandated limits on the compensation of Genesis executives. When Genesis engaged consultants to provide a proposed compensation plan, that plan needed to be approved by DCG.

95. Genesis also used DCG's office space and IT infrastructure. DCG, GGC, GAP, and Grayscale shared an office at 250 Park Avenue South in New York City, and their executives and employees worked side by side. Murphy and Moro sat next to each other. This shared space

allowed Silbert, Murphy, Kraines and other DCG executives and employees to see and talk to the Genesis team every day, facilitating their control over Genesis.

96. Moreover, DCG had full access to Genesis's books and records. Genesis used the general ledger software Sage Intacct for recording transactions and generating balance sheets. Genesis accessed Sage Intacct through DCG's license for the product, and Genesis's Sage Intacct records were stored within DCG's Sage Intacct module. DCG did not need Genesis's consent to pull information from those books and records. DCG and Genesis also shared an email server.

**b. Genesis Was Undercapitalized by DCG**

97. Project Euclid also confirmed by June 2021 that Genesis was massively undercapitalized. Goodwin found that GGC had a capitalization of 1.7%, and S&C found that GGC had a capitalization of 1.5%. Goodwin characterized that rate as "undercapitalized … compared to publicly-available information about other crypto lenders," including Voyager (3.7%), Silvergate (9.3%), and Galaxy (90.8%), and "compared to other companies that engage in secured lending, including Mid and Small-Cap Banks (6%-8%)[,] Mortgage REITs (11%-25%)[,] and Business Development Companies (45%-55%)." Similarly, S&C noted that "[m]ost banks with a loan portfolio of a similar size [to GGC] maintain 8-12% capital ratios," while "[o]ther specialty lenders may maintain capital ratios in the range of 10-15% or more." Despite its knowledge that Genesis was severely undercapitalized, DCG did nothing to address that problem.

**c. DCG Used Genesis as Its "De Facto Treasury"**

98. As a result of the control that it exercised over Genesis, DCG and its affiliates drew on assets in Genesis at will to serve DCG's needs. DCG used Genesis as its "de facto treasury" and piggy bank. For example, by the end of the second quarter in 2020, "DCG burned through

their LOC [line of credit] and want[ed] more cash" from Genesis. In this way, Genesis was "basically DCG's balance sheet."

99. DCG consistently took loans from Genesis on an unsecured basis and on favorable terms that would not have been available in arm's-length circumstances. For example, on June 10, 2020, DCG Managing Director Matt Beck emailed Genesis Co-Head of Trading and Lending Matt Ballensweig requesting a cryptocurrency loan from GGC to DCG. Although Ballensweig promptly provided potential loan terms, he shared that GGC would "need[] to source new capital" for the loan because its "inventory was a bit thin." Ballensweig later told Moro that few lenders would lend unsecured BTC, as DCG was requesting, and that the rate Genesis offered was even "maybe too cheap" given market conditions. But Genesis provided the assets DCG demanded.

100. DCG also took distributions from Genesis even when Genesis did not have sufficient liquidity to justify them. As part of Project Euclid, Goodwin found that "between April 11, 2018, and April 15, 2021, GGC made distributions to DCG totaling $31.09 million," including "$17.09 million [in] 'distributions' to DCG directly." Goodwin recommended that, at a minimum, DCG "[d]evelop a distribution policy that allows for flexibility, such that regular distributions will not be made in circumstances where GGC is experiencing business challenges or when the distribution would otherwise be viewed as putting GGC's operations in jeopardy." DCG developed no such policy.

101. Silbert also personally required Genesis to issue unsecured loans to DCG affiliates. For example, DCG caused Genesis to issue a loan to Foundry, DCG's crypto mining company, without any collateral, so that Foundry could further lend that money to BTC miners accepting computer equipment as collateral. From a business perspective, the loan terms made no sense for

Genesis, but the understanding among Genesis employees was that they were required to support the DCG ecosystem as Silbert mandated.

102. DCG's Project Euclid consultants identified Genesis's "treasury function" as a serious problem evidencing a lack of corporate separateness. S&C explicitly recommended that DCG "restructure" GGC's treasury function. DCG did not implement those recommendations. To the contrary, as late as 2022, DCG acknowledged that DCG "d[id] not have an independent Treasury function" and that GGC still was the "de[ ]facto Treasury for all [DCG] sub[sidiaries] given its access to external funds and operational capability."

**d. DCG Used Genesis to Fuel Grayscale and the Bitcoin Trust**

103. Between approximately 2019 and 2022, one of DCG's primary strategies was to use Genesis's lending as an instrument to grow the Bitcoin Trust—and, by extension, the Bitcoin Trust's significant management fees, which were then distributed to DCG as dividends. Indeed, management fee revenues associated with GBTC increased from approximately $35 million in 2019 to approximately $615 million in 2021. To Silbert, Genesis was a tool to aggregate and use cryptocurrency to further the interests of DCG and its affiliates. In particular, it furthered Silbert's belief in the value of holding bitcoin long term. The details of this strategy and its lucrative value for Silbert and DCG are described in detail below, but in sum, DCG's prioritization of Grayscale caused the Genesis loan book to become exponentially riskier with little liquidity as its loan book grew.

104. First, DCG, Silbert, Kraines, and Murphy used their managerial control over Genesis to require Genesis to loan to counterparties that would engage in a speculative trade in the market that was referred to internally as the "GBTC Trade" or "GBTC arbitrage trade." This increased the pool of assets held by the Bitcoin Trust, as well as the management fees DCG earned

via Grayscale, but it exposed Genesis to significant risk. Second, DCG, Silbert, Kraines, and Murphy used their managerial control over Genesis to cause Genesis to accept illiquid GBTC shares as collateral for loans to Genesis's largest counterparties. GBTC was illiquid because it could not be sold for six months after its purchase due to a lockup period imposed by the SEC, and DCG prohibited Genesis from re-selling GBTC even after the lockup period ended. Allowing borrowers like 3AC to secure their loans with GBTC (often at below-market value) incentivized them to engage in the GBTC Trade, growing the Bitcoin Trust and its management-fee revenue.

**i. DCG Required Genesis to Lend to Borrowers That Participated in the GBTC Trades.**

105. The GBTC Trade enriched DCG and Silbert via Grayscale and imperiled Genesis and its lenders. DCG's prerogative was for Genesis to lend to counterparties engaged in the GBTC Trade, while Grayscale and DCG profited risk free. In 2020, during Grayscale's biggest increase in BTC inflows for a week to date, Silbert himself admitted that, while Genesis's primary unsecured exposure was to borrowers engaging in the GBTC Trade, "th[o]se loans are all ring-fenced at Genesis Capital and no lenders have recourse against DCG. Doesn't mean they wouldn't come after us of course, but we are not legally on the hook."

106. Because of the high demand for GBTC shares, from 2018 until 2021, GBTC purchased on the secondary market (*i.e.*, not purchased directly from Grayscale or GGT) traded at a premium relative to the NAV of the BTC in the Bitcoin Trust. During that time, customers who bought GBTC directly from GGT—the only authorized participant of GBTC prior to Genesis's bankruptcy—received an asset worth more than the corresponding BTC used to purchase the GBTC. By way of example, if a customer bought $100 worth of GBTC on March 31, 2020, the customer would have hypothetically been able to sell that GBTC on September 30, 2020—six

months later—for approximately $176 on the secondary market after the six-month lockup period expired.

107. The graph below shows how GBTC traded at a premium to its NAV until early 2021 before switching to a discount to its NAV and finally settling at NAV in 2024.




108. While GBTC was trading at a premium to BTC, DCG and Grayscale required Genesis to encourage borrowers to engage in the GBTC Trade through the following steps:

Process:

1. Entity sends collateral to Genesis Capital. Genesis sends assets directly to Grayscale Trust.
2. Shares are created in Entity name in applicable Grayscale product.
3. Upon seasoning, shares are sent to brokerage account (Genesis not involved) and sold in open market
4. Entity purchases underlying asset at spot to re-pay the loan from Genesis.
5. Loan Closed. Collateral netted and funds sent to Genesis to pay for the spot purchase.

**Closing the Trade upon Expiry**

Once the shares unlock after a year in the brokerage account, the client can sell the shares on the OTC market. Using the proceeds, the client can either purchase the underlying borrowed asset directly from Genesis or away and return the borrow. The difference in the proceeds from the cost to purchase the underlying is the profit on the trade. If interest is chosen to be paid at maturity, interest will also be collected then.

109. DCG and Silbert were incentivized to use Genesis to facilitate as many of these GBTC Trades as possible. Loan origination was theoretically good for Genesis, and the BTC that

Genesis loaned out would stay locked in the Bitcoin Trust, no matter what happened to GBTC's share price relative to NAV. If Genesis was unable to recoup its loans, Grayscale still would hold the underlying BTC—and DCG would continue reaping the profits from Grayscale's hefty management fee, which was charged on the underlying bitcoin and not impacted if GBTC traded at a discount to NAV (as was the case after February 2021).

110. The obvious risk inherent in the GBTC Trade was that GBTC shares would start to trade at a discount relative to the NAV during the six-month holding period. This risk came to pass in February 2021. While saddling Genesis with the losses associated with that risk, Silbert contrived another opportunity for his own profit—the "Reverse GBTC Trade"—a reverse trade whereby DCG would purchase discounted GBTC shares and hold them, counting on the GBTC price to return to NAV or even a premium at some point in the future. DCG was working on securing SEC approval to convert the Bitcoin Trust into an exchange-traded fund ("ETF"), which DCG and Silbert anticipated would cause the price of GBTC shares to soar. (The SEC did not approve the conversion of the Bitcoin Trust into a spot Bitcoin ETF until a few years later, in January 2024.) DCG didn't use its own assets to purchase these discounted GBTC shares—as Silbert would want to keep the value of holding his bitcoin long-term. Instead, to participate in the Reverse GBTC Trade, DCG, Silbert, Murphy, and Kraines used their managerial control to require Genesis to issue intercompany loans to DCG worth approximately $500 million in liquid cryptocurrencies. DCG used that liquidity to purchase GBTC shares on the secondary market at times when GBTC traded at a discount, so that DCG would later be able to sell the GBTC shares for a profit.

111. By January 2021, just before GBTC stopped trading at a premium relative to NAV and started trading at a discount to its NAV, 3AC was the largest holder of GBTC, having increased

its holdings to 39 million shares, then worth approximately $1.3 billion. Genesis would accept the GBTC as collateral, mismark it by valuing it at NAV regardless of its market price, and loan 3AC even more liquid cryptocurrency so 3AC could continue the GBTC Trade. In this way, DCG's directive to accept GBTC as collateral was a key contributor to Genesis's ultimate collapse. DCG, Silbert, Kraines, and Murphy similarly required Genesis to follow parallel risky practices for other cryptocurrencies and the other Grayscale Trusts, thus compounding the harm to Genesis and increasing its risk exposure, while further enriching Silbert, DCG, and Grayscale.

#### ii. DCG Required Genesis to Accept GBTC as Collateral in Furtherance of DCG's Interests.

112. DCG, Silbert, Murphy, and Kraines also used their managerial control to force Genesis to accept GBTC shares as collateral for loans issued to counterparties, including 3AC. This practice increased demand for GBTC shares because counterparties knew GBTC could be used as collateral with Genesis, which ultimately benefited Silbert and DCG. It harmed Genesis, however, because Genesis could foreclose only upon highly illiquid GBTC shares in the event of a counterparty default.

113. DCG and Silbert also mandated that Genesis could not sell GBTC that it received as collateral from third parties or as loan repayment from DCG—even after the six-month lockup period expired. When Genesis was insolvent, Silbert instructed Genesis not to sell the GBTC it held even when Genesis was experiencing a serious liquidity crisis, prioritizing DCG and Silbert's larger enterprise over Genesis and its creditors. In addition to Silbert betting on GBTC shares trading at or above NAV in the future, Grayscale continued to earn management fees on the GBTC shares held at Genesis. Genesis, of course, received nothing.

114. The harm to Genesis was compounded by the fact that GBTC was valued at NAV for Genesis's lending purposes, even though Silbert instructed Genesis never to sell the GBTC

shares, and even after GBTC shares began trading at a discount to the underlying BTC. This meant that when Genesis's counterparties that had posted GBTC shares as collateral defaulted, their loans were undercollateralized by hundreds of millions of dollars. This risk was most acute with respect to 3AC because of the volume of GBTC that 3AC held, and it meant that billions of dollars' worth of loans that were issued from Genesis to 3AC were severely undercollateralized. But accepting GBTC as collateral helped Silbert, DCG, and Grayscale. It incentivized 3AC and other Genesis borrowers to purchase even more GBTC, thereby driving up the price and filling the Bitcoin Trust with more BTC. Silbert, DCG, and Grayscale profited from the management fees earned on the BTC held in the Bitcoin Trust, including BTC that had been loaned by Genesis and secured by GBTC collateral.

**e. DCG Exercised Heightened Control Over Genesis Beginning in June 2022.**

115. As the foregoing demonstrates, Defendants controlled Genesis from the outset, but that control became more pronounced in the summer of 2022 following the Three Arrows Capital default.

116. Genesis's CFO Alice Chan testified during her deposition that DCG had significant control over Genesis's operations and decisions during the Class Period alleged herein. For example, Ms. Chan testified that DCG controlled basic business functions of Genesis:

> **Question:** You referenced a Teams Chat and then you also referenced a conversation you had with Jordan Goldman and Amanda Cowie. Is there anything else . . . that you observed or a conversation that you had that lead you to the conclusion that DCG had to approve Genesis's public messaging during the summer of 2022 time period?
>
> **Chan (Genesis):** Yeah. I think it's a theme, at least the one that I observed – like, you know the period of time that I observed during the summer of 2022 where things needed to be approved, or vetted by DCG before a decision can be made. Even though because DCG is a parent company of Genesis, they did—it owns 100 percent of Genesis entities, DCG had the decision making on a lot of our—not just the messaging communication, but overall, the business strategy, where are we

going to register in terms of, like, the licenses . . . also geographically. They even have to approve our budget, our bonus. And then also – and also the critical hires.

117. Ms. Chan also testified that during the summer of 2022, as Defendants engaged in the misconduct outlined herein, there was a significant uptick in DCG's exerted control over Genesis:

**Chan (Genesis):** [S]tarting in the summer, like, June of 2022, there were a lot of frequent dialogues that DCG had with Genesis that I was invited to, such as, like, daily calls, multiple daily calls throughout the course of June and July. As well as, I would say, weekly meetings, like maybe beginning on the week every – every week with the Genesis management team, the DCG management team, to go through the business matters that was occurring at – at Genesis level.

In addition to that, there was also a monthly meeting with the DCG management team including Barry [Silbert], Michael Kraines, Mark Murphy and other strategy members at DCG. So, I would say, based on that observation . . . it's fair to say . . . they are heavily involved in terms of the decision making at Genesis.

118. Finally, Ms. Chan testified that eventually there were daily calls during the summer of 2022 attended by Defendants:

**Chan (Genesis):** I would say, mid-June I became very aware of the [3AC] situation by getting invited to a daily call starting that Monday of that week. It's mid-June if I recall correctly. During the call where – the list of DCG participants I mentioned before, and along with the management team from – from Genesis, during the call, you know they discuss about a potential default of Three Arrows.

**Question:** Who from DCG was on that call, do you remember?

**Chan (Genesis):** [I]t was Barry Silbert, Michael Kraines, Mark Murphy and I think maybe a couple of others from DCG side that worked for either Michael Kraines or Mark Murphy.

**Question:** And you mentioned that there were basically, going forward daily calls with DCG. Were those same people that you just mentioned on those calls every day?

**Chan (Genesis):** Most of the time. Definitely if not all three, but two of the three would – would join[].

**Question:** By the three you mean Barry Silbert, Murphy and Kraines; is that right?

**Chan (Genesis):** Yes. Correct.

**Question:** And you mentioned that Genesis management was on the call . . . would that include Michael Moro?

**Chan (Genesis):** Yes.

**Question:** And Derar Islim?

**Chan (Genesis):** Yes.

## II. GEMINI TRUST COMPANY, LLC.

119. Non-party Gemini Trust Company, LLC ("Gemini") is a New York-based cryptocurrency exchange and custodian founded in 2014 by Cameron and Tyler Winklevoss.

120. In February 2021, together with Genesis Global Capital, Gemini launched the Gemini Earn program, which as described in greater detail herein, offered owners of digital assets the opportunity to earn yield by investing those assets with Genesis Global Capital.

121. Each investor who invested digital assets with Genesis Global Capital via the Gemini Earn program signed a Genesis Yield Investment Agreement signed by Genesis Global Capital, Gemini, and the investor, with substantially identical terms to investors who invested directly with Genesis Global Capital, with the exception being certain sections of the agreement appointing Gemini as agent for Gemini Earn investors and outlining the purpose and scope of Gemini's agency.

122. Specifically, each Genesis Yield Investment Agreement signed by Gemini Earn investors contained the following language:

> **VI. Appointment of Custodian as Agent**
>
> a. Borrower and Custodian agree to execute and comply fully with the provisions of Exhibit A (the terms and conditions of which Exhibit are incorporated herein and made a part hereof).

> b. Lender represents, which representation shall continue during the term of this Agreement and any Loan hereunder, that it:
>
> (i) has received and reviewed a copy of this Agreement;
>
> (ii) has duly appointed Custodian as its agent to act on Lender's behalf ***for all purposes under this Agreement***;
>
> (iii) has duly authorized Custodian to enter into the Loans contemplated by the Agreement on its behalf and to perform the obligations of Lender under such Loans;
>
> (iv) is a Principal referred to in Exhibit A and will be liable as principal with respect to Loans entered into by Custodian on its behalf and its related obligations hereunder; and
>
> (v) has taken all necessary action to authorize such appointment of Custodian and such performance by it.

(Emphasis added).

123. Gemini was appointed as agent on behalf all Gemini Earn investors for *all purposes* relating to the performance of the Genesis Yield Investment Agreements, with Gemini treated as a principal to each agreement standing in the shoes of Gemini Earn investors for those purposes.

124. The sole limitation placed on Gemini's agency was that Gemini was "not authorized … to exercise discretion in determining the amount, timing or selection of any Loan on [Gemini Earn investors'] behalf[.]" But in every other respect, Gemini stood in the shoes of Gemini Earn investors.

125. To this end and as appointed agent for Gemini Earn investors, Gemini received, reviewed, and monitored quarterly disclosures from Genesis Global Capital regarding the Company's risk management practices, balance sheet status and health, and investment strategies. Gemini relied upon Genesis Global Capital's disclosures in determining whether to continue its partnership with Genesis via the Gemini Earn program or whether to terminate the program and recall all Gemini Earn investors' digital assets.

## III. GENESIS GLOBAL CAPITAL'S YIELD PROGRAM.

126. Beginning at least as early as July 2020, Genesis Global Capital began offering an investment and selling securities called "Yield Generation" (hereinafter "Genesis Yield"), which allowed "[h]olders of digital currencies [to] earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty."

127. The following screenshot shows Genesis Global Capital's website on July 21, 2020, including the Genesis and DCG logos:




***




128. The basic terms of investment in Genesis Yield were simple: in exchange for an investor tendering digital assets or cash to Genesis Global Capital and granting Genesis Global Capital the attendant rights to use those assets or cash in Genesis Global Capital's investment activities, Genesis Global Capital promised to pay the investor lucrative rates of return and promised the return of investors' assets at maturity of the loans.

129. Investments made directly with Genesis Global Capital could be for fixed terms such as six-months, or could be open-term. Genesis Global Capital referred to open term

investments as having a "call option." These "call options" on investments permitted an investor to demand repayment of all or a portion of an investment on any given business day, which would trigger an obligation on behalf of Genesis Global Capital to return the investor's capital.

130. Initially, investment in Genesis Yield was open to public investment as long as an individual could meet certain investment minimums set by Genesis Global Capital. Although the investment minimums changed over time, Genesis Global Capital did not always adhere to these requirements. In November 2022, the minimums purportedly enforced by Genesis Global Capital were 100 BTC, 1,000 ETH, $2 million U.S. Dollars, or $1 million of certain alternative digital assets. During the Class Period, Genesis Global Capital did not enforce or dropped the investment minimum for direct investors.

131. Beginning February 2, 2021, however, Genesis Global Capital dropped the investment minimum and began offering investors a way to invest any amount of digital assets in Genesis Yield via the Gemini digital asset platform.

132. Dubbed the "Gemini Earn" program on the Gemini digital asset platform, Genesis Global Capital began permitting any investor that held a Gemini digital asset platform account to elect to invest their digital assets in the Genesis Yield.

133. To invest, Gemini digital platform users entered into the Genesis Yield Investment Agreement with Genesis Global Capital and Gemini, and expressly appointed Gemini as their agent for purposes of their Genesis Yield investments. The agreement was a standard agreement and not individually negotiated with Gemini Earn investors. Genesis Yield investments made via Gemini Earn were open term investments, meaning that investors could redeem their investment at any time by giving notice to Genesis Global Capital.

134. Other investors who invested in Genesis Yield directly from the Company likewise entered into a standard Master Borrow Agreement which was not individually negotiated by direct investors. Investments made directly with the Company were fixed term or open term, where investors could redeem their investment at any time by giving notice to the Company.

135. Interest on Genesis Yield was calculated using a daily periodic rate applied to the principal invested, and interest was paid the month after it accrued. Interest payments were denominated in the same type of cryptocurrency or digital asset (or cash) originally invested.

136. Each Genesis Yield investor—whether or not the investment was made via the Gemini Earn program—entered into a Genesis Yield Investment Agreement with Genesis Global Capital which set forth the terms of the investment, including the types of occurrences that constituted events of default and what could cause termination of the agreement and required parties to make certain representations and warranties regarding the parties' financial condition (*i.e.*, neither party is insolvent), and more.

137. In each Genesis Yield Investment Agreement, Genesis Global Capital made the following representations to investors:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws. (the "Solvency Warranty")
>
> [Genesis Global Capital] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder. (the "Adverse Proceedings Warranty").

138. As detailed above, Plaintiff Gowda reviewed and relied upon these representations and warranties in deciding to invest in Genesis Yield.

139. Importantly, each Genesis Yield Investment Agreement executed by each Genesis Yield investor with Genesis Global Capital stated that the Solvency Warranty and Adverse Proceedings Warranty "shall continue" during the term of the investments meaning either:

a) the Solvency Warranty and Adverse Proceedings Warranty were deemed to have been made to each Genesis Yield investor every day during the life of each Genesis Yield Investment Agreement; or

b) that because of the Solvency Warranty and Adverse Proceedings Warranty made at the time of execution of the agreement, Genesis Global Capital had an affirmative duty to disclose or update member of the Class if either the Solvency Warranty or Adverse Proceedings Warranty ceased to be truthful.

140. To generate the yield promised to investors, Genesis Global Capital commingled and/or pooled Genesis Yield investor principal with those of other Genesis Yield investors; held Genesis Yield investor's principal in accounts in Genesis Global Capital's name or other names; pledged, repledged, hypothecated, rehypothecated, sold, lent, staked, arranged for staking, and otherwise transferred Genesis Yield investors' digital assets separately or together with other property; and otherwise used or invested such digital assets or currency at the investor's sole risk.

141. Genesis Global Capital had to engage in risky investment strategies to generate yield. As just one example, Genesis Global Capital invested billions of dollars worth of Genesis Yield investors' digital assets and cash with now-infamous digital asset hedge funds Alameda Research, LLC (owned by Sam Bankman-Fried) and Three Arrows Capital (previously defined herein as "3AC"), as well as Genesis Global Capital's parent DCG, who themselves believed they would earn outsized returns with those funds via their own proprietary investment strategies. At

the height of their relationship, Genesis Global Capital provided Alameda Research with over $6.5 billion in capital via loans that were often only 50% secured and were not over collateralized.

142. Genesis Asia Pacific lent assets to Singapore-based clients, such as cryptocurrency hedge fund 3AC, on behalf of Genesis Global Capital. Genesis Global Capital provided virtually all of Genesis Asia Pacific's lending capital. Genesis Asia Pacific, in turn, repaid Genesis Global Capital when Genesis Asia Pacific's own borrowers repaid Genesis Asia Pacific. Genesis Global Capital and Genesis Asia Pacific shared a single loan book managed by the Genesis Entities' Co-Head of Trading and Lending ("Managing Director No. 1") from New York.

143. In short, Genesis Global Capital engaged in undisclosed, unduly risky and self-interested investment strategies with investors' capital to earn yield. The returns earned by each Genesis Yield investor depended on the pooling of the invested digital assets, and importantly the ways in which Genesis Global Capital invested those assets. Ultimately, investor returns on Genesis Yield were dependent on Genesis Global Capital's managerial or entrepreneurial or efforts and risk management in investing activities. Because Genesis Global Capital sought to gain by reinvesting investors' assets with counterparties, investors were dependent on the skill, experience and risk management policies and procedures of Genesis and its executives and employees.

144. The income Genesis Global Capital earned investing Genesis Yield investors' assets was the only revenue-generating activity in which Genesis Global Capital engaged.

145. Although Genesis Global Capital styled Genesis Yield investors' investments as "loans" to Genesis Global Capital and characterized Genesis Global Capital's redeployment of those assets as a "borrowing and lending" business, in substance, Genesis Global Capital managed a pooled investment vehicle and/or issued note securities used to fund its own investment business.

146. Despite the economic realities of the Genesis Yield product, however, Genesis Global Capital made no attempt to comply with federal or state securities laws. Because of that, Genesis Yield investors' principal was not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC"), or insured by the National Credit Union Administration ("NCUA"). This lack of a protective scheme or regulatory oversight subjected Genesis Yield investors to additional risks not borne by investors who maintain assets with most SIPC member broker-dealers, or with banks, savings associations, or credit unions.

### A. DEFENDANTS CAUSED GENESIS GLOBAL CAPITAL TO DISREGARD RISK MANAGEMENT PRACTICES.

147. Defendants and Genesis Global Capital induced the Genesis Yield investors who invested via the Gemini Earn program to invest by touting Genesis Global Capital's purportedly robust risk-management practices and a supposedly thorough vetting process of the counterparties to which Defendants caused Genesis Global Capital to reinvest Class members' assets.

148. When Genesis sought to initiate the Gemini Earn Program and begin its lending relationships with Gemini Earn Lenders (at the start of the Class Period) Genesis Global Capital shared its "Overview of Enterprise Credit Risk Management" (the "Overview") with Gemini, the agent for Plaintiff Gowda and other Gemini Earn investors.

149. The Overview, according to Gemini, declared that Genesis Global Capital had "many levers to pull to ensure Genesis Global Capital is well protected, including collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools." It emphasized Genesis Global Capital's "ability to responsibly manage credit risk and face zero

defaults" and to "maintain a consistently high level of creditworthiness across our entire loan portfolio."

150. In the Overview, Genesis Global Capital represented to Gemini that, "[a]side from credit extension, Genesis [Global Capital] primarily lends on an 'over-collateralized' basis – *i.e.*, the collateral pledged exceeds the value of the loan." With respect to unsecured credit, Genesis Global Capital promised Gemini—who would serve as the agent for Gemini users that chose to invest in Genesis Yield—that "it would not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance."

151. Genesis Global Capital used the Overview to give Gemini the misimpression that Genesis Global Capital was a responsible financial institution, representing purportedly sound risk-management practices and a safe, over-collateralized loan book.

152. These representations to the agent of Genesis Yield investors who invested through Gemini Earn caused hundreds of thousands of investors to invest in Genesis Yield, believing that Genesis Global Capital observed sound risk management and counterparty risk policies.

153. According to a February 2, 2021 *CoinDesk* article titled "Gemini Partners with Crypto Lender Genesis to Offer 7.4% Yield on Customer Deposits":

> The product is offered in all 50 states, including New York where Gemini has its trust license. Users can get yield on any cryptocurrency available on the Gemini platform now and on Gemini's GUSD stablecoin at some point in the future. The product is open to active Gemini customers currently and will be rolled out to all Gemini customers later this month.
>
> Gemini collects part of the spread between interest paid on the crypto and interest Genesis charges on its loans to institutions. As part of the partnership, **Gemini reviewed Genesis' financial statements and verified that the lender's loans are overcollateralized, said Yusuf Hussain, Gemini's head of risk.**
>
> This is the third partnership of its kind for Genesis. It also powers interest-bearing accounts at crypto lender Ledn and crypto exchange Luno, which is also owned by Digital Currency Group.

> "As far as percentages of loans coming from partnerships, it's still relatively a small part right now, largely because they are relatively new," Genesis CEO Michael Moro said. "But we expect the numbers to become more significant over time as a sign of the success of these partnerships."

(Emphasis added).

154. Gemini repeated Genesis's representations to investors: "For example, on March 5, 2021, a business development employee at Gemini responded to an investor inquiry about Earn by stating: "based on our due diligence, Genesis is only lending assets deposited into [Earn] to institutional borrowers in an overcollateralized way."

**i. Genesis Global Capital Misrepresented its Risk Management Practices to Counterparties and Gemini Earn Investors' Agent.**

155. Genesis Global Capital's representations regarding its risk-management practices made to counterparties and their agents, including Gemini, were lies, a fact confirmed by Genesis's own CFO, Alice Chan during her July 24, 2024 deposition in the NY AG litigation. During her deposition, Ms. Chan testified that Genesis lacked basic risk management features such as a chief risk officer and that those failures caused Genesis's insolvency in the wake of the 3AC default:

> **Question:** What don't you agree with?
>
> **Chan (Genesis):** That our business operations continued to function normally [post 3AC collapse], that we had a strong risk management practice and framework[.]
>
> . . .
>
> **Question:** And you also mentioned that you believe the, we have strong risk management practices and frameworks, to be inaccurate. Why do you believe that that statement is inaccurate sitting here today?
>
> **Chan (Genesis):** Sitting here today if that would have been true, the Three Arrows situation could have been addressed or mitigated before it actually went default . . . . And I don't think at the time we had a – chief risk officer.

156. In truth, Genesis Global Capital's loan book was not over-collateralized, and was overly concentrated among a select group of counterparties. The below chart shows the approximate collateral coverage ratio for the following financial quarters:

| December 2020 | March 2021 | June 2021 | September 2021 | December 2021 | March 2022 | June 2022 | September 2022 |
|---|---|---|---|---|---|---|---|
| 60% | 87% | 71% | 85% | 90% | 61% | 76% | 66% |

**a. Genesis Was Overly Concentrated in Risky Counterparty 3AC**

157. Moreover, as it turned out, Genesis Global Capital was recklessly lending huge amounts to a counterparty, Three Arrows Capital, or 3AC.

158. Genesis Global Capital and Genesis Asia Pacific failed to conduct adequate due diligence on 3AC. Contrary to assurances to Gemini on February 18, 2022, that Genesis Global Capital reviewed its borrowers' "[m]ost recent financial statements with quarterly update cadence," neither Genesis Global Capital nor Genesis Asia Pacific had received audited financial statements from 3AC since July 2020. Genesis Global Capital and Genesis Asia Pacific also accepted from 3AC illiquid collateral to secure more than $500 million in loans.

159. This is borne out by June 13, 2022 messages sent between senior DCG leadership as news of 3AC's impending default on its obligations began to spread. After Kraines describes the situation, Defendant Silbert asks when DCG and/or Genesis received a balance sheet from 3AC, to which Defendants Kraines and Murphy say end of Q1, 2022. This prompted Defendant Kraines to admit "we were flying pretty blind imho[.]"

Michael Kraines 2022-06-13 08:31:08.680 AM

Barry just fyi TAC still has not shared over their balance sheet with us

Barry Silbert 2022-06-13 08:31:27.517 AM

when is the last one we got from them?

Michael Kraines 2022-06-13 08:31:43.170 AM

so far as I know March end

Mark Murphy 2022-06-13 08:32:05.253 AM

Yes end of Q1

Michael Kraines 2022-06-13 08:32:52.657 AM

we were flying pretty blind imho

### b. Genesis Was Overly Concentrated in Related Parties

160. From January 2022 through July 2022, DCG and its subsidiary, DCG International Investments, Ltd. ("DCGI"), collectively borrowed more than $800 million from Genesis Global Capital.

161. On January 24, 2022, Genesis Global Capital lent DCG $100 million in cash on an unsecured basis, with a stated maturity date of July 24, 2022.

162. Similarly, on February 23, 2022, Genesis Global Capital lent DCG another $100 million in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022.

163. During the period from January 2022 through May 2022, an entity called HQ Cash Management invested over $100 million with Genesis Global Capital:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-21 | | | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jan-22 | $ | - | $ | (1,000,000.00) | $ | (1,000,000.00 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Feb-22 | $ | (1,000,000.00) | $ | (1,004,554.79) | $ | (4,554.79 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Mar-22 | $ | (1,004,554.79) | $ | (1,011,297.69) | $ | (6,742.90 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Apr-22 | $ | (1,011,297.69) | $ | (1,018,813.16) | $ | (7,515.47 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | May-22 | $ | (1,018,813.16) | $ | (100,526,140.24) | $ | (99,507,327.08 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jun-22 | $ | (100,526,140.24) | $ | (1,197,327.65) | $ | 99,328,812.59 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jul-22 | $ | (1,197,327.65) | $ | - | $ | 1,197,327.65 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Aug-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Sep-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Oct-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Nov-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | 1/19/23 | $ | - | $ | - | $ | - |

164. HQ Digital appears to have served a single purpose: managing the personal wealth of Defendant Silbert and a select few other top DCG executives.

165. A Form ADV filed by HQ Digital entity HQ Investments LLC revealed that HQ Digital had four clients: one high net worth individual with over $3.6 billion AUM, and three pooled investment vehicles with a combined total of $8.1 million AUM:

| **Type of *Client*** | **(1) Number of *Client(s)*** | **(2) Fewer than 5 *Clients*** | **(3) Amount of Regulatory Assets under Management** |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | | ☐ | $ |
| (b) *High net worth individuals* | 1 | ☐ | $ 3,653,499,019 |
| (c) Banking or thrift institutions | | ☐ | $ |
| (d) Investment companies | | | $ |
| (e) Business development companies | | | $ |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 8,100,000 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | | ☐ | $ |
| (h) Charitable organizations | | ☐ | $ |
| (i) State or municipal *government entities* (including government pension plans) | | ☐ | $ |
| (j) Other investment advisers | | ☐ | $ |
| (k) Insurance companies | | ☐ | $ |
| (l) Sovereign wealth funds and foreign official institutions | | ☐ | $ |
| (m) Corporations or other businesses not listed above | | ☐ | $ |
| (n) Other: | | ☐ | $ |

166. Upon information and belief, the high net worth individual with over $3.6 billion AUM with HQ Digital reflected on the Form ADV was Defendant Silbert.

167. The Form ADV lists two "Control Person(s)" as controlling HQ Digital: Defendants DCG and Silbert.

168. HQ Digital managed the funds of Defendant Silbert and others via a series of limited partnerships named, *inter alia*, HQ Founders Liquidity Fund I LP, HQ Ecosystem Fund I LP, HQ Cash Management Fund LP, and HQ Enhanced Yield Fund LP, LP.

169. Bankruptcy filings show that the HQ Cash Management Fund invested extensively with Genesis Global Capital during the Class Period as HQ Digital sought to earn money for Defendant Silbert and other HQ Digital members.

170. From August 16, 2022, through November 16, 2022, nearly 50% of Genesis Capital's outstanding loans consisted of loans to its own affiliates, including hundreds of millions of dollars in unsecured loans to its own parent company, DCG.

171. As later revealed, Genesis's related-party unsecured lending to DCG had disastrous consequences when DCG failed to repay loans to Genesis.

**ii. Genesis Admits it was Insolvent No Later Than December 31, 2021 and Had a Duty to Investors to Detect and Disclose.**

172. In a verified complaint filed against Defendants, the Genesis estate admits that it was insolvent "no later than December 31, 2021."

173. According to Genesis, its transaction volume grew dramatically during the crypto boom in 2020 and 2021. In 2020, Genesis projected its revenue to grow by 1,000% within two years. Between the end of 2020 and the end of 2021, Genesis's loan exposure increased from approximately $4 billion to approximately $14 billion.

174. At the end of 2021, GGC's balance sheet purported to show just $425 million in book equity—an extraordinarily small amount of capital for GGC's approximately $14 billion dollar loan book. But even that number was inaccurate because it was calculated using the flawed risk methodology at Genesis. As demonstrated above, the risk infrastructure at Genesis was practically non-existent and did not scale with its loan book. Genesis's lending practices—which were directed and controlled by DCG with acquiescence from Moro—were risky in the extreme. There were no meaningful risk management policies, infrastructure, or oversight at Genesis, which meant Genesis regularly operated with limited liquidity reserves, high levels of exposure to market volatility, and a small number of highly correlated counterparties. Moreover, significant market movements were common in the crypto industry. In periods of increased volatility, Genesis's loan

counterparties, the collateral provided by those counterparties, and Genesis's funding sources were likely to experience elevated risk at the same time.

175. When adjusted for the actual and known risks associated with the Genesis loan book, according to Genesis, GGC's equity was negative and Genesis was insolvent by December 31, 2021, if not earlier. GAP was likewise insolvent. Its reported book equity of $91 million was wildly inaccurate, as a true fair market valuation that properly adjusts for these market realities shows GAP was insolvent by December 31, 2021, if not earlier. Indeed, by December 31, 2021, if not earlier, Genesis was insolvent by any measure—whether analyzed using the balance sheet test (a deficiency of assets below liabilities with no reasonable prospect that the business can continue as a going concern), a cash flow analysis (based on the companies' abilities to pay their debts), or a capital adequacy analysis.

176. As described in detail above, DCG knew of Genesis's insolvency—indeed, DCG, Silbert, Kraines, Murphy, and Moro drove Genesis to insolvency. In 2020, they received Friedman's audited financials identifying serious risk control failures at Genesis. Over the course of 2021 and early 2022, DCG's reputable third party Project Euclid consultants and Oliver Wyman concluded and reported to DCG that Genesis was severely undercapitalized and unable to withstand reasonably foreseeable market volatility and credit risk. These independent third parties raised concerns with DCG that "risk governance was not well defined," warned DCG of potential "break the business" scenarios, and told DCG that Genesis was "undercapitalized when compared to publicly available information about other crypto lenders." DCG knew about significant, easily identifiable balance sheet and operating deficiencies, such as extreme counterparty concentration and high unsecured exposure, excessive leverage, and significant wrong-way and altcoin collateral risk. DCG operated Genesis with significant counterparty underwriting and risk management

deficiencies and even violated their own flawed policies, including by having delayed and ad hoc process for margin calls, violating collateralization limits, and breaching concentration limits. There were audit weaknesses, about which DCG would have known as Genesis's sole equity-holder. And widely available rating agency guidelines for non-bank financial institutions considered these same factors in preparing ratings assessments. These assessments also confirmed that Genesis inappropriately relied on a small number of lender counterparties, primarily Gemini Earn Program participants and Bitvavo, to source the liquidity it used to operate its own lending business. This concentration of funding sources exposed Genesis to significant liquidity risks: if one of those two critical counterparties lost confidence in Genesis, it could call a huge volume of open term loans to Genesis, triggering a run on the bank, and devastating the Genesis loan book.

177. The Genesis Yield Investment Contracts, and specifically the Representations and Warranties Section, imparted a duty on Genesis to detect and disclose insolvency to its lenders, such as Plaintiff Gowda and members of the Class.

178. Defendants DCG, Silbert, Murphy, and Moro had a duty to act, to the extent they chose to act in concert with Genesis and on behalf of Genesis, consistly with Genesis's duties and obligations under those agreements. Instead, DCG, Silbert, Kraines, Murphy, and Moro prioritized DCG and Silbert at the expense of Genesis and its lenders like Plaintiff Gowda and members of the Class. DCG, Silbert, Kraines, Murphy, and Moro did so through their imprudent operation of Genesis's lending business, by treating Genesis as DCG's de facto treasury, and by their blatant self-dealing conduct designed to defraud Genesis creditors when 3AC and Alameda inevitably collapsed in 2022, described below.

**iii. 3AC and Babel Finance Default on Genesis Loans.**

179. In the days leading up to June 13, 2022, 3AC was the Genesis Entities' second-largest borrower. Although 3AC nominally borrowed from Genesis Asia Pacific, Genesis Global

Capital used Genesis Asia Pacific as a pass-through entity to lend its own assets to 3AC. Genesis Asia Pacific's loans to Three Arrows were open-term and callable by Genesis Asia Pacific. 3AC paid between 8-15% interest on these loans.

180. On June 13, 2022, 3AC defaulted on billions in loans from Genesis Asia Pacific. As a result of this default, Genesis Asia Pacific (and thus, the Genesis lending business generally) incurred a loss of approximately $1 billion in open-term, on-demand assets. Around the same time as 3AC's default, Genesis Global Capital also incurred more than $100 million in losses arising from the default of another borrower, Babel Finance.

181. The losses from 3AC and Babel created negative equity value at the Genesis Entities and created a deficit in the open-term assets available to repay Genesis Yield investors. Genesis Global Capital's internal documents stated that these losses opened a $1.1 billion structural hole in Genesis Global Capital's loan book.

### B. DEFENDANTS' FRAUDULENT SCHEME TO COVER-UP THE EQUITY HOLE AT GENESIS GLOBAL CAPITAL.

182. As of June 13, 2022, as a result of the 3AC and Babel defaults, Genesis Global Capital's liabilities exceeded its assets by approximately $1.1 billion. In other words, the Company was insolvent.

183. Genesis Global Capital's insolvency constituted an "Event of Default" under the Genesis Yield Investment Agreements:

> **VII. Default**
>
> It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":
> . . .
>
> (d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to

> abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;
> …
>
> (f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

184. As Defendants were aware, the Genesis Yield Investment Agreements provided that if an Event of Default (as defined above) occurred, lenders such as Plaintiff Gowda had the right to "declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable" and if the Event of Default persisted for 30 days or more, terminate the agreement.

185. As described in further detail below, knowing that the recall of loans or termination of the Genesis Yield Investment Agreements would be the end of Genesis Global Capital, Defendants engaged in a scheme which ultimately directed and caused Genesis Global Capital to conceal its insolvency in order to induce Plaintiff Gowda and members of the Class not to recall their loans or to make new loans to Genesis Global Capital.

186. Accordingly, following 3AC's default on June 13, 2022, Defendants engaged in a scheme to misrepresent the true financial condition of Genesis Global Capital (*i.e.*, conceal Genesis Global Capital's insolvency) from lenders such as Plaintiff Gowda who had loaned digital assets to Genesis Global Capital.

187. Defendants' scheme was intended to, and did, conceal Genesis Global Capital's insolvency and thereby induced investors such as Plaintiff Gowda and class members to continue loaning digital assets to Genesis Global Capital and to prevent Plaintiff Gowda and class members from calling their outstanding loans.

188. During the Class Period, representatives of DCG and Genesis Global Capital, including Silbert, normally met weekly via Microsoft Teams. However, following 3AC's default,

these meetings occurred daily, sometimes multiple times per day, with Silbert frequently personally participating. In these daily meetings, Defendants discussed how Genesis Global Capital should communicate with lenders such as Plaintiff Gowda, members of the Class, and their agents such as Gemini.

189. Defendant Silbert immediately recognized the problems that Genesis and DCG collectively faced, stating on June 13, 2022 that 3AC's default would "blow[] a $500mm to $1 billion hole in the Genesis balance sheet", likely sparking a run on Genesis "unless DCG tried to fill that hole," that but that "we don't have the capital to do so[.]"

Barry Silbert 2022-06-13 05:26:07.240 PM

we need to be prepared for a scenario where TAC blows a $500 mm to $1 billion hole in the Genesis balance sheet. which will result in everybody pulling their mon ey out of genesis capital that can

Barry Silbert 2022-06-13 05:26:40.560 PM

unless DCG tried to fill that hole, but we don't have the capital to do so

190. Defendant Silbert then opined that since DCG did not have the capital to rescue Genesis, this scenario meant "probably means [DCG] jettison[s] genesis capital." But Defendant Silbert recognized the problems "jettisoning" Genesis would cause for DCG (and himself personally), as he admitted "but DCG has borrowed USD and BTC from genesis, so not sure how that will play out[.]"

Barry Silbert 2022-06-13 05:26:59.607 PM

which probably means we jettison genesis capital

Barry Silbert 2022-06-13 05:27:23.100 PM

but DCG has borrowed USD and BTC from genesis, so not sure how that will play out

191. From June 13, 2022, through July 2022, DCG employees and executives (including Silbert and DCG's COO [Defendant Murphy] met with Genesis Global Capital's leadership daily, often multiple times a day. During these meetings, DCG and Genesis Global Capital employees,

agents and principals discussed how to communicate with counterparties about 3AC, and how to bolster the Genesis Entities' financial condition in the wake of these losses. During the same period, DCG's COO [Defendant Murphy] and DCG's Head of Communications [Amanda Cowie] helped draft talking points documents for use by DCG and Genesis Global Capital personnel in conversations with counterparties.

192. On June 13, 2022, Silbert directed Moro and COO [Defendant Murphy] to lead the company's response to the 3AC situation "with support and guidance from DCG" and asked that defendants Moro and Islim attend a "DCG board update and strategy called" scheduled for June 14, 2022.

193. Moro responded to Silbert by saying: "Derar [Islim] and I are involved every step [sic] of what has been happening . . . We will manage through this with help from you and DCG." Moro reported that these steps included "drafting both internal and external talking points on the [3AC] situation as needs arise."

194. On June 13, 2022, Silbert reported to DCG's board that 3AC defaulted and that Genesis Global Capital's "unsecured exposure," or expected loss at the time, was "uncomfortably big (well over $500 mm now)" and that "[t]hings have continued to deteriorate all around," including "the situation with [3AC]", and that as a result, Silbert was expecting a "bank run."

195. Silbert went on to explain that some of the collateral provided by 3AC was illiquid as it consisted of shares of the GBTC issued by DCG-subsidiary Grayscale, which Genesis Global Capital could not liquidate due to restrictions on sales of stock by the issuing company's affiliates. Accordingly, Silbert informed the board that he was "starting to think about bringing in equity partners directly into Genesis," showing concern for Genesis's equity balance sheet, and stating "[e]verything needs to be on the table" regarding financing.

196. On June 13, 2022, Defendant Silbert wrote to Genesis Global Capital's management team: "Just want to make sure everybody is clear that Genesis [Capital] is not to sell th[e] [GBTC] shares or enter into any transaction without consulting with me first."

197. Also on June 13, 2022, Defendants caused the Company to tweet and Defendant Moro to repost the following tweet that falsely represented that Genesis has "strong risk management practices and frameworks":




https://x.com/GenesisTrading/status/1536360521682849792?s=20

198. However, things were much different behind the scenes. Genesis Global Capital's Head of Trading Matthew Ballensweig was "nervous and rattled … and [wasn't] entirely thinking straight" according to Defendant Moro, who agreed to help Ballensweig "shore up liquidity."

199. For example, according to sworn testimony and evidence in *U.S. v. Sam Bankman-Fried*, on or around June 13, 2022, Ballensweig in a Telegram chat with executives from Alameda, including Caroline Ellison ("Ellison") asked Alameda to return hundreds of millions loaned to Alameda by Genesis Global Capital on an open-term basis: "hey, guys - seeing a fair amount of continued outflows from retail deposit aggregators, so to get ahead of this, we're going to increase the OT [open term] loan pullback to $400 million. Can you please let us know once the first batch and second batch are sent. Do we have an ETA on the first 250 million?"

200. On June 14, 2022, in advance of a strategy call with the DCG board and Genesis Global Capital personnel Moro, Islim, and others, Silbert emailed the DCG' board of directors regarding Genesis Global Capital's strategy after the 3AC default. In the email, Silbert presented the option to "[j]ettison[] the Genesis Capital business" by not supplying the Company with additional capital to strengthen its balance sheet, an admission that Genesis Global Capital as it currently stood was unable to withstand continued withdrawals because it was insolvent. Silbert also set forth two additional options, the first being to "support Genesis" by helping Genesis Global Capital to "stabilize its balance sheet, and the second being to fire Genesis's CEO Moro with Silbert himself replacing him as CEO of Genesis, while raising pre-IPO capital to "further strengthen the balance sheet, or down the road once things have stabilized." All three options discussed in this email (jettisoning Genesis Global Capital, supporting Genesis Global Capital with additional capital, and firing Moro with Silbert himself raising capital) were premised on the fact that Genesis Global Capital was insolvent and unable to meet its obligations.

201. And on June 14, 2022, Silbert, on behalf of DCG's board instructed that Moro and Genesis Global Capital deviate from its normal lending operations and "continue aggressively shrinking the loan book and, until such time as we have the right controls, risk monitoring, etc. in place—and we're through the winter—… to limit the extension of any new loans to counterparties." Of course, as discussed elsewhere herein, Defendants had repeatedly assured Gemini, agent for hundreds of thousands of class members, that Genesis Global Capital already had these controls and risk monitoring procedures in place.

202. At the same time, Ballensweig and his colleagues were falsely assuring concerned Genesis investors that they had their exposure to 3AC handled. For example, Ballensweig and

Genesis investor John Glover, CEO and founder of LEDN had the following exchange on June 14, 2022:

> **John Glover <1766227599>** 6/14/2022, 10:29 AM
> @mballen4791 @HamillGenesis given all of the rumours circulating about 3AC, I wanted to check to see if you have any exposure to them which may be cause for concern, or have they been meeting margin calls?
>
> **Matt Ballensweig <652078250>** 10:43 AM
> hey @John_Glover - definitely a lot of rumors out there - we're actively managing our exposure to TAC through this, have a lot of asset recourse and liquid collateral on hand - not concerned about our overall position with them as a CP. Generally, we still have robust capital on hand, just managing daily ebs/flows of book etc, but generally business as usual.

203. Simon Johansen of Jump Trading and Genesis's Leroy Lin had the following exchange on June 15, 2022 in which Lin parrots verbatim Ballensweig's messaging:

> **simon johansen <617665163>** 6/15/2022, 1:09 AM
> Hi team - any exposure to 3AC?
>
> **Leroy Lin <165112378>** 1:09 AM
> Hi Simon
>
> **Leroy Lin <165112378>** 1:11 AM
> Totally understand you inquiring - definitely a lot of rumors out there - we're actively managing our exposure to TAC, have a lot of asset recourse and liquid collateral on hand - not concerned about our overall position with them as a CP. Generally, we still have robust working capital on hand, just managing daily ebbs/flows of book etc, but business as usual.
>
> Most all of the exposure there was secured in liquid collateral that we can sell/hedge and any residual exposure we have recourse through to against the general assets held in the fund. We're actively monitoring, but feel good about the overall position and ability to collect in the event we have to on any loss we realize.

204. These efforts by Genesis's Ballensweig and Lin continued, as evidenced by the following exchanges:

> **K S <399811535>** 6/15/2022, 4:55 AM
> Has Genesis been affected by 3 arrows collapse?
>
> **Leroy Lin <165112378>** 4:56 AM
> Hi @KS_Ascent
>
> **K S <399811535>** 4:56 AM
> Hi
>
> **Leroy Lin <165112378>** 4:57 AM
> Totally understand you inquiring - definitely a lot of rumors out there - we're actively managing our exposure to TAC, have a lot of asset recourse and liquid collateral on hand - not concerned about our overall position with them as a CP. Generally, we still have robust working capital on hand, just managing daily ebbs/flows of book etc, but business as usual.
>
> Most all of the exposure there was secured in liquid collateral that we can sell/hedge and any residual exposure we have recourse through to against the general assets held in the fund. We're actively monitoring, but feel good about the overall position and ability to collect in the event we have to on any loss we realize.

205. On June 15, 2022, Defendants Silbert, Moro, Islim, Kraines, as well as Ballensweig and others strategized on how to proceed in a Microsoft Teams chat and agreed that the group

needed to prioritize concealing Genesis's financial condition from lenders such as Plaintiff Gowda and class members, as well from as the public. For example, in the June 15, 2022 Teams Chat, in advance of a call regarding the 3AC default, Ballensweig and Moro had the following exchange regarding leaking Genesis's overall financial health:

> **BALLENSWEIG**: we need to still be very cautious about what we say and how we sat it, we don't know theyre not recording . . . I know I sound like a conspiracy theorist but Im very concerned about any leakage of our overall net position
>
> **MORO**: I agree with the caution. Happy to join.

206. Later in the same June 15, 2022 Microsoft Teams Chat, Ballensweig shared the following "good news," highlighting the importance of Gemini Earn lenders to Genesis Global Capital's financial health and the group's belief that and willingness to perpetuate the false notion that Genesis Global Capital was in good financial health:

> **BALLENSWEIG**: good news is this:
> **BALLENSWEIG**: From Gemini: the rate of redemptions has been slowing since 6/13 at 10: 00 pm
> **MARK MURPHY**: Great
> …
> **BALLENSWEIG**: weve been defen[d]ing the castle all night and day on phone with depositers, prosepcts etc [sic]
> **SILBERT**: is there anything we/DCG can do to further install confidence in Genesis?
>
> **BALLENSWEIG**: it ultimately comes down to our ops/processing etc, as people see our responsiveness, word spreads fast. We have some portcos that have wanted to hop on calls today – I just woke to Wyre, we're speaking with Decentraland etc so if they triangulate with you, you can just reaffirm our position etc.
> **SILBERT**: great … marcus says that the word on the street is that genesis is the "blue chip" in this mess . . . we need to perpetuate that of course
> **BALLENSWEIG**: yes definitely

207. Consistent with Silbert's instructions to perpetuate the false notion that Genesis Global Capital was in good financial condition and "blue chip," on June 15, 2022 the Genesis Entities tweeted via their shared Twitter account:




208. Defendants Silbert, DCG, Murphy and Kraines, and Ballensweig re-tweeted this statement on June 15, 2022 that falsely represented that Genesis Global Capital's balance sheet was "strong" when at that time it had massive unsecured exposure to 3AC. Far from "operating normally," the Defendants knew, or at least recklessly disregarded, that Genesis Global Capital was facing a "bank run."

209. To that end, Genesis employee Michael Paleokrassas told the group in the June 15, 2022 Microsoft Teams the following:

> **PALEOKRASSAS**: Just heard from Josh B, he said that multiple clients have stated that our tweet helped them get comfortable and keep their loans to us."

210. Similarly, internal documents from Gemini indicate that several Gemini Earn investors expressed being reassured by public communications that Defendants caused to be made on behalf of Genesis Global Capital.

211. This was further echoed by DCG employee Matthew Kummel in messages to DCG's Amanda Cowie, who stated that she had worked with Genesis, or as she put it "collab'd" on the tweet:

Matt Kummell 2022-06-15 04:47:30.073 PM

Genesis tweeted earlier and I heard that it was good and settling for clients.

Amanda Cowie 2022-06-15 04:47:36.513 PM

we collab'd

212. On June 16, 2022, Defendant Moro and a managing director at Genesis Global Capital discussed "how to think about the equity hole on the [Genesis] balance sheet and plan to minimize that." Yet, on June 17, 2022, Defendant Moro tweeted the following:

**Michael Moro** @michaelmoro · Jun 17, 2022
Replying to @michaelmoro
3/Genesis can confirm that we carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call to us earlier this week. No client funds are impacted. We sold and/or hedged all of the liquid collateral on hand to minimize any downside.
9 109 511

**Michael Moro** @michaelmoro · Jun 17, 2022
Replying to @michaelmoro
4/We will actively pursue recovery on any potential residual loss through all means available, however our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on.
9 34 406

https://x.com/michaelmoro/status/1537822426536546306?s=20;

https://x.com/michaelmoro/status/1537822427790680066?s=20

213. Also on June 17, 2022, Defendants DCG, Kraines, and Ballensweig reposted Defendant Moro's twitter thread:

**Matt Ballensweig** @... · 6/17/22
A very important thread from our CEO at @GenesisTrading during a critical time in institutional crypto market history. The leaders of this space need to band together to set the industry standard. Onwards and upwards.

> **Michael Moro** @mi... · 6/17/22
> 1/While our policy is to never address specific client activity, we think it's prudent to provide clarity and transparency to the market in times of great volatilit...

Michael Kraines reposted
**Michael Moro** @michaelmoro Follow

1/While our policy is to never address specific client activity, we think it's prudent to provide clarity and transparency to the market in times of great volatility and speculation. We want our counterparties and clients to know the following:

11:40 AM · 6/17/22

Digital Currency Group reposted
**Genesis** @GenesisTrading Follow

Please see this thread from Genesis CEO, @MichaelMoro⤵️

> **Michael Moro** @michaelm... · 6/17/22
> 1/While our policy is to never address specific client activity, we think it's prudent to provide clarity and transparency to the market in times of great volatility and speculation. We wan...

11:45 AM · 6/17/22

214. DCG's COO [Defendant Murphy] reviewed and edited these tweets before Moro posted them. In strategizing the release of the tweets, DCG's COO [Defendant Murphy] directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Global Capital's compliance department that these tweets should come from the Genesis Entities corporate account. The Genesis Entities reposted Moro's tweets that same day.

215. Defendant Murphy confirmed his direct involvement in this thread of tweets, the intent behind them, and his belief that they had successfully convinced investors not to pull their money to Defendant Kraines:

| Mark Murphy | 2022-06-17 10:44:02.847 AM |
|---|---|
| Genesis is putting out a tweet thread shortly. I worked with them on it and I think it looks good. Should have a calming effect as they keep getting requests from cli ents. | |

| Mark Murphy | 2022-06-17 10:44:17.393 AM |
|---|---|
| will come from Moro's account | |
| Mark Murphy | 2022-06-17 10:44:37.860 AM |
| And would be good foe barry to rt | |

Mark Murphy 2022-06-17 11:42:23.453 AM

Moro tweet is up

Mark Murphy 2022-06-17 11:42:39.543 AM

I'll keep you posted about pissible DCG and Barry RT

Mark Murphy 2022-06-17 11:53:59.293 AM

Tweet has been very well received

Mark Murphy 2022-06-17 11:54:09.623 AM

Both on Twitter and in private communications

216. Murphy then went on to confirm that DCG employee Matthew Kummell had been deputized to personally intervene and work with Genesis's risk team in responding, and that the risk team had been operating deficiently ("there is a lot of low hanging fruit"):

Mark Murphy 2022-06-17 01:31:22.347 PM

Just a heads up that Kummell has been fantastic stepping in with the Risk team at Genesis. He said there is tons of low hanging fruit to improve analysis, communic ation and reporting, and beleives he'll have us in a better spot by Monday.

217. Similarly, in a June 17, 2022 phone call with Gemini's risk management personnel, Managing Director No. 1 [Ballensweig] stated, "Genesis remains solvent and operates [business as usual] at the moment. With the strong [loan book] and capital support from DCG, Genesis has no concerns on business operations." In the same call, Managing Director No. 1 further stated, "Genesis experienced a certain amount of losses from the liquidation, but will absorb the losses using its own balance sheet."

218. After the call with Gemini, Silbert and DCG's COO [Defendant Murphy] were updated that same day that Gemini "asked hard [questions] about [3AC]," but that Managing Director No. 1 "fended it off."

219. The tweets and statements to Gemini set forth above were false and misleading in at least five ways.

220. First, client funds had been impacted—the 3AC losses severely impaired Genesis Capital's ability to repay its counterparties, including Earn investors.

221. Second, due to 3AC's default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity, a fact well known by Defendants and Ballensweig.

a) For example, just one day after the Gemini call, Defendants were working behind the scenes to get a handle of their total losses which, remarkably, Genesis was unable to do easily despite the representations it had made to Gemini and others regarding its current solvency and past risk management practices. During this exercise, Defendants confirmed that when accounting for all of Genesis's positions, Genesis was insolvent, or "mega negative" by "half a billion" as Defendant Kraines. For his part, Defendant Moro pegged to total equity hole at approximately $800 million on June 18, 2022:

Michael Kraines 2022-06-18 09:53:07.777 PM

honestly I don't know - but if we satisfied all claims and monetized all assets, would we be big black, big red, or middle

Michael Kraines 2022-06-18 09:53:15.293 PM

for all GenCap?

Derar Islim 2022-06-18 09:53:15.623 PM

Maybe around 420 now

Michael Kraines 2022-06-18 09:53:20.153 PM

positive or neg?

Derar Islim 2022-06-18 09:53:39.140 PM

Positive without TAC or Babel

Michael Kraines 2022-06-18 09:53:59.433 PM

ah, so mega negative with them in

Michael Kraines 2022-06-18 09:54:24.907 PM

like a half billion?

Derar Islim 2022-06-18 09:54:58.123 PM

-0.5B with the hedges

Michael Kraines 2022-06-18 09:55:17.247 PM

if it were like $200mm the optics would be so much better

Derar Islim 2022-06-18 09:55:18.093 PM

I can't believe we are talking about this

Michael Kraines 2022-06-18 09:55:25.737 PM

nor can I

Derar Islim 2022-06-18 09:58:09.477 PM

0.5B might become the magical number

Michael Kraines 2022-06-18 09:58:59.490 PM

still better than some ambiguous billion or two

Michael Kraines 2022-06-18 09:59:10.667 PM

known better than unknown

Derar Islim 2022-06-18 10:38:29.103 PM

-800mm my rough calculations

b) Further, just one day later and two days after Ballensweig made those statements, on June 19, 2022, Ballensweig sent the following messages to Defendant Islim regarding Genesis's financial condition:

Matt Ballensweig <652078250> 2:04 PM

we need to immedaitely disucss revenue/keeping the lights on and also how to deal with the balance sheet hole from an opics perspective while we work thought this

Matt Ballensweig <652078250> 2:04 PM

people want to see what our balance sheet looks like post loss

Matt Ballensweig <652078250> 2:06 PM

I mean were losing about $2mm/mo right now on NIM and trading isnt making money

Matt Ballensweig <652078250> 2:06 PM

$2B of cash earning nothing for us

Matt Ballensweig <652078250> 2:06 PM

and we cant return to lenders cause its gone

Matt Ballensweig <652078250> 2:06 PM

once we get cash infusion we'll be operating again at positive NIM

Matt Ballensweig <652078250> 2:07 PM

but when you just cease to earn on $2b obviously its tough to make money

Matt Ballensweig <652078250> 2:08 PM
so 850mm balance sheet hole

c) And on June 20, 2022, Genesis CFO Alice Chan informed Defendant Kraines that via email of calculations which pegged the equity hole at $980 million based on the price of their illiquid GBTC collateral:

**GGC and GAP equity analysis and proposal**

**From:** Alice Chan
**Sent:** Monday, June 20, 2022 7:27 PM
**To:** Michael Kraines <michael@dcg.co>
**Cc:** Michael Moro <mmoro@genesistrading.com>; Derar Islim <DIslim@Genesistrading.com>
**Subject:** GGC and GAP equity analysis and proposal

Hi Michael,

Attached please find the updated equity analysis as of tonight. The new proposed equity infusion is approximately $980mm. This reflects the current market value of the GBTC shares.

Thanks,
Alice

d) In short, the Defendants themselves all uniformly acknowledged that the 3AC default had left Genesis with a massive "equity hole" ranging from $500 million to $980 million. In other words, Genesis was insolvent by that amount. Genesis's insolvency, recognized by Defendants, breached their investment contracts with investors, but Defendants and Genesis continued to conceal it from them.

e) Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us."

f) During this time, Defendant Silbert reached out to investment funds Ribbit and Fortress to discuss the firms investing in Genesis to rescue the business. Ribbit was given access to Genesis's financial data and on June 22, 2022 Ribbit provided a memo to DCG executives, including Kraines, that laid out

Ribbit's "honest assessment of the situation." Ribbit's assessment of Genesis's dire financial state was stark, and Ribbit identified several of the issues that Friedman, S&C, Goodwin, and Oliver Wyman had already identified for DCG. Ribbit opined that "Genesis [was] currently facing a severe liquidity crisis, and secondly an equity capital problem." Ribbit pointed out that Genesis would "need to be re-capitalized and likely restructured to operate as a viable going concern post August 2022." Ribbit accurately saw that "the reality [was] that Genesis [was] undercapitalized to the tune of $1B+" and that the "true equity capital hole could be upwards of $1.5-$2B" given the "value of alternative coin collateral (FTT & SRM) and that GBTC [was] marked at NAV vs. market value." Ribbit also "believe[d] there [were] material deficiencies in how DCG/Genesis [was] operating from a risk perspective." Ribbit was "not sure if the current Genesis [was] well-suited to run a large, diversified risk-taking business … based on the level of undercollateralized risk, the type of lending, and the risk management infrastructure that was described … by both Genesis and DCG." These were only some of a "host of other core procedural and infrastructure-related issues" that Ribbit identified.

g) Also on June 22, Silbert spoke with the investment management firm Fortress. Apparently taking a slightly different tack than he did with Ribbit, Silbert lied to Fortress and represented that "Genesis ha[d] a ton of liquidity and [was] operating as normal." Silbert shared his misrepresentations to Fortress with Murphy, Kraines, and several Genesis executives, including

Moro, Ballensweig, and Chief Legal Officer ("CLO") Arianna Pretto-Sakmann. Murphy agreed the language was "good messaging for the Genesis team to use." Moro dutifully responded, "100 percent."

h) But lying became harder and harder to do, as evidenced by a message sent by Defendant Murphy in a message to the group in which he shared a message sent by a Genesis employee in which the employee expressed it was getting "a bit hard to keep on saying nothings wrong…":

> Mark Murphy 2022-06-24 06:23:25.183 AM
>
> Marcus sent this to me and Barry:
>
> Just FYI this tweet is now doing the rounds. I'm getting a lot of questions from my team and it's a bit hard to keep on saying nothings wrong...
>
> https://twitter.com/FatManTerra/status/1539974901464895490?s=20&t=NJEtE5px3RRii3QdYaDaDQ

i) Nevertheless, three days later Silbert issued instructions to keep lying and say that, despite the above acknowledgements, "Genesis is sitting on a ton of liquidity and has a strong balance sheet and it's ability to meet withdrawals is totally fine right now", further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.

Barry, marcus and Michael >
4 participants

Chat Files More

We've been doing multiple daily calls with the Genesis sales and trading teams, and the message from the market has been consistent: everyone knows Genesis took a big hit, but everyone believes Genesis was equipped to sustain that loss. None of our counter-parties have panicked and outflows have slowed significantly.

That said...it's still a precarious situation so we need to be careful not to share too much internally

Barry S.

Yeah, and to further reinforce what mark said, Genesis is sitting on a ton of liquidity and has a strong balance sheet and it's ability to meet withdrawals is totally fine right now. We just can't allow people inside or outside question Genesis' solvency. A bank run on Genesis (or any of the players in the space - Blockchain, BlockFi, Voyager, Galaxy, etc) would have a pretty catastrophic on the industry and all of us

j) Meetings were scheduled with Ribbit and Fortress for June 27, 2022. The day before those meetings, Silbert sent the following message to his colleagues who were set to meet with these firms, acknowledging the meeting was to decide "whether Genesis should be saved as a business":

Barry Silbert 2022-06-26 06:44:52.390 PM

Hi guys, I just wanted to say good luck tomorrow with the Fortress and Ribbit teams. I know you're going to bring your A game. As you might have already conclud ed, the purpose of the meeting is more than just a deep dive into the Genesis balance sheet and
business. It is to answer the question as to whether Genesis should be saved as a business, let alone put more money into. I'm sure this is a question you are prep ared to answer -- and I'd certainly love to hear it too. Intuitively, I'd say, sure, there is
a huge opportunity to be the leading prime broker in the crypto space. But how do we back that up? How does the Genesis business need to change after this epis ode? In a world without Three Arrows as a client, significantly reduced exposure to Alameda, no Babel,
etc., what does Genesis actually look like from a P&L perspective once we're through this? What are the threats? What are the opportunities? How small do we nee d to make the team to rightsize and how do we do that successfully? I'm sure you have put thought
into all of this already and it is important that when you address this with them tomorrow, you provide a real honest assessment of where things are and where the y need to go -- with hopefully an optimistic future state that everybody can get excited about.
I look forward to hearing how you guys plan to address the fundamental question -- should Genesis be saved and why?

k) On June 27, DCG and Genesis executives met at Goodwin's offices to discuss an offer that Ribbit and Fortress had made to support Genesis.

Silbert did not agree with the low valuation Ribbit and Fortress had given Genesis, and turned down the financing offer. Notably, no one who viewed Genesis's financials during this time invested in Genesis.

222. Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.

223. Fourth, Genesis Capital had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to 3AC as an uncollectible asset on its balance sheet.

224. Fifth, Genesis Capital was not operating "business as usual;" the business was seeking to fill an equity deficiency and at Silbert's direction on June 14, 2022, limited the origination of new loans and started shrinking its loan book.

225. As a result of and in reliance on the statements made by Genesis to Gemini, Gemini continued to send Genesis Global Capital additional investor funds after June 17, 2022.

226. On or around June 20, 2022, in a Telegram chat with Alemeda executive Caroline Ellison, Ballensweig indicated that he discussed Genesis's loans to Alemeda with Sam Bankman-Fried and further indicated that Genesis sought repayment of $500 million loaned to Alemeda:

**BALLENSWEIG**: hey there - so spoke with Sam [Bankman-Fried] and I'm sure he filled you in——wouldn't be pushing you guys here if it wasn't totally necessary but we want to unwind $500 million in 250 clips. If you guys can show us what that's going to cost, it would be helpful, but we're basically in that position where this is no longer a luxury.

227. Ellison testified that Ballensweig told her that Genesis was experiencing recalls from its lenders and that she understood that Genesis needed Alemeda to repay $500 million in

loans from Genesis or that it "might go under"—directly contradicting Genesis Global Capital's representation that its balance sheet was "strong":

> Q. Can you just explain what you mean by recalls that Genesis was getting on their end.
>
> [Ellison] A. It meant Genesis was——the money that they were lending us, they were borrowing from others, including retail lending platforms, and customers were withdrawing their money from those platforms, so Genesis had to have a way to fulfill those withdrawals, and that's why they needed their money back from us.
>
> Q. This refers to speaking with Sam. What, if anything, did the defendant [Sam Bankman-Fried] tell you about his call with Matt Ballensweig?
>
> [Ellison] A. He told me that he talked to Matt and that Matt said that Genesis really needed the money and implied that they might go under or have to default on some loans if they didn't get it . . . .

228. Silbert's focus on concealing Genesis's insolvency (or "equity hole") to maintain the false perception of Genesis Global Capital's financial health is further highlighted in a June 21, 2022 instant messaging thread in which Silbert indicated he had told a new employee the following:

> **SILBERT**: "-our industry is in the midst of a healthy cleansing and deleveraging, but it is painful and nobody has been. spared, even us
>
> -across DCG and Genesis we have about —$2 billion of liquidity, but that is precious right now and we are in bunker mode and not deploying in order to be able to withstand whatever negative event comes next
>
> - we are all focused on making sure that the trust and confidence in Genesis remains high because we can't risk money leaving Genesis and depleting our liquidity - once we get through this, the Genesis access to low priced capital via the institutional investor and retail channel like Gemini is going to give us a major competitive advantage in a market where there is limited liquidity and will help power the next stage of investing
> …
> - what I didn't say, which we need to keep between us, is that even though our liquidity is super super strong right now, ***the hole in Genesis equity due to the Three Arrows exposure is something they we will need to fill by 6/30***. It is my sense that DCGI will play a role here in addressing the hole, hopefully temporarily, through the pledge of assets or if need be, the

> downstream of certain/all assets until prices recover. The challenge is we don't know what will be the recovery on the Three Arrows claim, or what will be the BTC price on 6/30, so it is difficult to calculate the hole. We're trying to come up with as many options as possible. This is super confidential/sensitive stuff, so please don't share with anybody, including Daniel, ***until he is in the circle of trust.***"

(Emphasis added).

229. On June 24, 2022, Silbert reiterated to colleagues that "[w]e just can't allow people inside or outside [to] question Genesis' solvency."

230. On June 27, 2022, Genesis Global Capital's then CEO, Moro, emailed DCG and Genesis Global Capital executives, explaining the need to show a "well-capitalized" balance sheet to counterparties like Gemini on June 30, 2022:

> Once the equity problem is solved, the liquidity problem is much easier to solve. I think we'll find people to lend us additional [cryptocurrency] with a well-capitalized 6/30 balance sheet.
>
> And yes, at some point, our losses in [3AC] and potentially Babel will become public. But if we're able to show our balance sheet after all of that happened and it still looks strong, I think that 1) people will care less about the losses and 2) we'll be better able to operate from a place of strength going forward.
>
> But as I told Barry this evening, we have a lot of work to do before we can get back to full-steam-ahead on lending. Better to think of it in wind-down mode for the time being, and just manage liquidity as loans roll off. Then we can look to rebuild.

231. In a June 28, 2022 email, Moro wrote to Silbert that he had discussed with other Genesis Capital representatives how to "best fill the equity hole," euphemistically referring to the Genesis Entities' negative equity value caused by the more than $1 billion in losses. Moro wrote that "[w]hile liquidity [was] still [Genesis Capital's] number one focus, [they] only ha[d] a couple of days until quarter-end." Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro continued:

> We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] … for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.

232. At this time, the Earn investors were one of Genesis Global Capital's largest sources of unsecured funding.

233. Silbert responded: "It is certainly our hope and intention to help Genesis address the equity-hole—hopefully by 6/30. To that end, the Genesis team should be working 24/7 with DCG and [DCG's subsidiary, DCG International Investments, Ltd.] teams to figure out all possible ways to do so along the lines" outlined in Moro's email.

**i. 3AC Declares Bankruptcy.**

234. On June 27, 2022, 3AC was required to liquidate its assets by a British Virgin Islands court following default on several of its liabilities. Subsequently, on July 1, 2022, 3AC sought Chapter 15 bankruptcy protection within the United States Bankruptcy Court for the Southern District of New York.

235. 3AC's bankruptcy filings revealed it had procured billions in loans from Genesis Global Capital. As of July 1, 2022, 3AC was indebted to Genesis Global Capital to the tune of approximately $2.3 billion. Post-liquidation, 3AC's outstanding obligation to Genesis Global Capital was $1.1 billion.

236. Because 3AC also owed other creditors billions of dollars, Genesis Global Capital would not recover any amount close to the $1.1 billion outstanding, which should have resulted in an immediate recognition of a substantial impairment of the 3AC debt on Genesis Global Capital's balance sheet.

237. The insolvency of 3AC sent shockwaves through the digital asset market, inducing a credit crunch that detrimentally impacted digital asset companies like Genesis Global Capital

and its competitors. This crisis led to several of Genesis Global Capital's competitors filing for bankruptcy protection or seeking emergency lines of credit, reflecting the severity of the resultant turmoil.

### ii. Defendant Silbert Saves DCG and Himself by Draining Liquidity from Genesis.

238. At the same time as Genesis was, in effect, insolvent and facing an "equity hole," starting in June 2022, Silbert and DCG began extracting liquidity from Genesis Global Capital despite Silbert's own acknowledgment of the perilous financial condition the Company was in.

239. Remarkably, on or about June 18, 2022, Genesis Global Capital lent approximately 18,697 bitcoin (valued at over $355 million as of June 18, 2022) to affiliate, DCGI, on an open-term basis which *reduced* Genesis's liquidity when every communication acknowledged the need to *improve* Genesis's liquidity to meet withdrawals.

240. Further, Genesis Global Capital bankruptcy filings show that in June and July of 2022, Defendant Silbert personally extracted over $100 million of personal capital he had invested with Genesis Global Capital via HQ Cash Management Fund LP by recalling investments HQ Cash Management Fund LP had made in Genesis Global Capital:

| | | | | | |
|---|---|---|---|---|---|
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-21 | | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jan-22 | $ - | $ (1,000,000.00) | $ (1,000,000.00) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Feb-22 | $ (1,000,000.00) | $ (1,004,554.79) | $ (4,554.79) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Mar-22 | $ (1,004,554.79) | $ (1,011,297.69) | $ (6,742.90) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Apr-22 | $ (1,011,297.69) | $ (1,018,813.16) | $ (7,515.47) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | May-22 | $ (1,018,813.16) | $ (100,526,140.24) | $ (99,507,327.08) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jun-22 | $ (100,526,140.24) | $ (1,197,327.65) | $ 99,328,812.59 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jul-22 | $ (1,197,327.65) | $ - | $ 1,197,327.65 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Aug-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Sep-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Oct-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Nov-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | 1/19/23 | $ - | $ - | $ - |

Capital withdrawn

241. Bankruptcy filings show further that other DCG and Genesis Global Capital insiders were extracting hundreds of millions of dollars' worth of capital from Genesis Global

Capital by redeeming their investments. The following two charts show that other Defendant DCG, Genesis Global Capital and GGT insiders extracted millions out of Genesis Global Capital:

SOFA 4 - Rider 2: Wages, Benefits, Loans and Other Beneficial Transfers

| NAME | DATE | DESCRIPTION | VALUE | |
|---|---|---|---|---|
| CONHEENEY, THOMAS | 1/19/2023 | Director Fees* | $ | 250,000.00 |
| Director | | | | |
| KRAINES, MICHAEL | 2/1/2022 | Interest Paid | $ | 2,123.28 |
| Director | 3/1/2022 | Interest Paid | $ | 1,917.81 |
| | 4/1/2022 | Interest Paid | $ | 2,123.28 |
| | 5/2/2022 | Interest Paid | $ | 2,054.79 |
| | 6/1/2022 | Interest Paid | $ | 2,123.28 |
| | 7/1/2022 | Interest Paid | $ | 2,054.79 |
| | 8/1/2022 | Interest Paid | $ | 2,123.28 |
| | 9/1/2022 | Interest Paid | $ | 2,123.28 |
| | 10/3/2022 | Interest Paid | $ | 2,054.79 |
| | 11/1/2022 | Interest Paid | $ | 2,123.28 |
| PALEOKRASSAS, MICHAEL | 2/7/2022 | Borrow Returned | $ | 60,000.00 |
| Former Co-Head of Trading and Lending | 2/24/2022 | Borrow Returned | $ | 40,000.00 |
| | 4/6/2022 | Borrow Returned | $ | 20,000.00 |
| | 4/12/2022 | Borrow Returned | $ | 70,000.00 |
| | 5/3/2022 | Borrow Returned | $ | 75,000.00 |
| | 6/15/2022 | Borrow Returned | $ | 1,295,890.81 |
| | 6/15/2022 | Interest Paid | $ | 37.35 |
| | 6/15/2022 | Interest Paid | $ | 4,970.53 |
| | 11/10/2022 | Borrow Returned | $ | 37,801.39 |
| PRETTO-SAKMANN, ARIANNA | 6/13/2022 | Loan Book Activity | $ | 758,919.97 |
| Chief Legal Officer | | | | |
| SILBERT, BARRY | 2/1/2022 | Interest Paid | $ | 23,671.23 |
| Chief Executive Officer | 3/1/2022 | Interest Paid | $ | 24,547.95 |
| (Digital Currency Group) | 4/1/2022 | Interest Paid | $ | 27,178.08 |
| | 4/14/2022 | Interest Paid | $ | 11,397.26 |
| | 4/14/2022 | Borrow Returned | $ | 4,000,000.00 |

Capital withdrawn

SOFA Question 4: Payments or other transfers of property made within 1 year before filing this case that benefited any insider

SOFA 4 - Rider 3: Coin Transactions

| NAME | DATE | TYPE | DESCRIPTION | COIN | COIN QUANTITY | COIN VALUE (USD) | |
|---|---|---|---|---|---|---|---|
| BALLENSWEIG, MATT | 10/12/2022 | Outflow | Collateral Returned | BTC | 4.25 | $ | 81,408.75 |
| Former Co-Head of Trading and Lending | | | | | | | |
| PALEOKRASSAS, MICHAEL | 6/15/2022 | Outflow | Borrow Returned | BTC | 415.58718963 | $ | 9,374,566.47 |
| Former Co-Head of Trading and Lending | 6/15/2022 | Outflow | Borrow Returned | USDC | 12,173.504 | $ | 12,173.50 |
| | 11/8/2022 | Outflow | Borrow Returned | ETH | 225.00 | $ | 300,341.25 |
| | 11/9/2022 | Outflow | Borrow Returned | BCH | 415.70924001 | $ | 37,018.91 |
| | 11/9/2022 | Outflow | Borrow Returned | USDC | 8,420.358958 | $ | 8,420.36 |
| | 11/9/2022 | Outflow | Borrow Returned | SUSHI | 29,609.27643424 | $ | 30,085.99 |
| | 11/9/2022 | Outflow | Borrow Returned | ZEC | 2,238.08806066 | $ | 78,109.27 |
| PRETTO-SAKMANN, ARIANNA | 6/18/2022 | Outflow | Borrow Returned | ETH | 29.35833993 | $ | 29,183.07 |
| Chief Legal Officer | 6/18/2022 | Outflow | Interest Paid | ETH | 1.19938374 | $ | 1,192.22 |
| | 6/20/2022 | Outflow | Borrow Returned | FIL | 120.0573083 | $ | 658.27 |
| | 6/20/2022 | Outflow | Interest Paid | ETH | 0.05692946 | $ | 64.16 |
| | 6/20/2022 | Outflow | Interest Paid | FIL | 9.17193948 | $ | 50.29 |

Capital withdrawn

242. As a former restructuring investment banker, Defendant Silbert knew that if Genesis Global Capital recognized its own insolvency immediately upon 3AC's collapse in June 2022 as it should have, it would have had to halt redemptions and potentially declare bankruptcy, which would have prevented *anyone*, including Defendant Silbert and other Genesis and DCG insiders, from withdrawing their capital from Genesis Global Capital.

243. Instead, at least in part to preserve access to their personal investments, as alleged below, the Defendants orchestrated the sham DCG Promissory Note transaction and used it as an excuse to continue to claim Genesis Global Capital was solvent while they extracted their own capital.

### C. DEFENDANTS FILLED THE EQUITY HOLE WITH A CHARADE AND CONTINUED MISREPRESENTING GENESIS'S FINANCIAL CONDITION.

244. As detailed above, from mid-June through June 30, 2022, DCG and Genesis Global Capital engaged in a communications campaign designed to conceal Genesis Global Capital's financial condition and mislead counterparties into believing Genesis Capital was operating "business as usual." Those counterparties included Gemini, who Gemini Earn investors had appointed as their agent for "all purposes" relating to the Genesis Yield Investment Agreements and who was tasked with conducting ongoing due diligence on behalf of their behalf.

245. The economic reality of Genesis Global Capital's financial condition dictated that Defendants should have caused the Company to declare itself insolvent and either seek recapitalization or restructuring. The myriad internal communications cited herein make clear that Defendants were aware that the Company was insolvent, yet schemed in ways designed specifically to conceal this fact. Indeed, instead of causing the Company to truthfully admit its insolvency, Defendants instead caused Genesis Global Capital to dubiously maintain that 3AC's $1.1 billion debt to Genesis Global Capital was still worth $1.1 billion and engage in a deceitful

financial transaction with DCG and Silbert designed to mislead the Company's counterparties and their agents.

246. This course of conduct was, according to Defendant Silbert, decided upon and executed by himself, DCG and its board: "***DCG and its board*** determined that it was in the best interest of Genesis [Global Capital], its lenders, and DCG to try to help support Genesis [Global Capital]."

247. Thus, with the second quarter set to close on June 30, 2022, the Company's balance sheet would show more than a billion dollars of exposure to 3AC, and minimal equity and liquidity. That would betray Genesis's insolvency, cause lenders to race to pull their assets off the platform, and lead to bankruptcy. Silbert admitted internally at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something … we will need to fill by 6/30." Silbert said to keep that information "super confidential" and not share it outside of "the circle."

248. DCG wanted to avoid a Genesis bankruptcy for two reasons. First, if Genesis filed for bankruptcy, DCG and its affiliates would have to pay back outstanding loans worth over $800 million to Genesis. Second, DCG could no longer use Genesis's funds as its de facto treasury, depriving Silbert's crypto empire of its essential source of financing. Kraines admitted this in a June 26 email to DCG's Jordan Fitterman, Gregory Ingrassia, and Ronald DiPrete. Kraines was "hung up on" the fact that "the money that DCG owes Genesis doesn't go away in bankruptcy." And, as Kraines explained, a Genesis bankruptcy "would also require the rest of DCG and [its] subs[idiaries] to be able to operate based solely on Grayscale cash flow without any incremental funding available from DCG for the foreseeable future."

249. Defendants thus decided to engage in a scheme to create the impression of a strong balance sheet at Genesis. Moro explained to Murphy and Kraines, "if [Genesis was] able to show

[its] balance sheet after all of that happened and it still looks strong, … 1) people will care less about the losses and 2) we'll be better able to operate from a place of strength going forward." Kraines similarly hypothesized whether it was "possible everyone [with open term loans] would agree to not demand their money back" if shown "a Big 4 audit showing that we have M2M [mark-to-market] asset value equal to our liab[ility] value." Thus, at the end of June 2022, DCG and Ducera embarked on what they called "Project River" to identify potential "roadmap[s]" to keep Genesis operating past the end of the quarter on June 30, 2022. DCG's Silbert, Kraines, Murphy, Katz, and Fitterman; Ducera's Kramer, Kishan Patel, and Adam Verost; and several Goodwin attorneys, were all part of Project River.

250. As part of Project River, Silbert, Murphy, and Kraines considered and rejected an option to "Close down Genesis Capital." In addition to Kraines's concerns about DCG needing to repay its loans to Genesis and losing its piggy bank in the event of a Genesis bankruptcy, DCG worried that if it shut down Genesis, DCG's reputation would be marred by a "black mark in the industry." DCG was also concerned about losing control of the company, because "[i]n bankruptcy, Genesis creditors would take control of any DCG stock held by Genesis."

251. Silbert, Murphy, and Kraines also considered and rejected an option through which "DCG issues new equity and contributes to Genesis." Islim explained to Kraines and Murphy that a potential solution to Genesis's "liquidity and credit (equity) problems" would be an "inject[ion]" from DCG to Genesis "before month-end" to "allow GGC to show a healthy balance sheet to creditors in early July." Similarly, Ballensweig emphasized that if DCG provided an equity injection, then Genesis could "raise additional capital while maintaining [its] existing relationships with lenders. But DCG did not have sufficient capital to save the company and keep DCG protected

at the same time. Regardless, DCG was interested in keeping its capital, not extending capital to Genesis.

252. But Defendants Silbert was instead looking "for a handful of good ideas re ways of increasing Genesis book equity without actually having to transfer hard assets down[,]" and, having rejected the option of issuing an actual equity infusion, on or about June 26, Silbert proposed creating the appearance of an equity infusion at Genesis by forcing Genesis to loan cash and assets to an affiliate, such as DCGI, and then requiring the affiliate to contribute the same cash and assets back to Genesis as equity. DCG's legal counsel, Goodwin, recommended against that proposal based on veil piercing and fraudulent conveyance concerns. Cognizant of DCG's concerns about protecting its own assets, Goodwin also warned Silbert that this transaction would "throw[] good money after bad" and put more assets at risk in an eventual bankruptcy.

253. The only option left for DCG was to lie. On June 28, 2022, Kraines purported to share "good news" with Moro, Islim, Ballensweig, Pretto-Sakmann, Paleokrassas, and Genesis's CFO Alice Chan. Kraines told Genesis that the DCG Board had "green-lit our moving down sufficient assets to bring your balance sheet into the black as of June 30th."

254. But that is not what happened two days later. Behind the scenes, the communications among Defendants, including DCG, Silbert, and Ducera, told a different story. Defendants did not provide an equity injection that would expose DCG and Silbert to loss if Genesis did not recover. Instead, they schemed to make Genesis's balance sheet appear strong without providing the liquidity Genesis needed.

255. On June 28, the Project River team—including DCG's Kraines, Fitterman, Ingrassia, and DiPrete; Ducera's Kramer, Patel, and Verost; and several Goodwin attorneys—discussed a potential transaction "to close the negative equity value of the Genesis balance

sheet(s).” The next day, on June 29, Ducera’s Patel circulated a draft of a proposed transaction, through which insolvent GAP would provide insolvent GGC with a $1.1 billion promissory note at zero percent interest and with no maturity date. Goodwin pointed out that “GAP [was] not a credit-worthy party” and a zero percent interest rate was “off-market.” Kraines agreed that “the optics would be better at some non-zero % number.” Kramer pushed back, saying “that if 0 interest works that’s what we should do.”

256. But Kraines explained that the “problem with trying to benchmark this to a real world comp is that it’s something of a no-bid situation”—an admission that this was not an arm’s-length transaction on market terms. Kraines continued, “the reason we’re actually doing this is because—practically speaking—we’re rescuing ourselves insofar as we’re all one consolidated entity at the end of the day.”

257. Out of self interest, and recognizing that he may personally face liability for supporting the DCG Promissory Note, Defendant Kraines drafted a June 30, 2022 word document which extensively and emphatically describes the myriad problems with the DCG Promissory Note transaction and questioning its legitimacy. Notably, in this document, Defendant Kraines recognizes that this transaction could be viewed as a “fraud on Genesis credit[ors]” and “the more this loan looks like an invention or convenience the more the billion dollars of fresh equity created looks questionable.”

Let's look at my judgement
-the guy who saw the need for the ring fencing exercise
-the guy who saw the need for risk management and brought outside experts in
-the guy who saw the need to increase the amount of risk reporting brought to the board

Now let's look at this transaction
-it's premised on a Genesis intercompany payable that's evidenced virtually nowhere with no terms whatsoever
-we're creating a billion dollars of brand new book equity based on a new intercompany loan – that we could unwind any time we want – and which if we did could be tantamount to fraud on the Genesis credits
-it's my name on the financials signing off

Now let's look at the intercompany loan
-re what we're assuming: there's a good case that intercompany loans come with some positive interest rate
-the whole premise of the fresh billion down at Genesis for their creditors to *see is that that this new intercompany loan is a real and serious loan* – absent that we created $1bb of equity fictitiously.
**-the more this loan looks like an invention or convenience the more the billion dollars of fresh equity created looks questionable.**

-this is Parent borrowing $1bb from GGC [recall that we're stepping into the shoes of GAP which borrowed the $1bb from GGC]
-let's look at the precedent: ***all of our intercompany loans come at a rate***

-what's Market?
-who else would put rescue financing into Genesis? The answer is no one. We asked and no one was interested.
-I'd argue that's not what's happening here –this isn't rescue financing where outside capital comes in to rescue a third party - **here *we're rescuing ourselves*** – this is ultimately all one balance sheet and the overall business is well capitalized

Replace an asset down at GGC – marking TAC to $0 – asset would have been marked to zero
GAP – treated as a capital contribution
Substantive and bona fide agreement
Did we mislead our counterparties
Doesn't have to be arm's length per se

Representation – our intention

***gonna be tricky if we forgive the loan**
Full balance due at the end of the term – cleaner for accounting and tax
-better – more protective

258. After admitting that Genesis was a mere alter ego of DCG and that DCG was attempting to conceal that fact, Kraines suggested a "modest" 1-2% interest rate.

259. Defendant Kraines' concerns regarding the DCG Promissory Note transaction's legitimacy were shared by DCG's accounting advisor, Ernst & Young. Ernst & Young refused to

sign off on the DCG Promissory Note transaction, described its legitimacy as a "gray area," and stated that the transaction would never be "airtight" from an audit perspective.

260. Ernst & Young's skepticism regarding the transaction is documented through text messages and deposition testimony from DCG employees Jordan Fitterman and Matthew Kummel, as well as deposition testimony from Ernst & Young's Jason Schwartz, who advised Defendant DCG at the time. For example, Kummel testified that he discussed the transaction with Schwartz and then relayed the details to Defendant Murphy via the following text message:




261. Ernst & Young's reservations about the DCG Promissory Note transaction's legitimacy, along with those of potential investors Fortress Investment Group, are further memorialized by evidence from DCG Vice President of Finance Jordan Fitterman, who took contemporaneous notes of conversations with Shwartz and others:

> **Fitterman (DCG VP) to Defendant Murphy (DCG)**: Audit/Accounting View: ***This will never be "air tight"*** – but from an audit perspective it's most (or only) defensible if there's demonstrated "intent" to actually repay the loan. (emphasis added).
>
> …
>
> **Fitterman (DCG VP) to Defendant Murphy (DCG)**: Considerations: We will have to document a loan with termed payback period(s) to show "intent" (per E&Y).
>
> …
>
> **Fitterman (DCG VP) to Defendant Murphy**: Timing is a judgment call, but if there's no signs of demonstration to actually pat this back in some amount within a "year or two",

> ***this would call <u>2022</u> financial statements into question***. (emphasis in original). (emphasis added).
> …
> **Fitterman (DCG VP) to Defendant Murphy**: Business/marketability risk with [Fortress] perceiving this as a back-treatment play while masking overall GGC/GAP to existing and future investors (compared to asset transfer).(emphasis added).

DCG's Fitterman's testimony reveals two key points. *First*, both Ernst & Young and Fortress Investment Group—both sophisticated finance entities—were deeply skeptical about the DCG Promissory Note transaction. Ernst & Young determined that relying on the DCG Promissory Note transaction to claim Genesis was solvent could render 2022 financial statements misleading and declined to provide approval of it. Similarly, Fortress Investment Group believed relying on the DCG Promissory Note transaction to claim solvency might be "masking" Genesis's financial condition to current and future investors, declining to provide capital to Defendant DCG. This sentiment is reflected in the Schwartz' deposition testimony:

> **Question:** Did you provide approval of the [DCG Promissory Note] transaction?
> Jason Schwartz (Ernst & Young): No.
>
> **Question:** Did you sign off on the transaction?
>
> **Jason Schwartz (Ernst & Young):** No. Sorry. Clarify. There were no opinions issued from [Ernst & Young]. There were no memos written by management. And I'm not sure what was meant by "sign-off," but there were no formal sign-offs, in customary sense, that opinions were issued.
>
> **Question:** So what do you mean when you say "formal sign-offs in the customary sense?"
>
> **Jason Schwartz (Ernst & Young):** Maybe it's just my background. When I hear "sign-off," I think a signed audit opinion or a signed memo. There was none of that in this case.

262. *Second*, none of Ernst & Young's recommended steps to demonstrate "intent to pay" were taken. The DCG Promissory Note was executed with no indication of intent to pay, with

payment deferred until 2032 rather than the "year or two" Ernst & Young had advised. As Defendant Silbert testified, the actual purpose of the DCG Promissory Note was that it "gave Genesis . . . positive equity on the balance sheet, which ensured its ability to continue to access capital from counterparties." Thus, the note was intended to attract investments by creating a false appearance of financial health.

263. The Project River team refined its strategy for addressing the Genesis balance sheet without jeopardizing DCG. Ultimately, DCG "offset" the $1.1 billion loss with a non-cash, speculative IOU that was not payable for a decade. Instead of providing Genesis with equity, DCG would provide the Promissory Note to mask the balance sheet hole through which DCG promised to pay Genesis $1.1 billion in 10 years (i.e., in 2032), at 1% interest in exchange for Genesis's liabilities and recovery from 3AC. Additionally, the Promissory Note had "no mandatory amortization," was "pre-payable at any time with no premium," had "no put option by GGC," and provided "an offset mechanism for any recoveries that are received through [3AC] proceedings." None of these terms would have been agreed to on the open market. Moreover, DCG provided no collateral to secure its obligation, and it made sure the repayment of the Promissory Note was subordinate to its repayment of an over $350 million credit facility to unrelated third parties. The Project River materials confirm that one of the Promissory Note's benefits was that it did "not require direct contribution of assets or capital of DCG into Genesis/GAP":

## Overview of Genesis Payable Transaction (Continued)

- The following table provides additional benefits and considerations regarding the proposed Genesis Payable Transaction

| | Genesis Payable Transaction |
|---|---|
| **Benefits** | ▪ Resolves GAP's book equity shortfall by June 30, 2022, preventing potential "run on the bank" situations due to loss of customer confidence<br>▪ Stabilizes the Genesis business<br>▪ Extends runway for Genesis to continue to operate and manage recovery on the TAC claims<br>▪ Does not require direct contribution of assets or capital of DCG into Genesis/GAP<br>▪ Does not require reorganization of DCG entities or subsidiaries to resolve GAP book equity shortfall<br>▪ Does not require third-party financing<br>▪ Does not require regulatory approval<br>▪ Does not require consents from existing DCG or Genesis lenders, although DCG will be required to notify Eldridge in the context of the subordination agreement for the Eldridge secured loan |
| **Considerations** | ▪ Requires DCG to support and repay $1.1bn gross payable according to the terms of the agreement<br>▪ In the event of a future Genesis bankruptcy, Genesis will be able to assert a claim for the then outstanding payable balance |

264. Accordingly, on June 30, 2022, Silbert, DCG, and the other Defendants caused Genesis Global Capital to engage in a sham transaction on the terms that Defendants dictated—devised with Ducera's and Kramer's help—causing Genesis to "sell" 3AC's debt to DCG in exchange for the DCG Promissory Note executed by Defendant Silbert to Genesis Global Capital for $1.1 billion due in 10 years at an interest rate of 1%. Under the [DCG]Promissory Note, DCG agreed to pay Genesis Global Capital a decade later at only 1% interest per annum to "replace" the receivables Genesis Global Capital would have otherwise received from Genesis Asia Pacific for the 3AC loans. Genesis Global Capital categorized this $1.1 billion as an asset on its balance sheet.

265. Silbert signed the [DCG] Promissory Note as CEO of DCG.

266. According to DCG, the [DCG] Promissory Note was fully approved by DCG's board of directors, which includes Defendant Silbert.

267. Moro signed the [DCG] Promissory Note as the CEO of Genesis Capital and Genesis Holdco, and as director of Genesis Asia Pacific.

268. DCG dictated the terms of the [DCG] Promissory Note, including the ten-year duration and 1% interest rate. DCG provided no collateral to secure its obligations under the [DCG] Promissory Note. To the contrary, DCG's repayment of the [DCG] Promissory Note was

subordinate to DCG's repayment of an over $350 million credit facility to unrelated third parties. DCG's pre-existing $350 million obligation reduced the likelihood that DCG could repay the [DCG] Promissory Note.

269. The [DCG] Promissory Note failed to ensure that Genesis Global Capital had sufficient capital to operate its business. The [DCG] Promissory Note required DCG to provide cash payments in no sooner than 10 years, whereas the 3AC-related liabilities DCG purportedly "assumed" were callable on demand; this created a mismatch between the [DCG] Promissory Note and Genesis Global Capital's billions of dollars' worth of on-demand obligations to Earn users. Genesis Global Capital's and DCG's internal documents reveal that the [DCG] Promissory Note's ten-year duration and 1% interest rate failed to address the "structural hole" caused by the 3AC losses. In an internal document, Genesis Capital's Chief Risk Officer acknowledged that the [DCG] Promissory Note "wreaks havoc on our balance sheet impacting everything we do." According to filings in the Genesis Bankruptcy Action, Michael Patchen was Genesis Global Capital's Chief Risk Officer during the period January 19, 2022 through October 2022.

**i. The Promissory Note Did Not Change Genesis's Financial Condition: Genesis Remained Insolvent.**

270. This June 30, 2022 "sale," however, was a sham. There was no exchange of money and no movement of capital, a fact confirmed by Defendant Moro during his deposition:

> **Question**: [I]s it fair to say that under the promissory note transaction, DCG provided no capital to Genesis?
>
> **Moro (Genesis CEO)**: They provided no cash to Genesis in the transaction.
> **Question**: And no cryptocurrencies?
>
> **Moro (Genesis CEO)**: No cryptocurrencies were also given to Genesis in the transaction.
>
> **Question**: None, correct?

**Moro (Genesis CEO)**: In connection with the promissory note, there were nothing given to Genesis.

271. Moreover, this sale could never have occurred between two parties negotiating at arm's length for at least three reasons:

272. First, the 3AC debt was not worth $1.1 billion at the time, and is not worth $1.1 billion now. The odds of Genesis Global Capital or DCG collecting anything near the full value of the debt were and remain incredibly low, and no party negotiating at arm's length with Genesis Global Capital would have valued the debt at $1.1 billion.

273. Second, even if the debt *were* worth $1.1 billion, the terms of payment were simply not competitive with the financing terms DCG would have received from a nonrelated party. No party other than a subsidiary completely controlled by Defendants DCG and Silbert would have "sold" a $1.1 billion debt for a 10-year promissory note at 1% interest.

274. Third, given the first two realities, there is simply no reasonable possibility the resulting DCG Promissory Note from DCG is worth anything close to $1.1 billion. According to Gemini, given the duration of the note and the underlying economic realities, the "note would be heavily discounted (approximately 70%) to reflect its value as of today (perhaps $300 million)."

275. In fact, on July 11, 2023 Genesis Global Capital itself filed a Notice of Filing of Exhibit to Disclosure Statement in the Genesis Bankruptcy Action **which estimated the value of the DCG Promissory Note between $90 million (a 92% discount) to $323 million (a 70% discount).**

276. According to an interview on the podcast *Unchained* on or around November 4, 2023 with Genesis investors who invested directly with Genesis and were members of an ad hoc committee of creditors, after the Class Period Defendant Silbert informed a steering committee of Genesis Global Capital creditors that he placed a value of $200 million on the [DCG] Promissory

Note: "Genesis was saying it's worth $1.1 billion. . . When we demanded the payment from Barry [Silbert] for it, he said, oh, well, you can't expect us to pay $1.1 billion for that piece of paper. It's only worth 200 million."

277. The DCG Promissory Note was a sham because the loan was uncollectable, and the economic reality was that Genesis Global Capital was insolvent at the time Defendants DCG and Silbert caused Genesis Global Capital to execute the DCG Promissory Note.

278. Worse, after Defendant Silbert executed the DCG Promissory Note on June 30, 2022, Defendants Moro, Islim, Kraines and Murphy caused Genesis Global Capital at the direction of and/or subject to the control of Defendants DCG and Silbert to disseminate misleading and false financial statements to prospective and existing investors, directly or via their designated agent, Gemini.

279. In furtherance of the Defendants' scheme, from July 2022 through November 2022, Genesis Global Capital sent Gemini, as the agent of Earn investors, reports falsely describing Genesis Global Capital's financial condition. For example, these reports falsely included the [DCG] Promissory Note as an asset that could be reduced to cash within a year. To further deceive Earn investors, Genesis Capital concealed and suppressed disclosure of quarterly income and cash flow statements from Gemini from June 30, 2022, through November 16, 2022. Genesis Global Capital also omitted explanatory footnotes to its balance sheet because those footnotes would have revealed the [DCG] Promissory Note's true nature. Genesis Global Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Global Capital's financial condition. Instead, members of Genesis Global Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the [DCG] Promissory Note or its terms.

280. This was consistent with the views of Defendant Silbert and Murphy, who agreed on July 5, 2022 that Genesis "shouldn't make mention of the amount [of the DCG Promissory Note]" but should instead continue perpetuate the lie that "DCG recapitalized genesis":

Barry Silbert 2022-07-05 03:21:12.437 PM

it definitely feels like we shouldn't make mention of the amount or that there is a rumored number floating around. the message should be genesis hedged, 85% w as collateralized and DCG recapitalized genesis

Mark Murphy 2022-07-05 03:21:33.040 PM

Yes, agreed

Barry Silbert 2022-07-05 03:21:44.207 PM

operating normal, adequate liquidity, etc.

281. On July 6, 2022, in reference to 3AC, Moro tweeted:

**Michael Moro** @michaelmoro · Jul 6, 2022
Replying to @michaelmoro
4/ Since then, we worked with @DCGco to find the optimal strategy to further isolate the risk. DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term.
34 18 89

**Michael Moro** @michaelmoro · Jul 6, 2022
Replying to @michaelmoro
3/ The loans to this counterparty had a weighted average margin requirement of over 80%. Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside.
5 10 77

https://x.com/michaelmoro/status/1544733041045786626?s=20;

https://x.com/michaelmoro/status/1544733042849320960?s=20.

282. DCG's COO [Defendant Murphy] and Head of Communications [Amanda Cowie] edited and helped draft these tweets, a fact confirmed by both Defendant Moro and Cowie in their respective depositions. For example, during Amanda Cowie's deposition, she stated:

> **Question:** Did DCG review the version – or this tweet [by Defendant Moro] before a version of it was posted to Twitter?
> **Cowie (DCG):** I believe I saw this before it went out, alongside others.
> . . .

> **Question:** To the best of your knowledge, did anyone else at DCG review this tweet before it was posted to Twitter?
> **Cowie (DCG):** I believe [DCG's] Mark Murphy was in the approval/review thread with the various Genesis leadership stakeholders, but I don't recall who else was involved.

283. Silbert reviewed these tweets before Moro posted them. DCG approved these tweets before they were published.

284. As Defendant Moro admitted during his deposition with the SEC, the tweets were false, misleading, and omitted material facts. DCG did not simply "assume" the $1.1 billion, open-term liability related to 3AC, which could be called at any time; it *replaced* that liability with an illiquid ten-year [DCG] Promissory Note.

285. According to Gemini, this statement was false and misleading. In reality, DCG had not ensured that Genesis Global Capital had the capital to operate. In fact, DCG had not given Genesis Global Capital so much as a penny of actual funding to make up for the 3AC losses. Instead, DCG entered into a 10-year promissory note with Genesis Global Capital at an interest rate of 1% — due in 2032. This note was a complete gimmick that did nothing to improve Genesis Global Capital's immediate liquidity position or make its balance sheet solvent. As described above, no cash, capital, or assets changed hands from DCG to Genesis Global Capital.

286. On July 6, 2022, Genesis Global Capital's Head of Communications and Public Relations [Marc Yaklofsky] sent a document titled "Talking Points to [Three Arrows] Questions" to Moro, as well as DCG's COO [Defendant Murphy], DCG's Head of Communications [Amanda Cowie], and various other senior employees at Genesis Capital and DCG with instructions to "review and approve." DCG's Head of Communications helped draft these talking points. DCG's COO also reviewed these talking points on July 6, 2022. These talking points were to be used by Genesis Capital personnel in conversations with counterparties, including Gemini.

287. During his deposition, Defendant Moro confirmed that the above "working group" from DCG participated in the drafting and review of the July 6, 2022 talking points:

> **Question**: What do you recognize it to be?
> **Moro (Genesis CEO):** It looks like an email that I sent on July the 6th, 2022, at 5:22 p.m., that is talking points, maybe revised updated talking points, to the Genesis sales, trading, and lending teams, specifically, in relation to Three Arrows Capital.
> …
> **Question**: [D]o you recall speaking with anyone at Genesis or DCG about these talking points?
> **Moro (Genesis CEO):** I don't recall specific conversations, but I would imagine that it was a similar process as the previous talking points.
> **Question**: In terms of the drafting of the documents?
> Moro (Genesis CEO): The working group regarding the other drafting and reviewing of the talking points.
> Question: Would that include [DCG's] Mark Murphy and [DCG's] Amanda Cowie as well?
> Moro (Genesis CEO): The best of my knowledge, it would have included them as well.

288. d

289. During his deposition, Moro also testified that DCG's description of the DCG Promissory Note transaction included in the July 6, 2022, which described the transaction as DCG "absorb[ing]" a loss, in fact misrepresented the transaction, calling "very bad paraphrasing":

> **Question:** I will direct your attention to the second full paragraph there.
> **Moro (Genesis CEO)**: Yes
> **Question:** Where it states "The residual loss was absorbed by DCG at the parent level." Do you see that?
> **Moro (Genesis CEO)**: I do see that.
> **Question**: What's the basis for the statement that the residual loss was absorbed by DCG at the parent level?
> **Moro (Genesis CEO)**: I think this is -- again, I think is a very bad paraphrasing of the actual transaction.
> **Question**: In what way?
> **Moro (Genesis CEO)**: It was an assumption of liability as opposed to an absorption of loss.
> …
> **Question**: And then it goes on to say, "So immediately assumed the loss." Do you see that?
> **Moro (Genesis CEO)**: I do see that.
> **Question**: And what's the basis for that statement?
> **Moro (Genesis CEO)**: Again, I think it's similar to the – [i]t sounds very similar to the first sentence. I think this is a paraphrasing of what actually happened. And I don't think it

actually describes accurately the transaction that took place with the promissory note. (emphasis added).
**Question:** And . . . . Why do you believe it doesn't accurately reflect the transaction?
**Defendant Moro (Genesis CEO):** Because the transaction itself, again, was an assumption of liability as opposed to an absorption of loss.

290. In short, Defendant Moro admitted during his deposition that the talking points drafted and reviewed by DCG, distributed to Moro and Genesis personnel, and used to assuage investors' fears about Genesis's stability, misrepresented the economic reality of the DCG Promissory Note transaction.

291. These talking points did not provide any information regarding the [DCG] Promissory Note, its ten-year duration or 1% interest rate, or the $1.1 billion value of Genesis Global Capital's losses. Instead, the talking points included the misrepresentations that DCG "absorbed" the losses, that Genesis Global Capital was "well capitalized," and that "DCG has assumed certain liabilities of Genesis related to [Three Arrows] to ensure [Genesis Global Capital] ha[d] more than adequate capital to operate and scale our business for the long-term."

292. Relying on the talking points Defendant Moro has admitted were misleading, on July 6, 2022, Genesis Entities' Co-Head of Trading and Lending, Managing Director No.1, (Ballensweig) informed Gemini, both over the phone and in writing, that the 3AC "[l]osses [were] predominantly absorbed by and netted against DCG balance sheet" and that Genesis Global Capital remained "well-capitalized." Genesis Global Capital misled investors and omitted material facts regarding its financial condition during these communications, including that Genesis Capital's balance sheet contained an illiquid $1.1 billion [DCG] Promissory Note.

293. The same day—July 6, 2022—representatives of Genesis Global Capital and/or GGT spoke to Gemini representatives (the "July 6 Call"). People participating from Gemini wanted accurate information about Genesis Global Capital's financial condition.

294. During the July 6 Call, Genesis Global Capital representatives made false and misleading statements about Genesis Global Capital's financial condition. These included false statements about Genesis Global Capital's assets and the nature of the collateral it was holding against loans Genesis Global Capital had made.

295. Following the July 6 Call, Ballensweig sent an email to Gemini (the "July 6 Email") attaching three documents. The July 6 Email and its attachments contained multiple false statements.

296. One attachment to the July 6 Email is a document entitled "Three Arrows Post-Mortem." This document stated, in part:

> We previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call. Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital.
>
> The loans to this counterparty had a weighted average margin requirement of over 80%. Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside.
>
> Since then, we worked with DCG to find the optimal strategy to further isolate the risk. DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term.

297. Statements in the "Three Arrows Post-Mortem" were false. It was not true that "DCG has assumed certain liabilities of Genesis." It was not true that Genesis Global Capital ensured that it had the "capital to operate . . . for the long term."

298. The second document attached to the July 6 Email is entitled "Gemini Risk Metric Request" and has a section titled "Financial Position per Asset." It included the following table:

| | Current | Receivable | | Liabilities | |
|---|---|---|---|---|---|
| | Assets | Loans | Collateral Rec. | Borrows | Collateral Pay. |
| **Total** | **$3,377,241,616** | **$4,449,809,050** | **$2,845,541,484** | **$7,178,964,609** | **$3,401,109,542** |
| USD / Stables | $697,626,546 | $2,302,015,337 | $182,699,279 | $3,913,570,170 | $901,183,977 |
| BTC | $376,993,113 | $1,383,698,893 | $668,600,703 | $2,130,962,286 | $277,037,598 |
| ETH | $205,767,255 | $558,439,389 | $581,873,409 | $769,744,681 | $582,174,981 |
| Other Assets | $2,096,854,702 | $205,655,432 | $1,268,146,027 | $364,687,472 | $1,640,712,985 |
| **Assets** | **$10,672,592,150** | **Liabilities** | **$10,580,074,150** | **Equity** | **$92,518,000** |

299. The table in the Gemini Risk Metric Request document is a fraud, because it includes the DCG Promissory Note as a "Current Asset" (within "Other Assets").

300. As a matter of generally accepted accounting principles—and common understanding—a "current asset" refers to cash and other resources that are reasonably expected to be realized in cash within a one-year period. The term thus specifically excludes amounts that are owed by an affiliate but are not collectible in the ordinary course of business within a year.

301. By including the DCG Promissory Note at its full-face value within the category of "Current Assets," Genesis Global Capital falsely represented that there was $1.1 billion in value on its balance sheet that could be collected in cash within one year. The DCG Promissory Note is worth only a fraction of its notional value and does not mature for 10 years. The note is plainly not a current asset, but Genesis Global Capital falsely presented it as one in order to prevent Gemini Earn investors' appointed agent Gemini from pulling Gemini Earn investments from Genesis Global Capital.

302. It is not a matter of conjecture that the DCG Promissory Note is included in the "Current Assets" category in the Financial Position per Asset table. Gemini specifically inquired about this and received more lies from Genesis in response.

303. In addition to distributing false and misleading balance sheets to investors and their agents, DCG continued to push the lie that Genesis's balance sheet was strong publicly, including to prominent publications such as the Wall Street Journal. For example, on July 18, 2022 DCG's

Amanda Cowie sent the following message to Wall Street Journal reporter Vicky Huang, directing Huang to the following false statement to be attributed to a "DCG spokesperson" "Both the DCG and Genesis balance sheets remain strong . . . Genesis continues to be well-capitalized and its operations are business as usual":

Message

**From:** Huang, Vicky [vicky.huang@wsj.com]
**Sent:** 7/18/2022 6:40:09 PM
**To:** Amanda Cowie [Amanda@dcg.co]
**CC:** Marc Yaklofsky [MYaklofsky@genesistrading.com]
**Subject:** Re: Time-sensitive press inquiry -- WSJ

[EXTERNAL]
Thank you, Amanda!

On Mon, Jul 18, 2022 at 1:29 PM Amanda Cowie <Amanda@dcg.co> wrote:

Hi Vicky – thanks for the chat. Here is the statement to be attributed to a DCG spokesperson.

- "Both the DCG and Genesis balance sheets remain strong. With no remaining exposure to Three Arrows Capital, Genesis continues to be well-capitalized and its operations are business as usual."

Per your question about confirming the New York arbitration – on background – Genesis is a firm that brought arbitration against 3AC in New York. But as we discussed on the phone, DCG took the liability from Genesis so Genesis isn't a party to the arbitration.

Let me know if anything else comes up.

Amanda

304. On July 27, 2022, a Gemini representative sent Genesis an email inquiring about the "Other Assets" row in the "Current Assets" column (as depicted by Genesis in a subsequent iteration of the Financial Position per Asset table) and highlighted it:

| | Current Assets | Receivable: Loans | Receivable: Collat Rec | Liabilities: Borrows | Liabilities: Collat Pay |
|---|---|---|---|---|---|
| **Total** | **$3,630** | **$5,105** | **$2,516** | **$7,038** | **$4,019** |
| USD / Stables | 328 | 2,231 | 177 | 3,466 | 1,159 |
| BTC | 639 | 1,552 | 439 | 2,062 | 279 |
| ETH | 490 | 942 | 422 | 1,061 | 795 |
| Other Assets | 2,173 | 379 | 1,478 | 448 | 1,786 |

| | | | | | |
|---|---|---|---|---|---|
| **Assets** | **$11,251** | **Liabilities** | **$11,057** | **Equity** | **$194** |

305. According to Gemini, on July 27, 2022, Gemini asked Genesis Global Capital: "Do we know what's included in the $2.2bn other assets? Are they all crypto or a mix of crypto and non-crypto? Can you please shed some light on this?"

306. On July 28, 2022, a Genesis Global Capital employee sent the following response:

> "Other assets" is a real-time metric where we looked to replicate, digital currency loans receivable on a real-time basis. This is comprised of a $500mm in alts, $500mm Grayscale shares, $1.1bn in receivables from related parties.

307. Genesis Global Capital's July 28, 2022 statement thus confirms that the $1.1 billion DCG Promissory Note was included in the "Other Assets" row in the "Current Assets" column represented on the documents given to Gemini. That was fraudulent. The DCG Promissory Note was not "receivable on a real-time basis."

308. This point is hammered home by the testimony of Defendant Islim during his deposition, who stated that he was initially in the dark as to the terms of the DCG Promissory Note, but that he was surprised by them given the accounting treatment Genesis had given the DCG Promissory Note:

> **Question:** I believe earlier you said that you were surprised to learn about the terms, correct?
>
> **Islim (Genesis)**: Yes.
>
> **Question:** And, in fact, you were surprised to learn about the ten-year term, is that correct?
>
> **Islim (Genesis)**: Yes.
>
> **Question:** And you were also surprised to learn about the 1 percent interest rate, correct?
>
> **Islim (Genesis):** Yes.
>
> **Question:** Can you explain to me why were you surprised about those terms?
>
> **Islim (Genesis)**: ***Simply my earlier understanding, it was a receivable between the -- Genesis and DCG. That means it's a more or less current asset that doesn't come with terms or attachments or any structure or term or any of that***. And second, no one

mentioned to me the details, so that was another part of the surprise. And then when I learned about it, it was a ten-year, 1 percent, those terms are a bit -- not seen in the crypto space in general. You don't see a ten-year loan or a ten-year note 10 or... Interest rate, 1 percent also wasn't typical. Yes, fed fund market was zero. Interest rates were zero. At 1 percent was a very low number.

**Question:** And a ten-year promissory note is not a current asset to your understanding, correct?

**Islim (Genesis)**: Well, I'm not an accountant, but I learned through the last two or three years that it seems not to be defined in that way, yes.

**Question:** And the 1 percent interest rate, what surprised you about that?

**Islim (Genesis)**: What surprised me about that? … I mean, cash rate around that time was between 7 to 12 percent for crypto and crypto business. So the 1 percent is a big deviation from the range that we were seeing in the market at that time. (emphasis added).

309. In addition, the Risk Metric report shared with Gemini on July 6 contained another section, labeled "Loan Book Metrics," in which Genesis Global Capital purported to provide information regarding (among other things) the weighted average duration of its outstanding portfolio of loans.

310. The Loan Book Metrics table stated, falsely, that the overall weighted average duration of Genesis Global Capital's outstanding loans was just 54.3 days:

**Loan Book Metrics**

*Duration calculated as Expiry Days from Today (Open Term as 7 Days). Rating from 1 to 12 corresponds to A to F rating, directionally*

| | Weighed Avg | |
|---|---|---|
| | Loan Duration (Days) | Rating |
| **Total** | **54.3** | **5.5** |
| USD / Stables | 76.3 | 5.1 |
| *USDT* | *58.9* | *4.4* |
| | | |
| BTC | 23.7 | 5.5 |
| ETH | 47.2 | 6.6 |
| Alt | 33.6 | 6.9 |

| Rating | Rating Characteristics |
|---|---|
| 1<br>2<br>3 | de minimis risk profile; excellent capitalization; minimal to no leverage; demonstrable outstanding risk management |
| 4<br>5<br>6 | low risk profile; strong capitaliztion; solid returns and performance trends; modest leverage; strong risk management |
| 7<br>8<br>9 | moderate risk profile; sustained capitalization; sustained positive returns and performance; demonstrable debt service capacity; established risk management |
| 10 | minimum acceptable risk profile; short history of results; thin capitalization; adverse developments |
| 11 | event of default; collateral shortfall; cessation of operations; adverse management change |
| 12 | realized loss event; insolvency; fraud |

311. Genesis Global Capital's statement that the weighted average duration of its outstanding loans was just 54.3 days was yet another fraud, because that calculation excluded the

$1.1 billion DCG Promissory Note and its 10-year duration. Had the DCG Promissory Note been included, upon information and belief, the resulting calculation would have yielded a weighted average loan duration of more than *765 days*—approximately *14 times* the figure that Genesis Global Capital falsely reported.

312. Genesis Global Capital excluded the DCG Promissory Note from its loan-duration calculations in order to conceal the existence and terms of the DCG Promissory Note from Genesis Global Capital's investors, thereby misrepresenting its true financial position.

313. Another attachment to the July 6 Email purported to be Genesis Global Capital's balance sheet as of June 30, 2022. This document also materially misrepresented Genesis Global Capital's financial condition.

314. As with the "Financial Position per Asset" table, the balance sheet did not disclose the existence of the $1.1 billion promissory note. Instead, apparently, the note was included as an asset on the balance sheet in a line item labeled "Receivable from related parties"—which had a stated value of approximately $1.137 billion. The DCG Promissory Note was included on the balance sheet at its full face value of $1.1 billion, even though, as discussed above, its true fair value was only a small fraction of that amount.

315. The purpose of misrepresenting the DCG Promissory Note's value is obvious: despite including the note at its full face value, the balance sheet showed "Total member's equity" of just $92.5 million. If the DCG Promissory Note had been included on the balance sheet at any reasonable estimate of its fair value, it would have disclosed that Genesis Global Capital was insolvent by *at least* hundreds of millions of dollars.

316. In the following weeks and months, Genesis Global Capital made numerous other false statements to Gemini. These included, for example, updates to the false "Risk Metric"

document described above, which contained the same Financial Position per Asset table that falsely included the DCG Promissory Note as a Current Asset. These updates were shared on a regular (sometimes daily) basis with Gemini.

317. On July 18, 2022, DCG filed a bankruptcy claim against 3AC for more than $1 billion. The same day, DCG's COO (Defendant Murphy) instructed Managing Director No. 1 (Ballensweig) in writing to "manage [G]emini and the other largest counterparties" because DCG was concerned that Earn investors would withdraw their assets. Thus, on July 18, 2022, Managing Director No.1 [Ballensweig] told Gemini's risk personnel conducting due diligence for Earn investors: "There might be some information relating to DCG's claim against [3AC] that gets published today or tomorrow. None of this is new information and all of our loses [sic] have already been absorbed by DCG/realized on our balance sheet.… All of the losses have already been reflected and are with DCG."

318. Even after July 18, 2022, Gemini transferred hundreds of millions of dollars' worth of investor assets to Genesis Global Capital under Earn.

319. These statements on July 6 and 18, 2022, were false, misleading, and omitted material information. DCG did not "absorb" the Genesis Entities' losses. The [DCG] Promissory Note concealed those losses on Genesis Capital's balance sheet but did not replace the lost open-term assets. On July 7, 2022, Managing Director No. 1 [Ballensweig] described the issue to DCG's COO [Defendant Murphy] as follows:

> the issue is more structural … even though DCG took on liability from [Genesis Asia Pacific], it still leaves a liquidity hole if we were to conceptually wind the book down to nothing, the liquidity hole long-term = the $900 m2m loss on [Three Arrows] + the lack of liquidity on the GBTC collateral which is another $450mm, so structurally, we have about 1.345B we'd need to get in the form of long-term debt or equity to ultimately have enough liquid capital to wind everything down.

320. In another communication dated July 22, 2022, Matt Ballensweig explained to a high-level DCG employee that the 3AC losses created a "[d]uration mismatch [at Genesis Capital] because we had [one billion] of open term assets with [Three Arrows] which no longer exist and thus cannot be used to offset all of our open term liabilities" including liabilities to the Earn investors. Managing Director No. 1 [Ballensweig] continued to explain that there was an additional "asset quality mismatch because $500 [million] of the collateral we absorbed to offset the [Three Arrows] losses was GBTC which isn't liquid. So both of these things on net contribute to the overall net liquidity gap [Genesis Capital] [has] as an organization.":

> Matthew Ballensweig | Genesis Cap 2022-07-22 03:49:15.057 PM
>
> Hey Matt- will get you some data to chew on over the weekend but it's duration mismatch and asset quality mismatch. Duration mismatch because we had 1.0B of open term assets with TAC which no longer exist and thus cannot be used to offset all of our open term
> liabilities (obviously not expecting all of our liabilities to be fleeting but still). Asset quality mismatch because $500mm of the collateral we absorbed to offset the T
> AC losses were GBtC which isn't liquid. So both of these things on net contribute to the
> overall net liquidity gap we have as an organization until we bring in liquid capital or utilize the gbtc to take on liquid capital.

321. Further, the losses were not reflected on Genesis Capital's balance sheet—they were reflected on Genesis Asia Pacific's Q2 2022 income statement, which Genesis Capital never provided to Gemini.

322. On July 21, 2022, Genesis Global Capital's CFO corrected some of these misstatements, writing in an email to a member of Genesis Capital's sales team: "[w]e should avoid using the word 'well-capitalized'" and "DCG didn't absorb the loss." The same day, Genesis Capital's CFO also messaged Managing Director No. 1 [Ballensweig] and several members of the lending team: "[w]e have to stop making reference that we are well capitalized."

323. On July 21, 2022, Genesis Global Capital's CFO informed DCG and the Genesis Entities' Heads of Communications of similar false statements contained in Genesis Capital's and DCG's talking points. Neither DCG nor Genesis Global Capital corrected any prior misstatements made to Gemini.

324. Genesis Global Capital's CFO objected to these false statements to further conceal Genesis Global Capital's financial condition. As Genesis Global Capital's CFO explained to Genesis Global Capital's Chief Marketing Officer on July 21, 2022: "I don't want sales to tell people we have no losses and then ask me to be on a call to justify that."

325. Genesis Global Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Global Capital's financial condition. Instead, members of Genesis Global Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the [DCG] Promissory Note or its terms. In a private message dated August 30, 2022, Genesis Global Capital's CFO confided to a colleague:

> We are only comfortable to share what will yield the best outcome for the firm. [Having the finance team] on the call without anticipated questions is not putting finance on the spot. It's putting the firm on the spot. That's what we have to convey [to Genesis Capital personnel] [and] why [having the finance team join counterparty calls] will be putting c suites and [the] firm "at risk."

326. Starting in July 2022, and continuing multiple times per week until November 16, 2022, Genesis Global Capital provided reports to Gemini that listed the value of Genesis Global Capital's "current assets." A "current asset" is one that can be reduced to cash or cash equivalents within the course of one year. These reports fraudulently categorized the [DCG] Promissory Note as a current asset, even though it was payable ten years later. In response to inquiries from Gemini, on July 28, 2022, Genesis Global Capital's CFO helped Genesis Global Capital's lending team draft an email to Gemini which explained that the "current assets" column in this report contained "$1.1bn in receivables from related parties"—*i.e.*, the [DCG] Promissory Note. This email to Gemini omitted any reference to the [DCG] Promissory Note's duration or other terms.

### a. Defendant DCG Fails to Repay Hundreds of Millions of Dollars Owed to Genesis Global Capital, Worsening Genesis Global Capital's Financial Condition

327. On July 24, 2022, with respect to the $100 million Genesis Global Capital loaned to DCG on January 24, 2022, DCG failed to repay that loan on or before its maturity date. Instead, on July 25, 2022, a DCG executive informed Managing Director No. 1 [Ballensweig] that DCG "literally [did not] have the money right now" to repay the loan.

328. At this juncture, Genesis was insolvent and DCG was in existential danger. Had Genesis Global Capital gone bankrupt at that time, DCG's loans to Genesis Global Capital would have been due, but DCG did not have the ability to repay the loan and would have been forced into bankruptcy.

329. Also on July 25, 2022, the same day, DCG's treasurer emailed Genesis Capital's COO [Defendant Islim] and Managing Director No. 1 [Ballensweig]:

> We received guidance from [Silbert] to re-paper the $100mm loan (with July 24th maturity) from Genesis to DCG by 10 months (until May 2023). Please let us know what documentation is needed to execute on the new loan. Also, we need to include language that the loan could be repaid early without any penalty.

330. Managing Director No. 1 [Ballensweig] objected, stating: "given the continued pressure from major lenders such as … Gemini … this duration mismatch will certainly put Genesis in a much worse spot." The same day, on July 25, 2022, DCG's Treasurer responded that DCG "need[ed] to preserve liquidity to meet our operating cash needs over the next few months." After additional objections, the next day, Managing Director No.1 [Ballensweig] relented stating: "it sounds like we don't have much room to push back, so we will do what DCG needs us to do." DCG also dictated the interest rate for this loan.

331. With respect to the February 23, 2022 loan from Genesis Global Capital to DCG of $100 million in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022,

after the payment became due, at DCG's insistence, Genesis Global Capital extended the maturity date of this loan to May 2023.

#### b. Defendants Misrepresented Genesis Global Capital's Financial Position

332. As demonstrated herein, Defendants DCG, Silbert, Kraines and Murphy knew, or had reason to know, that Genesis Global Capital investors would rely on Moro's statements and the DCG drafted talking points regarding Defendant DCG's support. Indeed, that was the whole point.

333. Even more troubling, key DCG officers and employees personally participated in drafting the misleading statements disseminated by Moro and other Genesis personnel. For example, on July 18, 2022, in response to an email exchange with another Genesis Yield investor, Mark Nuvelstijn, CEO and co-founder of Bitvavo, regarding the possibility of a parent guaranty of Genesis Global Capital's borrowing from DCG, Ballensweig suggested the investor's representative speak with DCG's then-COO, Defendant Murphy. Ballensweig stated: "I've broached the topic of a guarantee with [Defendant] Mark Murphy, DCG's COO and before we get there, I think it would make sense for you guys to set up a call to go through how DCG has viewed the loss and their plans to support Genesis [Global Capital] in perpetuity. There are many implications of establishing a formal guarantee but I think for starters you guys should hop on a call. Let me know if that works and we'll set something up this week."

334. On July 19, 2022, Defendant Murphy held a call with that investor's representative. In substance, speaking on behalf of Defendant DCG, Defendant Murphy reiterated the false story that had previously been shared with the investor in the same "Three Arrows Post-Mortem" document that Genesis Global Capital had sent to Gemini. Defendant Murphy stated that Defendant DCG stepped in to absorb Genesis Global Capital's losses on its 3AC exposure, and he

stated that those losses had been netted against Defendant DCG's balance sheet. He further stated that, following Defendant DCG's support, Genesis Global Capital was well capitalized to continue doing business as normal in the future. And he reassured the investor that Genesis Global Capital was among the most important parts of the broader DCG empire, that Defendant DCG had big plans for Genesis Global Capital's future business, and that DCG was committed to providing ongoing support to Genesis Global Capital to allow the company to continue growing.

335. Each of these statements—made by Defendant Murphy on behalf of Defendant DCG—was false.

336. Genesis Global Capital's losses were not absorbed by Defendant DCG or netted against Defendant DCG's balance sheet. Genesis Global Capital was insolvent, not well capitalized. And, as evidenced by Defendant DCG's failure to provide even the support that Genesis Global Capital had publicly claimed in the aftermath of 3AC's collapse, Defendant DCG in fact had no plans to continue providing ongoing support to Genesis Global Capital in order to permit Genesis Global Capital to avoid failure and continue growing.

337. Defendant Murphy made these affirmative misrepresentations as part of Defendants' fraudulent scheme.

338. Thereafter, Defendant Murphy and other DCG representatives were copied on email exchanges in which Genesis Global Capital continued to provide false information in response to the investor's requests for information. For example, on July 26, 2022, Defendant Murphy, then Defendant DCG's COO, was copied on an email exchange in which Ballensweig made a series of false statements in response to inquiries from the investor. Ballensweig explained that his response had been prepared with assistance from the "Finance and Accounting teams at both DCG and Genesis."

339. The Finance and Accounting team at DCG and Genesis included Ron DiPrete, and DCG's Head of Special Project, Finance, and DCG CFO Defendant Kraines.

340. As part of that response, Ballensweig provided details about approximately $1.8 billion in lending from Genesis Global Capital to affiliated entities that had been disclosed in Genesis Global Capital's prior reports. Ballensweig falsely stated that Genesis Global Capital had approximately $922 million in outstanding loans to DCG—an amount that purposefully omitted the $1.1 billion promissory note that Defendants DCG and Silbert sought to conceal from Genesis Global Capital's investors. At the same time, Ballensweig falsely stated that DCG had "assumed the $1.1bn loan on June 30, 2022"—a misrepresentation calculated to reassure the investor that Genesis Global Capital had already been made whole for its loss on the 3AC loans.

341. That was entirely fictitious, but Defendant Murphy made no effort to correct Ballensweig's misrepresentations. Nor did Ronald DiPrete, DCG's Head of Special Projects, Finance, who was also copied on the exchange.

342. On August 10, 2022 Defendant Murphy was appointed Chairman of the Board of Genesis Global Holdco LLC.

343. Later, on August 16, 2022, Defendant Murphy and DiPrete were copied (along with Jason Yacavone, a Director in DCG's Investments group) when Genesis Global Capital's Hamill Serrant sent an updated Genesis Global Capital balance sheet to the same investor. The updated balance sheet, dated as of July 29, 2022, once again falsely included the $1.1 billion DCG Promissory Note at its full face value in a "Receivable from related parties" line item. Even with that false entry, the balance sheet showed "Total member's equity" of just $95.4 million. And once again, none of DCG's representatives lifted a finger to correct the falsehood, preferring instead to keep the public and Genesis Global Capital investors in the dark.

344. During this period, Defendant DCG's representatives were repeatedly copied on email exchanges with Genesis Global Capital's personnel, in which Genesis Global Capital provided additional information in response to the investor's questions and requests. But DCG's representatives never stated that the core premise of the parties' discussions—namely, that DCG had already stepped in to absorb Genesis Global Capital's losses from its 3AC exposure—was false.

345. The participation of DCG officers and employees in these communications demonstrates that the effort to mislead was an agreed-upon common scheme. The participation of DCG officers and employees in these communications also assisted Genesis Global Capital in misleading Genesis Global Capital investors.

346. More broadly, the basic nature of the DCG Promissory Note also demonstrates that Defendant DCG was a willing participant in the scheme to mislead. After 3AC's collapse triggered a $1.2 billion loss for Genesis Global Capital, investors had good reason to question Genesis Global Capital's liquidity and the solvency of its balance sheet. The DCG Promissory Note was (unbeknownst to investors at the time) the basis of misrepresentations by Genesis that Defendant DCG had covered the loss. But a promissory note such as this would not be a rational response to investors' concerns: The DCG Promissory Note did not provide any short-term liquidity, and (on any reasonable statement of its actual present value on a balance sheet basis) the DCG Promissory Note represented at most a small fraction of Genesis Global Capital's loss on the 3AC loan. For both Defendant DCG and Genesis Global Capital, the DCG Promissory Note made sense only if its existence and terms could be concealed—because doing so allowed DCG to pretend to support Genesis Global Capital, without taking on the financial cost that would have required DCG to actually do so. Put simply, the terms of the DCG Promissory Note were tailor-made to allow

Defendant DCG and Genesis Global Capital to conspire to deceive Genesis Global Capital investors.

347. Eliminating any doubt that Defendant DCG and Genesis Global Capital worked hand-in-hand on the deception, multiple present or former Genesis Global Capital employees have stated as much in correspondence with Genesis Global Capital investors. Those communications specifically confirm that Defendant DCG's and Genesis Global Capital's finance and executive teams collaborated to prepare the false financial statements that were shared by Genesis Global Capital.

348. Defendants DCG and Genesis Global Capital thus agreed to the misleading financial presentation that would conceal the DCG Promissory Note's existence and its terms from Genesis Global Capital's investors.

349. According to an interview on the podcast *Unchained* on or around November 4, 2023 with Genesis investors who invested directly with Genesis:

> [Defendants Silbert and Moro] went out and publicly told people that [they] filled the hole . . . publicly said Genesis balance sheet is strong, it hasn't been affected. You induced us to loan new Bitcoin to you based on the fact that you stated Genesis was solvent because you have provided the $1.1 billion dollar note . . . If in June [2022], Barry [Silbert] had said, look, we're going to help Genesis by giving them $1.1 billion, and this is how we did it. We give them a promissory note that's due in 10 years at 1% interest, nobody would have re-loaned. We would have seen basically what happened. But what they did is they kept it a secret. They guarded that.

350. This point is further emphasized by the following August 16, 2022 conversation between Defendant Kraines and Ronald DiPrete, in which Kraines states "I guess the problem si that Genesis flushed the billion – we didn't pay them a billion – so if we ignore the note all in they're still short a billion":

Michael Kraines 2022-08-16 09:56:11.603 PM

put differently, I guess the problem is that Genesis flushed the billion - we didn't pay them a billion - so if we ignore the note all in they're still short a billion?

Ronald DiPrete 2022-08-16 10:24:47.427 PM

i think that's right

our liquidity is tighter than i'd like

i'll get really granular over the next 48 hours on it but it's never gotten better upon closer examination

if we had $3bn today like we might have expected, losing funding might be more acceptable

bigger risk is if Gemini shuts down its Earn program which is bringing SEC heat

liquidity / diversification of funding is still key if we can do it without hamstringing ourselves

Michael Kraines 2022-08-16 10:25:44.600 PM

ah, I hadn't taken losing Gemini into account

## D. DEFENDANTS AND GENESIS GLOBAL CAPITAL CONCEALED INFORMATION THAT WOULD HAVE REVEALED THEIR DECEIT.

351. Genesis Global Capital's CFO and other personnel directed employees not to disclose the [DCG] Promissory Note to counterparties such as Gemini. Indeed, many Genesis Global Capital employees were not informed of the [DCG] Promissory Note until months after its signature.

352. When counterparties requested additional information concerning Genesis Capital's financial statements, Genesis Global Capital continued to conceal and suppress information that would have revealed the [DCG] Promissory Note or losses on counterparty defaults. In July 2022, Genesis Global Capital's CFO directed other personnel to tell counterparties that the notes to Genesis Global Capital's balance sheet—which would have explained the [DCG] Promissory Note and its impact on Genesis Capital's balance sheet—were not prepared more frequently than the end of the year. This was false. Genesis Capital prepared notes for its quarterly balance sheets in prior quarters, including its unaudited balance sheets for the second and third quarters of 2021 and the first quarter of 2022.

353. In a July 2022 Microsoft Teams chat, Genesis Global Capital's CFO confessed to her co-workers that the "real reason" why Genesis Capital would not provide these footnotes to

counterparties was because "[i]n the notes, we are required to disclose a lot of things [w]hich will highlight what happened" including the "assignment of liab[ilities]"—*i.e.*, the [DCG] Promissory Note.

354. In another Microsoft Teams chat, in September 2022, Genesis Global Capital's CFO explained to coworkers that without the footnotes, counterparties would not know about the [DCG] Promissory Note from the balance sheet alone.

355. After June 30, 2022, Genesis Capital's CFO, in consultation with DCG, directed Genesis Capital personnel not to share cash flow and income statements and to withhold Genesis Asia Pacific's financial statements from counterparties. These financial statements would have revealed hundreds of millions of dollars in losses during the second quarter of 2022 and would have revealed that DCG did not "absorb the loss."

356. Cash flow and income statements were important to Gemini's ability to assess Genesis Capital's ability to pay back Earn investors. Thus, Gemini requested Genesis Capital's cash flow and income statements for the second quarter of 2022 on multiple occasions after June 30, 2022.

357. Genesis Capital ignored these requests and Gemini allowed them to do so.

358. Before executing the [DCG] Promissory Note, Genesis Global Capital executives, including Moro, Genesis Global Capital's CFO, and Managing Director No 1 [Ballensweig], informed DCG officers and employees what financial statements had previously been shared with counterparties, including Gemini. Thus, both DCG and Genesis Global Capital knew that they were deviating from past practices in providing only a balance sheet to Gemini.

359. Genesis Global Capital personnel soon grew concerned that Genesis Global Capital had provided false information to counterparties. On September 1, 2022, Genesis Capital's

Director of Lending reported to its interim CEO [Defendant Islim]: "I'm hearing concerns from front office folks…. They're concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity…. There still is no liquidity infusion from DCG to fill the gap and instead we have a 'note'." Nevertheless, neither DCG nor Genesis Global Capital's CEO Defendant Islim corrected the misstatements that Genesis Global Capital employees made to counterparties, including the Earn investors.

360. On September 9, 2022 Genesis executive Michael Patchen shared the following concerns with Defendant Kraines, stating that Genesis was having trouble attracting new borrowers and that without them, the "business is doomed because of the 1.5B hole in the balance sheet" which Patchen then attributed to "sins of the past":

Michael Patchen 2022-09-09 10:20:20.820 AM

Without sufficient equity we can't attract new borrowers, without new borrowers the business is doomed because of the 1.5B hole in the balance sheet. Even with st
rong financials, borrowers naturally roll off ... you always need to be able to attract new
borrowers. AQR had a 20% churn ... even in good times we needed to attract new investors to replace those that left. We just need sufficient equity to do that ... pl
us we can show pretty easily that we are profitable on this equity minus the structural hole
caused by sins of the past

361. Defendants knew Genesis was on the brink of collapse, which would be revealed in Genesis's third-quarter financials due to close on September 30, 2022. Given the dire situation in which Defendants found themselves, they revisited a June 26 proposal by Defendant Silbert to orchestrate a transaction between Genesis, DCG, and DCGI that would create the appearance of an equity infusion on Genesis's books. Back in June, DCG's attorneys at Goodwin had recommended against such a transaction, over concerns of alter ego, fraudulent conveyance, and risking DCG's own liquidity. But now, Bitvavo and Gemini were pulling assets, and circumstances had gotten worse. DCG landed on providing an "equity round-trip transaction"—yet another balance sheet trick of illusory equity without real value.

362. On the morning of September 27, 2022, Ducera sent discussion materials containing DCG's proposal for the equity round trip. As Ducera's materials made plain, GGC

would "repay [the] existing open term token loan" to DCGI, DCGI would then "contribute[] such repayment to DCG as a dividend," and DCG would "contribute[] such dividend as equity tokens to GGC." Ducera's deck highlighted that the transaction would involve "no cash, no cash movement." Ducera's deck explained that GGC would modify the terms of four existing unsecured loans to DCG totaling around $500 million as purported "arms-length amendments." For all four loans, the maturity dates would be extended, the interest rates would be lowered, and the loans would remain unsecured. This would be the purported consideration for the DCG equity contribution although as usual, Genesis protested, had no say, and received nothing of value from DCG's equity round trip.

363. On September 29, 2022, DCG caused GGC to enter into the proposed transaction. GGC repaid an existing 75,300 ETH loan (worth $100 million) extended to it by DCG subsidiary DCGI; DCGI contributed that same 75,300 ETH to DCG in the form of a dividend distribution; and DCG then would contribute that 75,300 ETH back to GGC as an equity contribution (the "September 29 Transaction"). The September 29 Transaction was purely cosmetic and was designed to create the false impression that DCG was providing an equity infusion into Genesis that increased its liquidity and to deceive lenders into believing that DCG was supporting Genesis.

364. Ducera, of course, helped DCG effectuate the September 29 Transaction by preparing the necessary documentation. The transaction was memorialized by DCG's Gregory Ingrassia:

<u>First Transaction: GGC repayment of token loan to DCGI:</u> Transfer Complete
- **Asset**: ETH
- **Amount**: $100mm
- **Legal documents**:
1. Genesis (Arianna, Andrew) to finalize and distribute token loan repayment/amendment documents and share with DCG/DCGI.
2. DCGI (Jason, Matt, Daniel, Mike Katz) to review and sign-off on token loan repayment/amendment documents.
- **Timing of token movements**:
1. Before 9am EST on Thu: Genesis (Hamill) to send repayment of ETH token loan to DCGI wallet
2. Before 10am EST on Thu: DCGI (Natasha) to confirm receipt of ETH tokens in DCGI's wallet at Coinbase

<u>Second transaction: DCGI dividend distribution to DCG:</u> Transfer complete
- **Asset**: ETH
- **Amount**: $100mm
- **Legal documents**: Legal team (Goodwin, Mike Katz) to finalize and distribute legal documents related to the dividend distribution from DCGI to DCG.
- **Timing of token movements**:
1. Before 11am EST on Thu: DCGI (Natasha) to initiate ETH dividend distribution from DCGI wallet to DCG wallet
2. Greg/Diliana/Bill to approve transaction in Coinbase
3. Greg/Diliana to approve transaction via video callback with Coinbase

<u>Third transaction: DCG equity injection to GGC:</u> Transfer complete
- **Asset**: ETH
- **Amount**: $100mm
- **Legal documents**: Legal team (Goodwin, Mike Katz) to finalize and distribute equity distribution documents.
- **Timing of token movements**:
1. Before 3pm EST (latest 7pm EST) on Thu: DCG (Natasha) to initiate ETH equity injection to DDC wallet
2. Greg/Diliana/Bill to approve transaction in Coinbase
3. Greg/Diliana to approve transaction via video callback with Coinbase
4. After 3pm EST (latest 7pm EST) on Thu: Genesis (Hamill) to confirm receipt of ETH tokens in GGC's wallet

365. Just as it had done with the Promissory Note, DCG capitalized on the September 29 Transaction to deceive large lenders into believing DCG was supporting Genesis and that Genesis was solvent. At DCG's direction, Defendant Islim told Bitvavo's Nuvelstijn that DCG "finalized the $100mm new equity infusion in GGC to strengthen our balance sheet further." This was no "infusion" of "new equity," as internal DCG documents acknowledge GGC paid $100 million worth of ETH to DCGI and received back those same assets from DCG the same day. Shortly thereafter, Kramer called over $2.6 million in personal loans to Genesis. Islim explained to Silbert, Kraines, and Murphy that Kramer called his loans "right after [Genesis] updated [Ducera] on the Gemini situation." Even Kraines admitted that Kramer and Ducera pulling their loans was "not a great vote of confidence."

## E. DEFENDANT SILBERT PERSONALLY INTERVENED TO KEEP INVESTORS FROM WITHDRAWING INVESTMENTS.

366. Accounting tricks aside, Defendants knew Genesis was insolvent by $1.5 billion. For example, in the following slide taken from an October 11, 2022 presentation on Genesis's liquidity, it states "[a]cross all Genesis entities at the end of Q3, cash and majors liquidity of $1.5bn less net OT payables of $1.9bn and net FT payables of $1.1bn result in a liquidity gap of ~($1.5bn)." In other words, Genesis had $1.5 billion in cash and major liquid assets, but owed $3.0 billion in net payables—leaving a liquidity shortfall of approximately $1.5 billion:

**Genesis Balance Sheet as of Sep 30th '22**

Across all Genesis entities at the end of Q3, cash and majors liquidity of $1.5bn less net OT payables of ($1.9bn) and net FT payables of ($1.1bn) result in a liquidity gap of ~($1.5bn):

Available liquidity of $1.5bn excludes $0.2bn of regulatory cash and $0.2bn Altcoins

| ($bns) | As of Sep 30th '22 | | Assets less Liabilities & Equity | Comments |
|---|---|---|---|---|
| | Assets | Liabilities & Equity | Delta | |
| Cash & Cash Equivalents | $0.4 | $0.0 | $0.4 | Includes $160mm of regulatory cash at GGT and GGML |
| Customer cash | 0.5 | 0.0 | 0.5 | Customer segregated cash / collateral |
| USD Stables | 0.2 | 0.0 | 0.2 | |
| BTC and ETH | 0.6 | 0.0 | 0.6 | |
| Altcoins | 0.2 | 0.0 | 0.2 | |
| (A) **Total Cash and Tokens** | **$1.9** | **$0.0** | **$1.6** | Liquidity defined throughout as Cash & Equiv + BTC & ETH |
| (B) **Total Other Assets (excl. Loans)** | **$0.5** | **$0.1** | **$0.4** | |
| Genesis Open Term Receivables/Payables | $2.4 | $3.5 | ($1.1) | Loan book as of 9 Sep 30th, which includes Bitvavo $0.4bn OT payable assumed to pull in Oct '22 and Nov '22 |
| Genesis Open Term Collateral Receivable/Payables | 1.1 | 1.8 | (0.8) | |
| (C) **Open Term Gross Receivables/Payables** | **$3.4** | **$5.3** | **($1.9)** | |
| *Memo: OT Receivables/Payables (excl. Interco.)* | *1.7* | *4.8* | *(3.1)* | Excludes $1.2bn net interco. |
| Genesis Fixed Term Receivables/Payables | $0.5 | $1.6 | ($1.1) | Includes $300mm DCG interco. loans, currently due in May '23. Forecast assumes that these loans will convert to OT |
| Genesis Fixed Term Collateral Receivable/Payables | 0.1 | 0.2 | (0.0) | |
| (D) **Fixed Term Gross Receivables/Payables** | **$0.6** | **$1.7** | **($1.1)** | |
| *Memo: FT Receivables/Payables (excl. Interco.)* | *0.3* | *1.7* | *(1.4)* | Excludes $0.3bn net interco. |
| (E) **DCG Receivable** | **$1.1** | **$0.0** | **$1.1** | $1.1bn DCG interco. excluded from loans above |
| (F) **Equity** | **0.0** | **$0.3** | **(0.3)** | $0.4bn across GAP, GGC, GGCI, GGT, and GGM |
| Total (A) + (B) + (C) + (D) + (E) + (F) | $7.5 | $7.5 | $0.0 | |

Net payables of $3.0bn include OT of $1.9bn and FT of $1.1bn

5 | CONFIDENTIAL Note: Market data as of September 30, 2022 (BTC: $19,855, ETH: $1,321)

367. The same presentation outlined that as things stood, Genesis would simply run out of cash in February of 2023 (if not earlier), but that if Gemini withdrew its funds Genesis would be immediately illiquid and unable to honor redemptions, stating "Genesis's Status Quo case liquidity goes negative by Feb' 23, but if Gemini OT is pulled, liquidity drops to ~($0.5bn) by end of this month":




368. On October 12, 2022, the same day the above was circulated, Gemini held a call with Genesis and informed them that Gemini would be seeking to terminate the Gemini Earn program and would be withdrawing customer funds. In other words, the nightmare scenario outlined above was occurring. During the call, Gemini's Cameron Winklevoss expressed a desire to withdraw all customer funds in "days" and noted that when Gemini "spoke to Matt in September he made it sound we could withdraw in days and ask[ed] whether the situation now is different." After Genesis explained that the agreement had a 30 day notice provision and that withdrawal of all customer funds in days was not feasible, Gemini agreed to draft a formal termination notice to be served the next day.

369. Defendant Silbert—DCG's founder and CEO—personally participated in perpetuating the lie that Genesis was solvent and capable of honoring its obligations. On the afternoon of October 13, 2022 (following several direct discussions regarding the future of the Gemini Earn Program) Gemini sent an email to Genesis Global Capital providing 30 days' notice of the termination of the Gemini Earn Program and the Gemini Earn MLAs. Within 24 hours,

Defendant Silbert personally emailed Cameron Winklevoss, co-founder of Gemini, seeking a face-to-face meeting.

370. Defendant Silbert acknowledged that his request was prompted by the uncertain "future of the Gemini-Genesis lending relationship." Defendant Silbert posited that he and Cameron Winklevoss should be exploring "ways to take advantage of the crypto winter" and suggested that "there are a number of ways that Gemini-Genesis-DCG could more closely collaborate."

371. Following Gemini's October 13, 2022 formal notice, Defendants scrambled to determine whether and for how long Genesis could continue to operate. During this exchange, Defendant Kraines offered the following thought, regarding the 3AC default and DCG Promissory Note transaction, stating that "the damage was done when we took the $1.1bb torpedo hit – the assumption of the liab was no more than kicking the can down the road . . . so the damage was done when Genesis lost the $1.1 bb – it was always going to have to be cleaned up."

Michael Kraines 2022-10-13 07:29:00.093 PM

and to make myself feel even better, I'd point out that the damage was done when we took the $1.1bb torpedo hit - the assumption of the liab was no more than k
icking the can down the road

Michael Kraines 2022-10-13 07:29:37.697 PM

so the damage was done when Genesis lost the $1.1bb - it was always going to have to be cleaned up

This is an admission by Kraines that, consistent with his prior reservations outlined above, that the DCG Promissory Note did nothing to restore solvency to Genesis and that Genesis had remained insolvent from the moment 3AC defaulted in June 2022.

372. Defendants updated the slide deck on October 17, 2022 which Defendant Kraines distributed with the warning that the liquidity situation if Gemini pulled their money is "is a bad one"

Message

**From:** Michael Kraines [michael@dcg.co]
**Sent:** 10/17/2022 8:13:53 PM
**To:** Mark Murphy [mark@dcg.co]; Simon Koster [Simon@dcg.co]
**CC:** Diliana Damianova [Diliana@dcg.co]; Jordan Fitterman [Jordan@dcg.co]
**Subject:** DRAFT Genesis Analysis
**Attachments:** Genesis Financial Update Oct 17 v9.pdf

Guys - as promised fyi I'm attaching the up-to-the minute version of our consolidated analysis of the situation at Genesis. As we can discuss tomorrow -- depending on what set of assumptions you look at -- the liquidity situation at Genesis post at Gemini pull of the OT is a bad one.

Note that this work has been reviewed at a high level by Genesis & the Investments team, although of course there's more work for all of us to do in terms of vetting the available data and narrowing down our assumption set. Ducera also has seen the deck and their feedback is pending.

Look forward to discussing together, and of course there's more to follow.

**Michael Kraines**
Chief Financial Officer
Digital Currency Group

373. As detailed herein, Genesis had been insolvent for months by this time, but continued to operate praying it could stay liquid for long enough to somehow bail itself out. But what Defendant Kraines left out of his October 17, 2022 cover email was that, although Gemini pulling its money from Genesis would exacerbate Genesis's liquidity issue, Genesis was now projecting that even if Gemini did not pull their funds, and things remained "status quo", Genesis would run out of liquidity by the end of November 2022. Specifically, as shown below, the forecast was that "Genesis hits negative liquidity by Nov ''22.":

## Genesis Status Quo Assumptions & Liquidity

Assuming 15% OT borrow attrition in Oct '22 (after Bitvavo OT loans are repaid), Genesis' liquidity falls to ($158mm) in Nov '22:

**Hey Assumptions for "Status Quo" Scenario**

- ✓ **Liquidity includes USD / stables, BTC, and ETH** (i.e., Alts are excluded from liquidity – the assumption is being confirmed with Genesis)
  - i. GBTC collateral returned to Genesis is assumed 'quasi-liquid' at 50% of market value (not included in the Status Quo scenario, since GBTC is pledged to Gemini)
- ✓ **No OT balances are received, and 15% OT borrows are returned** (the assumption is being confirmed with Genesis), with the following exceptions:
  - i. Bitvavo OT borrows of $413mm total is assumed to be pulled in Oct '22
  - ii. Unsecured OT lends of $46mm are repaid in Oct '22 (not included in the Status Quo scenario, since considered a new liquidity source)
- ✓ **FT loans and borrows roll off per schedule** (i.e., no FT loans roll over to OT – assumption being confirmed with Genesis)
  - i. Vitaly's lends and borrows (net liquidity impact of ~($254mm)) are not extended and are assumed to be repaid by Oct 31st '22
- ✓ **No counterparty defaults**, including CashCloud
- ✓ **No capital injections**
- ✓ **No new originations**
- ✓ **$300mm of DCG FT loans due in May '23 moved to OT**
- ✓ **Flat token prices** based on market data (BTC: $19,855, ETH: $1,321)

**Status Quo Liquidity Negative in November 2023 ($mms)**

| | Current | Negative[1] | Change | | |
|---|---|---|---|---|---|
| | 9/30/2022 | 11/30/2022 | $ | % | |
| USD / Stables | $895 | | | | |
| BTC | 339 | | | | |
| ETH | 221 | | | | |
| Total Liquidity | $1,456 | (D) ($158) | ($1,614) | -111% | (A) |
| *Memo: Alts* | 190 | | | | |
| *Memo: Total Liquidity (incl. Alts)* | 1,646 | | | | |
| Net Open Term Balance | ($1,570) | ($698) | $872 | 56% | (B) |
| Net Fixed Term Balance | (1,386) | (673) | 713 | 51% | |
| **Net Asset Balance** | **($2,957)** | **($1,371)** | **$1,586** | **54%** | |
| Net Asset Surplus/(Shortfall) | ($1,501) | ($1,529) | ($28) | -2% | (C) |

(A) Due to OT pulls, and since FT borrows coming due through Nov '22 exceed FT loans coming due for the same period, liquidity decreases by $1.6bn

(B) As these FT borrows are repaid, outstanding FT balances improve by $713mm but net liability remains

(C) The implied funding shortfall remains relatively flat given change in liquidity is dollar for dollar with the change in net FT balances, with the exception of the exclusion of Alts due to their assumed lack of liquidity

(D) Genesis hits negative liquidity by Nov '22

6 | CONFIDENTIAL Note: Market data as of September 30, 2022 (BTC: $19,855, ETH: $1,321)
[1]Illustrates the first month when liquidity becomes negative

374. Defendant Silbert's request to Gemini resulted in a lunch meeting between Cameron Winklevoss and Silbert at a restaurant in New York City on October 22, 2022. At that lunch meeting, Defendant Silbert made numerous representations designed to induce Gemini not to discontinue the Earn program. Silbert was aware at the time that Genesis Global Capital was massively insolvent, because—unbeknownst to Gemini and Genesis Global Capital investors—DCG had provided Genesis with a 10-year promissory note rather than assuming the 3AC losses as had been claimed. Defendant Silbert was further aware that Defendant DCG had not provided meaningful near-term liquidity to Genesis Global Capital sufficient to allow Genesis Global Capital to honor its obligations, again contrary to statements made to Genesis Global Capital investors. Defendant Silbert disclosed none of those highly material facts regarding Genesis Global Capital's insolvency and lack of liquidity, even as he was urging Gemini to continue the Gemini Earn Program.

375. Defendant Silbert did more than conceal those numerous material facts. Rather, he created a cover story that was designed to—and did, in fact—affirmatively misrepresent the reason why he was urging Gemini to continue the Earn program. Defendant Silbert represented that

Genesis Global Capital simply needed sufficient time to effect an orderly unwinding of its "complex" loan book, and that any difficulty that the termination of the Gemini Earn Program would cause for Genesis Global Capital was merely a mismatch in the timing of Genesis Global Capital's loan positions. That is, Silbert affirmatively misrepresented that Genesis Global Capital faced only a short-term timing mismatch between its outstanding loans and borrowing.

376. In reality, as Defendant Silbert well knew, Genesis Global Capital's problems ran far deeper than a mere "timing" issue. Genesis Global Capital had a gaping hole in its balance sheet, because the $1.1 billion of support that DCG had purportedly given Genesis in order to "assume" the Genesis 3AC losses was, in actuality, the 10-year-distant promissory note. As explained above, the DCG Promissory Note was worth (at most) a tiny fraction of its face value and offered no realistic prospect of allowing Genesis to meet its obligations as they came due. And the weighted average duration of Genesis's outstanding loans was more than 765 days (or more than 2 years), hardly a short-term timing mismatch. Defendant Silbert pushed his cover story even further, suggesting that Genesis Global Capital, Defendant DCG, and Gemini should explore an arrangement to collaborate closely in the future.

377. Defendant Silbert's misrepresentations had the desired effect. Relying on Defendant Silbert's claims, Gemini elected to delay the termination of the Gemini Earn Program—and not to explore the possibility of pursuing more rapid termination or other relief, as Gemini would have done if Defendant Silbert had stated the truth.

378. Then, just days before the end of the Class Period, Defendant Silbert caused DCG to negotiate and enter into a November 10 tripartite agreement between and among Genesis Global Capital, Defendant DCG, and Gemini. Pursuant to that agreement, Defendant DCG promised to transmit additional collateral in the amount of 31,180,804 shares of GBTC (valued in excess of

$626.1 million as of July 6, 2023) to Genesis Global Capital for the benefit of Gemini Earn investors. On information and belief, Defendant DCG transmitted the collateral to Genesis Global Capital but did not instruct or allow Genesis Global Capital to transfer that collateral to Gemini as agreed.

379. But even assuming that Defendant DCG nominally fulfilled its contractual obligation, the real purpose of the agreement was a ruse. By purporting to demonstrate still further support for Genesis Global Capital's obligations in the form of collateral—despite knowing that Genesis Global Capital was massively insolvent—Defendant DCG induced Gemini to continue the Gemini Earn Program. Gemini would not have done so if Defendants Silbert and DCG had come clean about Genesis Global Capital's true financial condition, rather than repeatedly misrepresenting it.

380. Under these circumstances, Defendants Silbert and DCG were under a legal obligation not to conceal the true nature of Genesis Global Capital's financial condition. Defendants Silbert and DCG understood that Gemini was relying on the financial information and other representations provided by Genesis Global Capital—including, in particular, multiple assurances that Genesis Global Capital's losses relating to 3AC had been absorbed by Defendant DCG—as essential facts in deciding whether to terminate the Gemini Earn Program on the 30-day timeline Gemini had previously communicated. Moreover, the falsity of those representations was not discoverable by Gemini through ordinary diligence. Thus, Defendants Silbert and DCG were under a legal obligation to speak the truth and to correct those misrepresentations.

381. Defendant Silbert's partial disclosures regarding Genesis Global Capital's financial condition were equivalent to actual misrepresentations—made on Defendant DCG's behalf—regarding Genesis Global Capital's solvency. In particular, Defendant Silbert's assurances that

Genesis's problems were a mere "timing" issue were deliberate half-truths, calculated to mislead Gemini into concluding that Genesis Global Capital was not in fact insolvent.

382. The above acts committed by Defendants DCG, Silbert, Moro, Islim, Kraines and Murphy caused Genesis Global Capital to misrepresent its financial health to Plaintiff Gowda via affirmative false statements made directly to investors and investors' agent *and* via Genesis Global Capital omitting to inform investors of its insolvency when it had a duty to do so under the Genesis Yield Investment Agreements.

383. As a result of the fraudulent scheme and material omissions described above, Plaintiff Gowda and members of the Class invested in Genesis Yield. Plaintiff Gowda and members of the Class would not have (nor would any reasonable investor) invested in Genesis Yield had they known Genesis Global Capital's true financial conditions.

384. As alleged above, on or about June 18, 2022, Genesis Global Capital lent approximately 18,697 bitcoin (valued at over $355 million as of June 18, 2022) to affiliate, DCGI, on an open-term basis. Rather than repaying this loan in bitcoin—the denomination of the loan—DCGI partially repaid that loan on November 10, 2022, with 25,999,457 shares of GBTC which were worth approximately $250 million as of November 10, 2022.

385. This repayment deprived Genesis Global Capital of liquidity because unlike bitcoin, Genesis Global Capital neither borrowed nor lent GBTC, and could not liquidate the GBTC shares due to affiliate sales restrictions.

386. After this repayment, 4,550.45 bitcoin (approximately $80 million as of November 10, 2022) remained outstanding on Genesis Global Capital's loan to DCGI. On November 10, 2022, DCG made Genesis Global Capital extend the maturity date for the remaining amount to May 11, 2023. These loans all remain unpaid.

387. On or about November 12, 2022, Genesis Global Capital privately sought an emergency loan of between $750 million and $1 billion from a third party, and informed the proposed lender that it was facing a "liquidity crunch primar[ily] due to certain illiquid assets on its balance sheet following the events of [Three Arrows]" including (1) the [DCG] Promissory Note; (2) GBTC; and (3) unsecured loans to DCG. Genesis Global Capital did not—or could not—obtain this emergency loan.

### F. THE TRUTH BEGINS TO BE REVEALED: GENESIS GLOBAL CAPITAL SUSPENDS REDEMPTIONS CAUSING INVESTOR LOSSES AND MISREPRESENTS THE REASON.

388. Defendants were only able to perpetuate their lies for so long and, on November 8, 2022 Genesis became unable to meet investor withdrawals. Between November 8 and 11, 2022, Genesis missed approximately $266 million in investor withdrawals. And, by November 9, 2022 Silbert acknowledged that Genesis was now "seeing the beginning of a bank run" which he believed could deplete all Genesis's liquidity "by as early as next week" and that he was "afraid that a Genesis bankruptcy is becoming a strong possibility":




389. Despite the above events and concessions, on November 9, 2022 Genesis issued a DCG-drafted communication via Twitter which included the following false statement: "the

operation of our lending and trading businesses have not been impacted by recent market events." This statement was false and misleading and caused investors such as Plaintiff Gowda and members of the class not to withdraw their funds.

390. The November 9, 2022 communication was followed by a November 11, 2022 email to existing Genesis investors, which again falsely portrayed Genesis as operating normally and further claimed that DCG had provided an equity infusion of $140 million:

Message

**From:** Genesis [noreply@genesistrading.com]
**Sent:** 11/11/2022 9:03:01 AM
**To:** Barry Silbert [barry@dcg.co]
**Subject:** Genesis Update

Genesis Update

[EXTERNAL]

CAUTION: This email originated from outside of the organization.



Genesis Client,

We are writing to provide an update on our current balance sheet as we position Genesis for its next phase of growth.

While the operation of our lending and trading businesses has not been impacted by recent market events, Genesis has taken steps to strengthen its balance sheet with an additional equity infusion of $140M from our parent company, Digital Currency Group. This additional capital will bolster our position as a global leader in crypto capital markets and allow us to support our clients and the growing demand for our services.

Genesis continues to operate with transparency as we always have, and we remain steadfastly committed to our clients throughout all market conditions. Please contact us if you have further questions.

Regards,
Genesis

391. The November 11, 2022 communication's claim that DCG had provided a $140 million equity infusion was false, misleading, and was actually the opposite of what occurred. In reality, DCG had *withdrawn* approximately $40 million in cryptocurrencies from Genesis,

provided an equity infusion to a separate Bermuda-based Genesis entity, and transferred ownership of that entity away from Genesis Capital for no consideration.

392. On November 16, 2022, Genesis Global Capital announced, via Twitter, that Genesis Global Capital would not permit further redemptions or new loan originations due to withdrawal requests exceeding Genesis Global Capital's liquidity, and the undisclosed material negative risks of Genesis's true financial condition that Defendants concealed since June 2022 began to be revealed:

> FTX events have created an unprecedented market, resulting in abnormal withdrawal requests, which have exceeded our current liquidity... In consultation with our professional financial advisors at counsel we have taken the difficult decision to temporarily suspend redemptions and the new loan origination in the lending business[.]

393. The November 16, 2022 announcement misleadingly blamed FTX for Genesis Global Capital's inability to honor customer redemptions instead of acknowledging that the blame lay with the dubious transactions and accounting methods employed by Genesis Global Capital and Defendants.

394. In fact, Genesis Global Capital was unable to continue to process redemption requests because Genesis Global Capital had become insolvent in June 2022 when it was unable to collect $1.1 billion of the $2.3 billion loaned to 3AC and the loan to parent Defendant DCG continued to decline in value.

395. Genesis Global Capital was not merely illiquid; it was insolvent and had been since June 2022. This fact was confirmed when, on January 19, 2023, Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd., voluntarily filed petitions under Chapter 11 of the U.S. Bankruptcy Code in the Southern District of New York.

## IV. PLAINTIFF GOWDA AND MEMBERS OF THE CLASS RELIED ON GENESIS'S MISREPRESENTATIONS AND OMISSSIONS TO THEIR DETRIMENT

### A. Reliance on Genesis Global Capital's Misrepresentations

396. Plaintiff Gowda invested digital assets worth in excess of $636,000 as of January 2023 in the Genesis Yield program through the Gemini Earn platform.

397. Gowda's Genesis Yield investment consisted of 0.049 BTC, 632,970.2 GUSD, and 69.456636 LINK.

398. Of that amount, Gowda invested $451,000 in the Genesis Yield program after June 13, 2022.

399. In each Genesis Yield Investment Agreement, Genesis Global Capital represented and warranted that it "is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws."

400. In each Genesis Yield Investment Agreement, Genesis Global Capital represented and warranted that there were "no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement."

401. Both representations were false when made to Gowda and to Class members who invested after June 13, 2022. Genesis Global Capital was insolvent, and the 3AC default and bankruptcy proceedings could reasonably be anticipated to have an adverse effect on their Genesis Yield investments.

402. Gowda reviewed these representations before signing the Genesis Yield Investment Agreement and investing.

403. Gowda relied on these representations in deciding to invest, both directly and through Gemini, his appointed agent for all purposes in connection with the Genesis Yield Investment Agreements.

404. Gowda would not have invested had he known that Genesis Global Capital was insolvent and that these representations were false.

**B. Reliance on Genesis Global Capital's Omissions**

405. Gowda also invested in the Genesis Yield program before June 13, 2022.

406. Gowda continued to hold his Genesis Yield investment after June 13, 2022, when Genesis Global Capital was insolvent.

407. Genesis Global Capital did not disclose to Gowda that it was insolvent.

408. Genesis Global Capital did not disclose to Gowda that the 3AC default and bankruptcy proceedings could reasonably be anticipated to have an adverse effect on his Genesis Yield investment.

409. Genesis Global Capital had a duty to disclose its insolvency and to update its representations that it "is not insolvent and is not subject to any bankruptcy or insolvency proceedings."

410. That duty arose from Genesis Global Capital's representations and warranties, from its superior knowledge of its own financial condition, and from its partial disclosures about its solvency and operations.

411. Genesis Global Capital made these same omissions to every Class member. Genesis Global Capital told no investor that it was insolvent.

412. Gowda relied on the absence of any disclosure that Genesis Global Capital was insolvent.

413. Gowda relied on the absence of any disclosure that the 3AC proceedings threatened his investment.

414. Had Genesis Global Capital disclosed its insolvency and the threat the 3AC proceedings posed, Gowda would not have continued to hold his Genesis Yield investment.

**C. Reliance on Genesis Global Capital's Representations to Gemini and to the Public**

415. Gemini was the appointed agent for all purposes of investors who invested in Genesis Yield through the Gemini Earn program, including Gowda.

416. As that agent, Gemini conducted ongoing due diligence of Genesis Global Capital on behalf of Earn investors.

417. Genesis Global Capital made representations to Gemini about its risk-management practices, its investment strategy, and its financial condition.

418. Gemini received and reviewed those representations and continued to offer the Genesis Yield program to Earn investors in reliance on them.

419. Gemini's reliance on Genesis Global Capital's representations is imputed to Gowda and the Class.

420. Genesis Global Capital also made public statements about its risk-management practices, its investment strategy, and its financial condition.

421. On February 2, 2021, Genesis Global Capital publicly touted its risk-management practices.

422. Genesis Global Capital continued to make public statements assuring investors of its soundness through the fall of 2022, after the 3AC default had rendered it insolvent.

423. Those representations to Gemini and to the public were false. Genesis Global Capital's risk-management practices had failed, and the company was insolvent.

424. Gowda and Class members relied on Genesis Global Capital's representations to Gemini and to the public when they invested in and continued to hold the Genesis Yield program.

425. Gowda and Class members would not have invested or continued to hold their assets had they known the truth about Genesis Global Capital's risk-management practices and financial condition.

## V. GENESIS'S AND DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS HARMED PLAINTIFF GOWDA AND CLASS MEMBERS

426. Genesis Global Capital promised to pay Genesis Yield investors interest on their invested assets and to return their principal on demand or at maturity.

427. Defendants' concealment caused Gowda and Class members to invest, to continue to hold their assets at Genesis Global Capital, and to refrain from or delay seeking redemption while Defendants disguised the company's insolvency.

428. On November 8, 2022, Genesis Global Capital became unable to meet investor withdrawals.

429. Between November 8 and November 11, 2022, Genesis Global Capital missed approximately $266 million in investor withdrawals.

430. On November 16, 2022, Genesis Global Capital suspended redemptions and stopped honoring withdrawal requests.

431. After November 16, 2022, no investor, including Gowda and Class members, could obtain the digital assets they had invested.

432. On November 16, 2022, Genesis Global Capital also stopped paying interest on Genesis Yield investments.

433. After November 16, 2022, Gowda and Class members received none of the interest that continued to accrue on their assets.

434. On January 19, 2023, Genesis Global Capital filed for bankruptcy.

435. The bankruptcy further restricted the ability of Gowda and Class members to recover their digital assets and the interest owed on them.

436. In or around May and June 2024, through the Genesis bankruptcy and related arrangements with Gemini, Gowda and Class members received in-kind distributions of digital assets.

437. Those distributions, though described as "100% in-kind distributions," did not make Gowda and Class members whole.

438. The distributions did not include the interest that Genesis Global Capital had promised to pay and that accrued on the invested assets through the date of distribution.

439. The distributions did not compensate Gowda and Class members for the loss of use and the time value of their digital assets during the period they were denied access to them.

440. The distributions did not account for changes in the value of the digital assets between the date redemptions were suspended and the date of distribution.

441. The distributions did not compensate Gowda and Class members for the lost opportunity to deploy their digital assets elsewhere while Defendants withheld them.

442. Gowda and Class members do not seek a duplicative recovery of principal that has been returned to them. They seek damages for the interest, the time value of their assets, and the other losses Defendants' misconduct caused.

443. Defendants obtained and retained benefits at the expense of Gowda and Class members, including the use of investor assets, the deferral of more than $800 million in obligations owed by DCG and its affiliates to Genesis Global Capital, and the avoidance of the consequences of Genesis Global Capital's insolvency.

444. While Defendants represented that Genesis Global Capital was sound, Silbert withdrew more than $100 million of his own capital from Genesis Global Capital, and DCG continued to use Genesis Global Capital as its source of funding.

445. Defendants' deceptive acts and practices were a producing cause of the losses suffered by Gowda and Class members.

446. Defendants' misrepresentations and omissions were a direct and proximate cause of the losses suffered by Gowda and Class members.

447. The injuries Gowda and Class members suffered flow from the same conduct that gives rise to the federal securities claims in *McGreevy*: the concealment of Genesis Global Capital's insolvency, the sham DCG Promissory Note, and the false statements about the company's financial condition.

448. Gowda and Class members could not have avoided these injuries through reasonable diligence. Defendants and Genesis Global Capital controlled the information about the company's financial condition and concealed the truth from investors and from Gemini.

449. As a result of Defendants' conduct, Gowda and Class members suffered actual damages, economic damages, and consequential damages in an amount to be proven at trial.

## CLASS ALLEGATIONS

450. Plaintiff Gowda brings the Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) and seeks certification a Class defined as follows:

> All Texas residents who invested in Genesis Yield as offered by Genesis Global Capital during the period February 2, 2021 through November 16, 2022.

(the "Class" or "Texas Class").

451. Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and

Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff Gowda and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

452. Plaintiff Gowda reserves the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

453. **Ascertainability**. The proposed Class is readily ascertainable because it is defined using objective criteria so as to allow class members to determine if they are a member of the Class. Further, the Class can be readily identified through records maintained by Genesis Global Capital.

454. **Numerosity (Rule 23(a)(1))**. The Class is so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class, as herein identified and described, is not known, upon information and belief there are hundreds of thousands of individuals and entities that invested in Genesis Yield and were damaged.

455. **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including:

a) Whether Defendants made false or misleading representations about Genesis Global Capital's solvency, capitalization, risk-management

practices, and financial condition to Genesis Yield investors and to Gemini as their appointed agent;

b) Whether Defendants concealed or failed to disclose material facts about Genesis's insolvency, the terms and true value of the DCG Promissory Note, and the absorption of the Three Arrows Capital losses;

c) Whether the DCG Promissory Note was booked and represented as a current asset at its $1.1 billion face value when its actual value was a fraction of that amount;

d) Whether Defendants' representations and omissions were material to a reasonable investor's decision to invest in, or to maintain assets in, the Genesis Yield program;

e) Whether Defendants knew their representations were false, or made them with reckless disregard for or without reasonable care as to their truth;

f) Whether Defendants' conduct constituted false, misleading, deceptive, or unconscionable acts or practices under the Texas Deceptive Trade Practices–Consumer Protection Act;

g) Whether Defendants committed common-law fraud, fraudulent inducement, or fraud by nondisclosure, and whether they owed and breached a duty to disclose;

h) Whether Defendants agreed, expressly or tacitly, to conceal Genesis's true financial condition, and whether they are jointly liable for the resulting conduct as civil conspirators;

i) Whether Defendants were enriched at the expense of Gowda and the Texas Class, and whether equity and good conscience require restitution;

j) Whether Gowda and the Texas Class sustained damages as a result of Defendants' conduct, and the proper measure of those damages, including actual, statutory, treble, and exemplary damages.

456. **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims of the other members of the proposed Class. Plaintiff Gowda and members of the Class suffered injuries as a result of Genesis Global Capital and Defendants' wrongful conduct that is uniform across the Class.

457. **Adequacy (Rule 23(a)(4))**. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting the Action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class.

458. **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their

ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision- making.

459. Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

460. Plaintiff Gowda reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT, Tex. Bus. & Com. Code §§ 17.41, et seq. (On behalf of Plaintiff Gowda and the Texas Class Against All Defendants)

461. Plaintiff Gowda, individually and on behalf of the Texas Class, repeats and realleges each preceding allegation as if fully set forth herein.

462. Plaintiff Gowda continues to maintain that Genesis Yield constituted a security under federal law.

463. Plaintiff Gowda does not waive that position by asserting this claim under the Texas Deceptive Trade Practices–Consumer Protection Act.

464. Plaintiff Gowda pleads this claim in the alternative, including to the extent Genesis Yield is determined not to be a security, or to the extent Defendants' marketing, solicitation,

servicing, concealment, retention, redemption-related conduct, and failure to return investor assets and promised interest are actionable under Texas law independent of whether Genesis Yield is a security.

465. Plaintiff Gowda is a "consumer" within the meaning of Tex. Bus. & Com. Code § 17.45(4).

466. Plaintiff Gowda and Texas Class members sought or acquired Genesis Yield-related services by purchase or lease.

467. Those services included digital-asset lending services, yield-generation services, account-administration services, interest-calculation and interest-payment services, borrower-selection and risk-management services, balance-reporting services, transaction-processing services, and redemption-related services.

468. Those services were a central object of the Genesis Yield transaction and Plaintiff Gowda's DTPA claim does not rest on the mere loan of money or a private lending contract.

469. Defendants are each "persons" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

470. Defendants engaged in "trade" and "commerce" within the meaning of Tex. Bus. & Com. Code § 17.45(6).

471. Defendants advertised, offered, sold, serviced, administered, directed, approved, or caused the advertising, offering, sale, servicing, and administration of Genesis Yield-related services to Texas residents, including Plaintiff Gowda and Texas Class members.

472. Defendants' conduct occurred in Texas or directly affected Texas residents.

473. Plaintiff Gowda and Texas Class members resided in Texas, accessed the Gemini Earn platform and Genesis Yield-related materials from Texas, received or were exposed to

Defendants' statements and omissions in Texas, made investment and retention decisions in Texas, and suffered economic injury in Texas.

474. Defendants engaged in false, misleading, and deceptive acts and practices in violation of Tex. Bus. & Com. Code § 17.46(b).

475. Defendants represented that Genesis Yield-related services had characteristics, uses, benefits, standards, quality, and approval that they did not have, in violation of Tex. Bus. & Com. Code § 17.46(b)(5) and (7).

476. Defendants advertised Genesis Yield-related services with intent not to provide them as advertised, in violation of Tex. Bus. & Com. Code § 17.46(b)(9).

477. Defendants failed to disclose information concerning Genesis Yield-related services that they knew at the time of Plaintiff Gowda's and Texas Class members' transactions, with intent to induce Plaintiff Gowda and Texas Class members into transactions they would not have entered had the information been disclosed, in violation of Tex. Bus. & Com. Code § 17.46(b)(24).

478. Defendants' false, misleading, and deceptive acts and practices included representing, directly or indirectly, that Genesis Yield was a safe, reliable, liquid, high-yield way to earn returns on digital assets.

479. Defendants concealed material facts concerning Genesis Global Capital's solvency, liquidity, capitalization, counterparty concentration, related-party exposure, risk-management failures, and ability to honor redemptions.

480. Defendants represented, caused Genesis Global Capital to represent, or allowed Genesis Global Capital to represent that Genesis Global Capital was not insolvent, was not subject

to bankruptcy or insolvency proceedings, and was not aware of proceedings that could reasonably be anticipated to have an adverse effect on the Genesis Yield transactions.

481. Defendants knew or recklessly disregarded that those representations were false or misleading when made, repeated, or allowed to stand.

482. Genesis Global Capital was impaired, illiquid, or insolvent no later than the 3AC default.

483. The 3AC default created a material hole in Genesis Global Capital's balance sheet.

484. Genesis Global Capital lacked the liquidity required to honor investor withdrawals in the ordinary course.

485. Defendants misrepresented and concealed the nature, terms, value, and effect of the DCG Promissory Note.

486. Defendants represented, caused others to represent, or allowed investors and their agents to believe that DCG had assumed, absorbed, or cured Genesis Global Capital's losses.

487. The DCG Promissory Note did not provide Genesis Global Capital with cash, cash equivalents, or short-term liquidity sufficient to satisfy investor withdrawals.

488. Defendants concealed that Genesis Global Capital had failed to follow the risk-management, collateralization, counterparty-monitoring, and concentration controls that Defendants and Genesis Global Capital represented were protecting investor assets.

489. Defendants concealed that Genesis Global Capital had become concentrated in 3AC, DCG, DCG affiliates, and related parties.

490. Defendants concealed related-party transactions, intercompany loans, liquidity drains, and other transactions that benefited DCG, Silbert, and the DCG conglomerate while

increasing the risk that Genesis Global Capital could not satisfy its obligations to Genesis Yield investors.

491. DCG and Silbert dominated, directed, controlled, and benefited from Genesis Global Capital's business and from the concealment of Genesis Global Capital's true financial condition.

492. Murphy and Kraines participated in DCG's control over Genesis Global Capital, the handling and reporting of Genesis Global Capital's financial condition, the DCG Promissory Note transaction, and related communications or decisions designed to preserve DCG's interests and prevent investor withdrawals.

493. Moro and Islim participated as senior Genesis executives in the operation of Genesis Global Capital, communications concerning Genesis Global Capital's financial condition, and post-3AC conduct designed to preserve Genesis Global Capital's business and prevent investors and their agents from learning the truth.

494. Defendants caused or permitted Gemini, as the appointed agent for Gemini Earn investors, to receive incomplete, false, or misleading information concerning Genesis Global Capital's financial condition, risk management, liquidity, solvency, counterparty exposure, related-party exposure, DCG support, and redemption capacity.

495. Because Gemini acted as the appointed agent for Gemini Earn investors, including Plaintiff Gowda and Texas Class members, Defendants' misrepresentations and omissions to Gemini were misrepresentations and omissions to Plaintiff Gowda and Texas Class members.

496. Plaintiff Gowda relied, directly and through Gemini as his appointed agent, on Genesis Global Capital's representations and warranties in connection with each investment he made in Genesis Yield.

497. Plaintiff Gowda also relied, directly and through Gemini as his appointed agent, on Defendants' and Genesis Global Capital's statements and omissions concerning Genesis Global Capital's solvency, liquidity, capitalization, risk-management practices, counterparty exposure, related-party exposure, DCG support, and ability to honor redemptions.'

498. Defendants intended that Plaintiff Gowda, Texas Class members, Gemini as the appointed agent for Gemini Earn investors, and other investor agents rely on Defendants' misrepresentations, omissions, and concealment.

499. Defendants' representations and omissions were material.

500. A reasonable Texas consumer would have considered it important that Genesis Global Capital was impaired, illiquid, or insolvent, that Genesis Global Capital could not honor redemptions in the ordinary course, that the DCG Promissory Note did not provide short-term liquidity, and that Genesis Global Capital could not return investor assets and pay promised interest as represented.

501. Defendants also engaged in unconscionable acts and practices within the meaning of the Texas DTPA.

502. Defendants took advantage of Plaintiff Gowda's and Texas Class members' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

503. Defendants had superior and exclusive knowledge of Genesis Global Capital's true financial condition, undisclosed exposures, balance-sheet treatment, related-party transactions, DCG support, and ability to satisfy withdrawal requests.

504. Plaintiff Gowda and Texas Class members could not reasonably discover those concealed facts.

505. Plaintiff Gowda and Texas Class members would not have invested, would not have continued investing, would have recalled their digital assets earlier, or would not have delayed seeking redemption had Defendants disclosed the truth.

506. Defendants' false, misleading, deceptive, and unconscionable conduct was a producing cause of Plaintiff Gowda's and Texas Class members' economic damages.

507. Plaintiff Gowda and Texas Class members suffered economic damages, including unpaid interest, loss of use of their digital assets, loss of control and liquidity, time-value damages, consequential economic losses, and other damages alleged herein.

508. The in-kind distributions received through the Genesis Bankruptcy Action did not compensate Plaintiff Gowda and Texas Class members for all promised interest, loss of use, loss of control, loss of liquidity, time value, or other economic injuries caused by Defendants' misconduct.

509. The in-kind distributions also did not disgorge Defendants' ill-gotten gains or retained benefits.

510. Defendants acted knowingly and intentionally within the meaning of Tex. Bus. & Com. Code § 17.45(9) and (13).

511. Defendants knew, or were aware of information establishing, that Genesis Global Capital was impaired, illiquid, or insolvent; that the 3AC default created a material balance-sheet hole; that the DCG Promissory Note did not provide short-term liquidity sufficient to honor withdrawals; and that investors and their agents were being misled.

512. Defendants nevertheless concealed those facts and continued to induce investors to place or maintain assets with Genesis Global Capital.

513. This protective complaint was filed to preserve Plaintiff Gowda's and Texas Class members' claims from limitations defenses.

514. To the extent Defendants contend that pre-suit notice under Tex. Bus. & Com. Code § 17.505 was required and not provided, notice was rendered impracticable by the need to file suit to prevent limitations from expiring.

515. To the extent any notice issue remains, it should result, at most, in abatement rather than dismissal.

516. Plaintiff Gowda and Texas Class members seek all relief available under the Texas DTPA, including economic damages, additional damages for knowing or intentional conduct, court costs, reasonable and necessary attorneys' fees, pre- and post-judgment interest, and all other relief the Court deems proper.

## SECOND CLAIM FOR RELIEF

### COMMON-LAW FRAUD, FRAUDULENT INDUCEMENT, AND FRAUD BY NONDISCLOSURE
### (On behalf of Plaintiff Gowda and the Texas Class Against All Defendants)

517. Plaintiff Gowda, individually and on behalf of the Texas Class, repeats and realleges each preceding allegation as if fully set forth herein.

518. Plaintiff Gowda continues to maintain that Genesis Yield constituted a security under federal law.

519. Plaintiff Gowda does not waive that position by asserting common-law fraud, fraudulent inducement, and fraud by nondisclosure claims.

520. Plaintiff Gowda pleads these claims in the alternative, including to the extent Genesis Yield is determined not to be a security, or to the extent Defendants' conduct is actionable under Texas common law independent of whether Genesis Yield is a security.

521. Defendants made, directed, approved, caused, or substantially assisted material misrepresentations and omissions concerning Genesis Global Capital's financial condition, solvency, liquidity, capitalization, risk management, counterparty exposure, related-party exposure, DCG support, and ability to honor redemptions.

522. Defendants made those misrepresentations and omissions to Plaintiff Gowda, to Texas Class members, to Gemini as the appointed agent for Gemini Earn investors, and to the market through public and investor-facing communications.

523. Defendants caused Genesis Global Capital to represent and warrant that it was not insolvent and was not subject to bankruptcy or insolvency proceedings.

524. Defendants caused Genesis Global Capital to represent and warrant that it was not aware of pending or threatened proceedings that could reasonably be anticipated to have an adverse effect on the Genesis Yield transactions or the accuracy of Genesis Global Capital's representations and warranties.

525. Those representations were false when made, repeated, allowed to stand, or deemed made after Genesis Global Capital became impaired, illiquid, or insolvent.

526. Defendants concealed that Genesis Global Capital was impaired, illiquid, or insolvent.

527. Defendants concealed that the 3AC default created a material hole in Genesis Global Capital's balance sheet.

528. Defendants concealed that Genesis Global Capital could not honor redemptions in the ordinary course.

529. Defendants concealed the terms, value, accounting treatment, and economic effect of the DCG Promissory Note.

530. Defendants represented, caused others to represent, or allowed investors and their agents to believe that DCG had assumed, absorbed, or cured Genesis Global Capital's 3AC-related losses.

531. That representation was false because the DCG Promissory Note did not provide Genesis Global Capital with cash, cash equivalents, or short-term liquidity sufficient to satisfy investor withdrawals.

532. Defendants concealed that Genesis Global Capital's risk-management, collateralization, counterparty-monitoring, and concentration controls had failed.

533. Defendants concealed that Genesis Global Capital had material exposure to 3AC, DCG, DCG affiliates, and other related parties.

534. Defendants' misrepresentations and omissions were material.

535. A reasonable investor would have considered Genesis Global Capital's solvency, liquidity, capitalization, risk management, counterparty concentration, related-party exposure, DCG support, and redemption capacity important in deciding whether to invest, continue investing, refrain from recalling assets, or delay seeking redemption.

536. Defendants knew their representations were false or misleading when made.

537. Alternatively, Defendants made the representations recklessly, without knowledge of their truth, and as positive assertions intended to induce reliance.

538. Defendants intended that Plaintiff Gowda, Texas Class members, Gemini as their appointed agent, and other investor agents rely on the misrepresentations and omissions.

539. Defendants intended to induce Plaintiff Gowda and Texas Class members to invest in Genesis Yield, continue investing, refrain from recalling their assets, or delay seeking redemption.

540. Plaintiff Gowda relied, directly and through Gemini as his appointed agent, on Genesis Global Capital's representations and warranties in connection with each investment he made in Genesis Yield.

541. Plaintiff Gowda and Texas Class members also relied, directly and through Gemini as their appointed agent, on Defendants' and Genesis Global Capital's statements and omissions concerning Genesis Global Capital's solvency, liquidity, capitalization, risk-management practices, counterparty exposure, related-party exposure, DCG support, and ability to honor redemptions.

542. Plaintiff Gowda's and Texas Class members' reliance was reasonable and justified.

543. Plaintiff Gowda and Texas Class members lacked access to Genesis Global Capital's internal books and records, risk reports, board materials, communications with DCG, communications concerning the DCG Promissory Note, information concerning related-party transactions, and other information necessary to discover Defendants' deception.

544. Defendants had superior and exclusive knowledge of the concealed facts.

545. Defendants had a duty to disclose the concealed facts.

546. Defendants had a duty to disclose because they made partial disclosures concerning Genesis Global Capital's solvency, liquidity, capitalization, risk management, DCG support, and ability to honor redemptions that were misleading without disclosure of the omitted facts.

547. Defendants had a duty to disclose because they voluntarily spoke about Genesis Global Capital's financial condition and were required to tell the whole truth.

548. Defendants had a duty to correct or update prior statements and warranties that became false or misleading after Genesis Global Capital became impaired, illiquid, or insolvent.

549. Defendants also had a duty to disclose because the concealed facts were known to Defendants and were not reasonably discoverable by Plaintiff Gowda, Texas Class members, or Gemini through ordinary diligence.

550. Defendants breached their duty to disclose by concealing Genesis Global Capital's insolvency, the 3AC balance-sheet hole, the true terms and effect of the DCG Promissory Note, Genesis Global Capital's lack of short-term liquidity, and Genesis Global Capital's inability to honor redemptions.

551. Defendants concealed material facts while causing Genesis Global Capital and its agents to continue communicating with investors and investor agents in a manner designed to preserve investor confidence, prevent withdrawals, and avoid disclosure of Genesis Global Capital's true condition.

552. Defendants fraudulently induced Plaintiff Gowda and Texas Class members to enter into Genesis Yield transactions, continue those transactions, maintain their assets at Genesis Global Capital, refrain from recalling their assets, or delay seeking redemption.

553. Plaintiff Gowda and Texas Class members would not have invested, would not have continued investing, would have recalled their digital assets earlier, or would not have delayed seeking redemption had Defendants disclosed the truth.

554. Defendants' fraud, fraudulent inducement, and fraud by nondisclosure proximately caused Plaintiff Gowda's and Texas Class members' damages.

555. Plaintiff Gowda and Texas Class members suffered actual damages, including unpaid interest, loss of use of their digital assets, loss of control and liquidity, time-value damages, consequential economic losses, and other damages alleged herein.

556. Defendants' conduct was willful, malicious, or fraudulent within the meaning of Texas law.

557. Plaintiff Gowda and Texas Class members seek actual damages, consequential damages, exemplary damages where available, pre- and post-judgment interest, costs, and all other relief available under Texas law.

## THIRD CLAIM FOR RELIEF

## NEGLIGENT MISREPRESENTATION
**(On behalf of Plaintiff Gowda and the Texas Class Against All Defendants)**

558. Plaintiff Gowda, individually and on behalf of the Texas Class, repeats and realleges each preceding allegation as if fully set forth herein.

559. Plaintiff Gowda pleads this claim in the alternative to his intentional fraud claims.

560. Defendants supplied false information in the course of their business and in transactions in which they had a pecuniary interest.

561. Defendants supplied, directed, approved, or caused false information to be supplied to Plaintiff Gowda, Texas Class members, Gemini as their appointed agent, and other investor agents.

562. The false information concerned existing facts, including Genesis Global Capital's solvency, liquidity, capitalization, balance-sheet condition, counterparty exposure, related-party exposure, risk-management practices, DCG support, and ability to honor redemptions.

563. Defendants supplied, directed, approved, or caused false information concerning the DCG Promissory Note.

564. That false information included statements or presentations suggesting that DCG had assumed, absorbed, or cured Genesis Global Capital's 3AC-related losses.

565. That false information also included financial statements, balance-sheet presentations, risk materials, talking points, public statements, and investor communications that omitted the DCG Promissory Note's ten-year maturity, 1% interest rate, lack of collateral, lack of short-term liquidity, and fair-value impairment.

566. Defendants supplied that information for the guidance of Plaintiff Gowda, Texas Class members, Gemini as their appointed agent, and other investor agents.

567. Defendants knew, or should have known, that Plaintiff Gowda, Texas Class members, Gemini, and other investor agents would use that information in deciding whether to invest, continue investing, refrain from recalling assets, or delay seeking redemption.

568. Defendants failed to exercise reasonable care or competence in obtaining, verifying, communicating, and correcting that information.

569. Defendants knew, or should have known, that Genesis Global Capital's financial condition, liquidity, solvency, DCG support, and redemption capacity were material to Plaintiff Gowda and Texas Class members.

570. Plaintiff Gowda relied, directly and through Gemini as his appointed agent, on the false information Defendants supplied or caused to be supplied.

571. Texas Class members relied, directly and through Gemini as their appointed agent, on the false information Defendants supplied or caused to be supplied.

572. Plaintiff Gowda's and Texas Class members' reliance was justifiable.

573. Plaintiff Gowda and Texas Class members lacked access to the information necessary to discover the falsity of Defendants' statements and omissions.

574. Plaintiff Gowda and Texas Class members would not have invested, would not have continued investing, would have recalled their digital assets earlier, or would not have delayed seeking redemption had Defendants supplied accurate information.

575. Defendants' negligent misrepresentations proximately caused Plaintiff Gowda's and Texas Class members' pecuniary losses.

576. Plaintiff Gowda and Texas Class members suffered pecuniary losses, including unpaid interest, loss of use of their digital assets, loss of control and liquidity, time-value damages, consequential economic losses, and other damages alleged herein.

577. Plaintiff Gowda and Texas Class members seek pecuniary damages, pre- and post-judgment interest, costs, and all other relief available under Texas law.

## FOURTH CLAIM FOR RELIEF

### CIVIL CONSPIRACY
### (On behalf of Plaintiff Gowda and the Texas Class Against All Defendants)

578. Plaintiff Gowda, individually and on behalf of the Texas Class, repeats and realleges each preceding allegation as if fully set forth herein.

579. Defendants and non-party Genesis Global Capital combined to conceal Genesis Global Capital's true financial condition and to prevent investors and their agents from learning that Genesis Global Capital was impaired, illiquid, or insolvent.

580. Defendants and Genesis Global Capital had a meeting of the minds on the object of the conspiracy.

581. The object of the conspiracy was to preserve Genesis Global Capital's business, prevent investor withdrawals, protect DCG and DCG affiliates, conceal Genesis Global Capital's insolvency, and avoid the consequences of Genesis Global Capital's inability to honor redemptions.

582. Defendants and Genesis Global Capital agreed to accomplish that object through unlawful means, including fraud, fraudulent concealment, fraudulent inducement, fraud by nondisclosure, and negligent misrepresentation.

583. Defendants and Genesis Global Capital also agreed to accomplish that object by concealing the true terms, value, and effect of the DCG Promissory Note.

584. Defendants and Genesis Global Capital committed overt acts in furtherance of the conspiracy.

585. Those overt acts included creating, approving, executing, and using the DCG Promissory Note to conceal Genesis Global Capital's 3AC-related losses.

586. Those overt acts included classifying or presenting the DCG Promissory Note in a manner that concealed its true economic effect from investors and their agents.

587. Those overt acts included preparing, approving, disseminating, or causing the dissemination of misleading financial statements, balance-sheet materials, risk reports, talking points, tweets, public statements, and investor communications.

588. Those overt acts included concealing Genesis Global Capital's insolvency and lack of liquidity from Gemini as the appointed agent for Gemini Earn investors.

589. Those overt acts included inducing Gemini not to terminate the Gemini Earn program earlier or not to demand faster return of Gemini Earn investor assets.

590. Those overt acts included causing Plaintiff Gowda and Texas Class members to invest, continue investing, refrain from recalling assets, or delay seeking redemption.

591. Defendants participated in the conspiracy for their own financial benefit and for the benefit of DCG, DCG affiliates, Genesis Global Capital, or the DCG conglomerate.

592. DCG and Genesis Global Capital were separate legal persons.

593. The individual Defendants also acted for personal or independent financial interests, including preserving DCG, protecting the DCG conglomerate, avoiding repayment obligations, preventing a run on Genesis Global Capital, preserving insider access to liquidity, and avoiding disclosure of conduct that exposed them to liability.

594. Defendants' conspiracy proximately caused Plaintiff Gowda's and Texas Class members' damages.

595. Plaintiff Gowda and Texas Class members suffered actual damages, including unpaid interest, loss of use of their digital assets, loss of control and liquidity, time-value damages, consequential economic losses, and other damages alleged herein.

596. Defendants are jointly and severally liable for the damages caused by the conspiracy.

597. Plaintiff Gowda and Texas Class members seek actual damages, consequential damages, exemplary damages where available, pre- and post-judgment interest, costs, and all other relief available under Texas law.

## FIFTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT AND RESTITUTION
### (On behalf of Plaintiff Gowda and the Texas Class Against All Defendants)

598. Plaintiff Gowda, individually and on behalf of the Texas Class, repeats and realleges each preceding allegation as if fully set forth herein.

599. Plaintiff Gowda pleads this claim in the alternative to his statutory and tort claims.

600. To the extent Texas law treats unjust enrichment as an equitable basis for restitution rather than a standalone cause of action, Plaintiff Gowda pleads unjust enrichment as an equitable restitution theory.

601. Plaintiff Gowda and Texas Class members conferred benefits on Defendants.

602. Those benefits included the use and retention of investor digital assets, avoided repayment costs, avoided interest obligations, preserved liquidity, value preserved for DCG and DCG affiliates, and benefits obtained by delaying disclosure of Genesis Global Capital's true financial condition.

603. Defendants obtained and retained those benefits through fraud, concealment, misrepresentation, undue advantage, or other inequitable conduct.

604. Defendants obtained and retained benefits by inducing Plaintiff Gowda and Texas Class members to place or maintain assets with Genesis Global Capital while Defendants concealed Genesis Global Capital's true financial condition.

605. Defendants obtained and retained benefits by using Genesis Global Capital and Genesis Yield investor assets to support the DCG conglomerate and DCG affiliates.

606. Defendants obtained and retained benefits by avoiding or delaying repayment of obligations owed by DCG and DCG affiliates to Genesis Global Capital.

607. Defendants obtained and retained benefits by avoiding payment of promised interest and by delaying the return of investor assets.

608. Defendants obtained and retained benefits by shifting the economic burden of remediation to Gemini, the Genesis Bankruptcy Action, collateral, settlements, and other third-party efforts.

609. The in-kind distributions received by Gemini Earn investors do not eliminate Defendants' unjust enrichment.

610. Those distributions did not include all promised interest, did not compensate for the loss of use, control, liquidity, or time value of investor assets, and did not disgorge the benefits Defendants obtained or retained.

611. Defendants should not be allowed to use recoveries funded, facilitated, preserved, or achieved through other parties, the Genesis Bankruptcy Action, collateral, settlements, or other third-party efforts to retain the benefits of their own misconduct.

612. Defendants hold money, digital assets, value, or benefits that in equity and good conscience belong to Plaintiff Gowda and Texas Class members.

613. Equity and good conscience require Defendants to restore, disgorge, or otherwise return the benefits they obtained or retained from their misconduct.

614. Plaintiff Gowda and Texas Class members seek restitution, disgorgement, money had and received, pre- and post-judgment interest, costs, and all other equitable relief available under Texas law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gowda, individually and on behalf of the Texas Class, respectfully requests that the Court enter judgment against Defendants and grant the following relief:

A. Certifying this action as a class action under Federal Rule of Civil Procedure 23;

B. Certifying the Texas Class alleged in this Complaint;

C. Appointing Plaintiff Gowda as representative of the Texas Class;

D. Appointing Plaintiff's counsel as counsel for the Texas Class;

E. Declaring that Defendants violated the Texas Deceptive Trade Practices–Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, et seq.;

F. Awarding Plaintiff Gowda and the Texas Class economic damages under the Texas Deceptive Trade Practices–Consumer Protection Act;

G. Awarding Plaintiff Gowda and the Texas Class additional damages for Defendants' knowing or intentional DTPA violations, including up to three times economic damages where permitted by law;

H. Awarding Plaintiff Gowda and the Texas Class actual damages, consequential damages, pecuniary losses, and other damages available under Texas common law;

I. Awarding Plaintiff Gowda and the Texas Class damages for unpaid promised interest and yield;

J. Awarding Plaintiff Gowda and the Texas Class damages for the loss of use, control, liquidity, and time value of their digital assets;

K. Awarding Plaintiff Gowda and the Texas Class damages for the inability to sell, transfer, reinvest, hedge, stake, lend, or otherwise deploy their digital assets while withdrawals were suspended;

L. Awarding Plaintiff Gowda and the Texas Class exemplary damages where permitted by Texas law;

M. Awarding Plaintiff Gowda and the Texas Class restitution, disgorgement, money had and received, and all other equitable relief necessary to prevent Defendants from retaining benefits obtained through their misconduct;

N. Ordering Defendants to disgorge the benefits they obtained or retained from inducing Plaintiff Gowda and Texas Class members to place or maintain assets with Genesis Global Capital while Genesis Global Capital was impaired, illiquid, or insolvent;

O. Ordering that Defendants not receive credit, setoff, or reduction for recoveries funded, facilitated, preserved, or achieved through Gemini, the Genesis Bankruptcy Action,

collateral, settlements, or other third-party efforts, except to the extent necessary to prevent a duplicative recovery of the same injury;

P. Awarding Plaintiff Gowda and the Texas Class pre-judgment interest at the maximum rate permitted by law;

Q. Awarding Plaintiff Gowda and the Texas Class post-judgment interest at the maximum rate permitted by law;

R. Awarding Plaintiff Gowda and the Texas Class reasonable and necessary attorneys' fees under the Texas Deceptive Trade Practices–Consumer Protection Act and any other applicable law;

S. Awarding Plaintiff Gowda and the Texas Class costs of suit and all recoverable litigation expenses; and

T. Granting such other legal, equitable, or further relief as the Court deems just and proper.

Dated: June 30, 2026

Respectfully submitted,

**SILVER GOLUB & TEITELL LLP**

*/s/ Ian W. Sloss*
Ian W. Sloss ct31244
Johnathan Seredynski ct30412
Krystyna Gancoss ct31660
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com

*Counsel for Plaintiff and the Proposed Class*